**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

---

**UNITED STATES OF AMERICA**

**Plaintiff** **Civil Case No. 99-565-L**

**v.** **Judge Lagueux**

**MONETA CAPITAL CORPORATION**

**Defendant**

---

# FOURTH RECEIVER'S REPORT FOR THE PERIOD JUNE 1, 2003 TO DECEMBER 31, 2004

## I. Introduction

This Fourth Receiver's Report ("Receiver's Report") is being filed with this Court by the United States Small Business Administration ("SBA"), which was appointed Receiver ("Receiver") for Moneta Capital Corporation ("Moneta") pursuant to the Order of this Court dated February 2, 2000. This Receiver's Report will detail the activities of the receivership for the period from June 1, 2003 through December 31, 2004, and summarize the background of the receivership and its current cash position. This Receiver's Report also incorporates the activities during this reporting period of Zeus Realty Holdings, LLC ("Zeus"), a wholly-owned subsidiary of Moneta. Where significant events occurred subsequent to the period covered by this Receiver's Report, but before the submission of this report to this Court, they are also reported herein.

## II. Background

Moneta, a Rhode Island corporation, was licensed as a Small Business Investment Company ("SBIC") by SBA on May 4, 1984 under §301(c) of the Small Business Investment Act of 1958 (the "Act"), as amended. The sole shareholder of Moneta is Northeast Capital Corporation Profit Sharing Trust. In accordance with the Act, SBA guaranteed a total of four subordinated debentures issued by Moneta, which were issued between 1988 and 1989 in the total amount of $5.5 million. These debentures required Moneta to make semi-annual interest payments from the date of issuance through and including payment in full at the maturity of the debentures.

By letter dated September 12, 1997, Moneta was informed that SBA had determined that Moneta was in violation of 13 C.F.R. §107.203(b), having defaulted on the payment of its debentures. SBA also informed Moneta that, pursuant to 13 C.F.R. §107.203(b)(1), SBA had accelerated Moneta's entire debt. The default remained uncured, and a complaint seeking the appointment of SBA as receiver for Moneta was filed on November 11, 1999. After a hearing before this Court, SBA was appointed Receiver on February 2, 2000.

## III. Operation of the Receivership

### A. <u>General Operations</u>

The overall function of the Receiver is to identify, marshal and liquidate the assets of Moneta. The Receiver has analyzed records kept by the former management of Moneta as well as records kept by SBA, has prepared schedules and analyses of Moneta's assets, has analyzed and commenced and defended legal proceedings involving Moneta, and has analyzed claims against Moneta and made recommendations to this Court for their disposition. The Receiver has continued to sell assets where possible, to collect funds due to Moneta and to otherwise administer the Receivership, the sole purpose of which is to effectuate an orderly liquidation of Moneta subject to the approval of this Court. Specific actions taken by the Receiver are

discussed in greater detail below.

Upon completion of the liquidation of Moneta, the proceeds of the liquidation will be used to satisfy the claims of creditors, including SBA, in the order of priority determined by this Court. Any excess proceeds will be distributed to the sole shareholder as ordered by this Court.

## B. **Personnel**

The Receiver maintains all of Moneta's corporate and financial records at its Receivership Office, located at 666 Eleventh Street, N.W., Suite 200, Washington, D.C. 20001. The Receiver shares office space and administrative services with approximately 25 other receiverships.

Pursuant to paragraph 5 of the Receivership Order, the Receiver utilizes the services of lawyers, accountants and other professionals to assist in operating the Receivership. In February 2000, Stephen D. Jones was retained as Principal Agent to operate the Receivership, and he continues to be the Principal Agent while also utilizing the services of his colleagues at The Carisbrooke Company, LLC, in certain aspects of the daily operation of the receivership. The Principal Agent assists the Receiver in (1) the administration of the assets and accounts of Moneta; (2) carrying out Moneta's receivership functions and responsibilities, including the liquidation of Moneta's assets in an orderly manner; and (3) the pursuit of claims belonging to Moneta which may result in monetary recovery for the receivership estate.

In addition to the Principal Agent, the Receiver has from time to time retained, and currently retains, other persons to render assistance, including Zarrelli& Riggs, P.C., which maintains the books and accounting records of the Receiver, and Shechtman Halperin Savage, a Providence law firm retained to pursue various Moneta claims and actions.

## C. **Corporate Compliance, Accounting and Tax Matters**

Moneta's principal place of business was Providence. The Receiver notified the Secretary of State for Rhode Island that Moneta is in receivership. The Receiver also changed Moneta's registered agent in Rhode Island and other jurisdictions where Moneta has or had business relationships, and served notice accordingly. The Receiver notified all taxing authorities that

Moneta had been placed in federal receivership, and that this Court has jurisdiction over all matters involving the Moneta receivership estate. Moneta's tax year ends on March 31, and Moneta is current in its tax filings through the period ending March 31, 2004; the return for the period ending March 31, 2005 is not yet due. Zeus's returns have been consolidated with Moneta's as Zeus is a wholly-owned subsidiary of Moneta.

**D. Claims Matters**

The Receiver filed a Motion for an Order approving the form and manner of notice to claimants and establishing a claims bar date with this Court. By Orders of this Court, three claims bar dates were established: May 23, 2001; June 6, 2001; and a final date of August 23, 2001, by which date all claims were to be submitted or be forever barred. A notice to claimants and creditors was published, and the Receiver also mailed claims bar notices to numerous individuals and entities whose names and addresses the Receiver had gleaned from the files provided by the former management of Moneta. Sixty-six individual claims were received, many in the form of multi-part claims. The Receiver recommended to this Court that nineteen claims should be paid, in the aggregate amount of $533,314.83, plus interest in certain instances; that nine claims should be denied, as they related to participations, while still acknowledging a valid participation; that twenty-four claims should be paid; and that fourteen claims should be ignored as they had been withdrawn. In addition, a claim concerning Marsh Landings is still awaiting a final determination by this Court, and until that time no recommendation on that claim can be made by the Receiver. This Court accepted these recommendations by Order dated December 19, 2003.

Claimants Callaghan, Vara and DiMento filed an objection to the Court-ordered claims disposition as it related to their claim, but were overruled by this Court. That ruling has been appealed to the First Circuit. Claimant Nancy Lovett also filed an objection, seeking permission to file a claim against Moneta as an alter ego of other Kilberg entities, and this objection was also overruled by this Court. Lovett has appealed to the First Circuit. Both of these cases were argued before the United States Circuit Court of Appeals for the First Circuit on February 9, 2005. A decision is currently pending.

## IV. ASSET ACCOUNTS

At the beginning of the Receivership, the assets taken over by the Receiver consisted of real estate acquired in foreclosure, one paying loan and two non-performing loans, and various positions in syndicated loans and in assets acquired through foreclosure. In addition, Moneta's cash account, with a minimal balance, was turned over to the Receiver shortly after the inception of the receivership, while that of Zeus was turned over to the Receiver when the Receiver closed that account. The current status of these assets is as follows.

### A. Cash

All cash is deposited into an account at Sun Trust Bank, in the name of SBA as Receiver for Moneta Capital Corporation; there is another, inactive account in the name of SBA as Receiver for Moneta Capital Corporation, Managing Member of Zeus Realty Holdings. The Receiver intends to merge this account into the Moneta Receiver's account as soon as certain accounting issues have been resolved. Since the period covered by this report, the Receiver has changed banks, and the accounts are now held, in the same names as now, at BB&T Bank. The total balance in the accounts of SBA as Receiver for Moneta and Zeus as of December 31, 2004 was $489,382.24. The Receivership began operations on February 2, 2000, with a zero cash balance, and the Receiver immediately borrowed $50,000 from SBA, pursuant to a Receiver's Certificate, to fund operations. Moneta's minimal cash on hand in Sovereign Bank in Rhode Island was left in the bank to cover outstanding payroll liabilities.

Total borrowings incurred prior to this reporting period totalled $5.6 million, of which $1,750,000 was to repurchase a mortgage as detailed below, $250,000 was to provide vital funding to Hotel on the Cay and $3.1 million was used to pay off secured Rocky Point creditors and pay numerous Rocky Point expenses; the remaining $500,000 was used for operational and administrative purposes. Prior to this reporting period the Receiver repaid the Receiver's Certificate, issued on September 28, 2001, in the amount of $1,750,000, plus $174,529.54 in interest, that had been used to purchase a first mortgage on real property owned by Zeus that was under threat of foreclosure by the first mortgage holder.

During the period covered by this Receiver's Report, Moneta has not issued any Receiver's Certificates or borrowed any money from SBA. Also, during the period of this Receiver's Report, receipts from receivership operations totalled $1,343,240.37, while receivership expenditures, net of financing and borrowing costs, totalled $1,416,053.50. A detailed listing of the Receiver's financial affairs is attached as Exhibit 1 to this Report. Subsequent to the period covered by this Receiver's Report, the Receiver has, with this Court's approval, recently issued a Receiver's Certificate for, and thereby borrowed, $250,000 in order to fund ongoing expenses at Rocky Point while the sale of this asset is in process.

**B. Performing Debt Instruments**

1. American Shipyard Company, LLC    Principal balance at 12/31/04: Zero

American Shipyard Company ("ASC") is a working shipyard in Newport, Rhode Island. The history of this asset has been detailed in prior reports to this Court.

During this reporting period, specifically on June 18, 2003, this Court ordered that the lead lender position in this loan be turned over by the Fairway Receiver to the Moneta Receiver. The Moneta Receiver then made regular monthly payments to all participants, based on the guidelines the Fairway Receiver used, and kept the remainder in a restricted account. In October 2003, ASC paid the loan off in full. The Receiver immediately paid the last month's interest to all participants, as well as their original investment principal. The Receiver demanded from Kilberg and from Acropolis an accounting of how they had acquired an interest in the ASC loan, but did not receive a response. Therefore, the Receiver finally distributed the remaining ASC monies to all participants, with the exception of that due to Northeast Capital Pension Trust as that entity is embroiled in a dispute between Kilberg and the Department of Labor.

## C. Non-Performing Debt Instruments

1. Antonelli Plating Company — Principal Balance at 12/31/04: $38,050.68
$159,981.18

In February 1991 Fairway made a loan in the amount of $100,000 to Antonelli Plating Company ("Antonelli"), a Providence-based plating business. This loan was subsequently sold to Moneta. In April 1995, Moneta made a loan in the amount of $225,000 to Antonelli and Antell Cattle Company, Inc. ("Antell"). Certain members of the Antonelli family guaranteed both of these loans, and Moneta also took a security interest in all of the assets of Antonelli, a first mortgage on a farm house in Bridport, Vermont, and a first lien on a herd of dairy cattle at the farm in Vermont. No payments have been received on either of these loans since October 1999. The total aggregate outstanding balance on both these loans at November 30, 2004, was $393,823.19 with interest continuing to accrue at a per diem rate of $15.86 on the $100,000 loan and $68.88 on the $225,000 loan.

The Receiver filed a complaint with this Court in February 2001, case number 01-CV-062ML, seeking a judgment against Antonelli and Antell, and the guarantors on the loans. The Receiver filed a motion for summary judgment in September 2001, which was granted on November 11, 2001. On June 25, 2002, this Court entered a judgment in Moneta's favour in the amount of $301,785.48, with interest continuing to accrue.

The Receiver retained the Vermont law firm of Deppman & Foley to pursue foreclosure against both the farm and the cattle, if they can be located. Deppman & Foley commenced foreclosure proceedings on the farm and the Receiver won the action and obtained a foreclosure decree in which title passed to the Receiver. However, under Vermont law Antonelli was entitled to a six-month stand-still and redemption period, during which time the property could be redeemed in exchange for payment in full of the amount owed. That period expired on December 8, 2004, and assurances by Antonelli that the amount owed would shortly be paid in full proved empty. Currently the Receiver has appraisals of the property in progress. Upon completion of new appraisals the Receiver will proceed to sell the property. The Receiver also obtained an

approximate value of the cattle from two cattle appraisers. However, the cattle seem to have disappeared, and the Receiver is endeavouring to ascertain whether it is possible to locate them. In the event of a deficiency, the Receiver will attempt to collect on the personal guarantees securing the defaulted loans.

2. Roseland Acres Principal Balance at 12/31/04: $171,584

In June 1990 Wallace Capital Corporation ("Wallace"), another SBIC in receivership, made a loan in the amount of $660,000 to Roseland Acres ("Roseland"), a 25-acre working horse farm and equestrian center in Tiverton, Rhode Island, and Fairway simultaneously bought a fifty percent participation in this loan. The following month Fairway in turn sold a sub-participation to Moneta in the amount of $175,000.

Although the Moneta Receiver has been able to produce accounting records of both Moneta and Fairway showing that the money to purchase the sub-participation was actually paid by Moneta to Fairway, and also to produce correspondence between the two companies concerning this purchase, the Receiver was unable to locate a participation agreement between Moneta and Fairway. After the property securing the loan was sold by the Wallace Receiver without presentation of a sub-participation agreement, the Fairway Receiver informed the Receiver that, pursuant to an Order of this Court dated September 16, 2002, it could not pay Moneta without a sub-participation agreement, and that Moneta was simply an unsecured general creditor of the Fairway receivership estate to the extent of the amount owed on this sub-participation. Given the financial condition of the Fairway receivership estate, it is unlikely that this amount will ever be paid. Accordingly, the Moneta Receiver filed a claim against Kilberg in his personal bankruptcy action in the United States Bankruptcy Court for the District of Rhode Island for this amount as he had clearly been negligent in not preparing and executing a participation agreement.

## D. Real Estate Owned

### 1. 205 Front Street, Pawtucket, RI.

This property was acquired by foreclosure following a default on the loan made by Moneta to the principals of Front Street Auto Sales. The property was operated as a used car lot and auto repair facility, causing the Receiver some concern as to the environmental condition of the property. Upon foreclosure, prior to the inception of this receivership, title to the property was taken in the name of Northeast Capital Corporation ("Northeast"), an entity controlled by Kilberg, which also made a loan to the principals of Front Street Auto Sales and which was also in default. Title was taken in the name of Northeast allegedly so Moneta would not have any potential environmental liabilities. Northeast assigned the property to Moneta upon the Receiver's request by an assignment dated May 25, 2000, and a purchase and sale agreement was signed between the Receiver and a buyer in July 2000, which agreement allowed the buyer to conduct a limited environmental study. The sale of this property was confirmed by this Court in September 2000.

That study showed some environmental problems at the site, and the Receiver immediately removed a number of drums of potentially hazardous materials from the site. Further negotiations resulted in a new contract, which was signed by the Receiver and the buyer on March 16, 2001, for a purchase price of $170,000. Under the terms of the new contract, the Receiver agreed to demolish the building on the property, remove the asbestos, remove the underground storage tank, and level the site. The buyer and the Receiver also agreed to enter into a tri-partite Brownfields agreement with the state Department of Environmental Management. All of this was done to the satisfaction of the buyer and the state of Rhode Island.

Unfortunately, the assignment from Northeast proved unsatisfactory, by which time Northeast itself had been placed in state court receivership. The Northeast receiver finally agreed to complete the sale and remit the proceeds to Moneta as Moneta had an unsatisfied first mortgage that far exceeded the value of the property. The Northeast receiver then proceeded to move at a glacial pace. Following the period covered by this report the Northeast receiver finally

closed on the sale, but the proceeds were not immediately forthcoming. The Receiver anticipates that these funds will be remitted shortly.

2. 164 Front Street, Pawtucket, RI.

This property was also acquired by foreclosure following a default on the loan made by Moneta to the principals of Front Street Auto Sales. This property was also used as an auto repair facility, and is located next to a major scrap and garbage facility, which has caused the Receiver additional concern as to the environmental condition of the property. Upon foreclosure, title to the property was taken in the name of Northeast, which also made a loan to the principals of Front Street Auto Sales and which also was in default, allegedly so Moneta would not have any potential environmental problems. This property remains titled in the name of Northeast, which is now in state court receivership. Given the title issues, but more importantly the environmental issues, and having made every effort to sell the property for a significant price, the Receiver has decided to abandon the property, and hereby requests that the Court allow it to abandon the property and write off this possible asset.

3. Country Crest Place, Cumberland, RI.

The history of this asset has been reported in previous Receiver's Reports. In 2002, the $200,000 loan that was part of the sale was paid in full. The Receiver and its accountants have compiled and reconciled a complete accounting of all cash disbursements and receipts for the plaza, and upon the resolution of certain accounting issues any proceeds remaining after Moneta has been repaid the operating expenses it funded will be distributed to the participants in the original loans secured by this property.

4. 843 Reservoir Avenue and 7 Riverfarm Road, Cranston RI.

These properties consist of a vacant free-standing jewelry store in good condition, located

on a corner lot on the major thoroughfare of Reservoir Avenue; and a vacant adjacent property on Riverfarm Road that was originally built as a residence but is zoned commercial. These properties were acquired by Moneta in foreclosure following the default by Diamonds by Sammartino Sisters, Inc. ("DSS") on loans made to the company by Moneta. A sale of the Reservoir Avenue property for $287,000 was in progress to a local jewelry company before the inception of the receivership. However, Moneta had assigned title to the property pre-receivership to Acropolis, a company formed and controlled by Kilberg. When the Receiver was informed of this, the Receiver required Acropolis to assign the property back to Moneta.

After a long period during which there was no interest shown at reasonable prices, several interested parties emerged, and the Receiver agreed on a price of $355,000 for both properties. A contract for purchase and sale was signed and the proposed sale was advertised according to the provisions of 28 U.S.C. § 2001. A valid counter-offer was received and the Receiver held a telephone auction involving the original purchaser and the counter-offeror. The original purchaser, Donald J. Batten & Associates, was the winner of the auction, and agreed to by the properties for $425,000. This sale was confirmed by this Court on May 12, 2004.

DSS left behind at the Reservoir Avenue property numerous items of jewelry locked in the safes, none of which was of any substantial value. The Receiver commissioned an appraisal from a local appraiser, and then moved the jewelry to Washington. A Washington D.C.-based auction house auctioned this jewelry in several lots for a total sales price of $4,598.51. The last jewelry auction took place on August 23, 2003.

5. Somerset Avenue, Dighton MA.

This 30-acre plot of raw land, zoned commercial, on the outskirts of the small town of Dighton, Massachusetts, was acquired in foreclosure following the default by Taunton Coin on loans made to the company by Moneta. Prior to the Moneta receivership, title to this property was taken by Northeast Capital Corporation, a company controlled by Kilberg. A small part of the land adjoins the Taunton River at a point approximately six miles from Narragansett Bay. The great majority of the land consists of wetlands or is otherwise unsuitable for building.

Appraisals commissioned by the Receiver concluded that only a small portion of the property could be built upon. There has been virtually no interest in the property and the Receiver has been unable to sell it. The Receiver intends to have title properly transferred to Moneta, for the benefit of the Moneta receivership estate and several other parties who participated in the financing with Moneta, but this process has been delayed by the Northeast special master and state court receivership proceeding.

## E. <u>Other Assets</u>

### 1. <u>Rocky Point Amusement Park</u>

This property is a defunct landmark amusement park situated on 124 acres of waterfront land on Warwick Neck, overlooking Narragansett Bay. A more detailed history of this asset is detailed in the First Receiver's Report to this Court.

After having rejected offers made to the bankruptcy trustee in the range of $6 million to $9 million and after receiving the permission of this Court and of the United States Bankruptcy Court for the District of Rhode Island, the Receiver instituted a foreclosure sale on July 29, 2003. The Receiver was the successful bidder at that auction, bidding $8.5 million of its debt. There then followed a period of serious interest in the property from a number of potential buyers, and the Receiver met or spoke extensively with all of them, reviewing their plans for the property. The Receiver set a number of terms which potential buyers had to meet, and eventually on November 5, 2003 a telephone auction was held amongst the five parties still interested at a price the Receiver found acceptable. Vanderbilt Capital, LLC ("Vanderbilt"), emerged from that auction as the highest bidder, with a bid of $25 million.

Negotiations with Vanderbilt over the terms of a purchase and sale agreement were finally completed in May 2004, and two purchase and sales contracts were executed: one for the Rocky Beach portion of the property, in the amount of $11.25 million, and the other for the remaining portion of Rocky Point, for $13.75 million. The sale is contingent upon Vanderbilt

receiving all of the required permits for the development of the land. A motion to approve the sale was then filed with this Court, which approved the sale by Order dated November 10, 2004. In December 2004 the sale was advertised in the *Wall Street Journal*, the *Boston Globe* and the *Providence Journal*. No counter-offers were received as a result of those advertisements. Vanderbilt has continued to perform some basic site preparation work at Rocky Point. Both parties are ready to move forwards with the sale once the appeal described below has been decided.

Scotti & Associates ("Scotti"), a real estate brokerage firm retained by the bankruptcy trustee for CR, filed a motion with this Court, objecting to the sale and seeking to intervene on the basis that the Receiver should pay Scotti a commission on the $25 million sale. This court denied Scotti's motion and overruled his objection, and instructed Scotti to file a claim with the Receiver. Subsequent to the period covered by this Report Scotti filed his claim with the Receiver. The Receiver has reviewed the claim and has informed Scotti that it is the Receiver's position that Scotti did absolutely nothing to bring about the sale and therefore is not entitled to a commission.

The Rocky Beach Association (the "Association"), the association of some of the owners of the cottages sitting on the Rocky Beach portion of the property, also filed an objection and sought to intervene on the basis that the selling price for the Rocky Beach portion of the property was arbitrarily determined and therefore unfairly interfered with their right of first refusal. Both the Receiver and Vanderbilt have tried to work with the Association to find a solution to their concerns, and the Receiver has even allowed the Association a right of first refusal, even though the Receiver believes that their one-year right expired in September 2003, a year after their leases were not renewed by the bankruptcy trustee when they expired in September 2002. This Court held a hearing on the Association's motion. While the motion to intervene was granted, for a limited purpose, the objection was overruled. Subsequent to the period covered by this Report, the Association filed an appeal with the First Circuit, which appeal is pending. The Receiver's position is that the purchase price was not arbitrarily determined, and that the Association's position is without merit.

2. Hotel on the Cay/Legend Resort, LP, Christiansted, St. Croix, USVI.

In 1991, Fairway made a $1.7 million loan to TSA Acquisition, Inc. and Legend Resorts, LP (collectively "Legend"), the operator of Hotel on the Cay, a time share resort on its own island, Protestant Cay, in Christiansted Harbour, St. Croix, U.S. Virgin Islands. Fairway sold participations in the loan, and Moneta bought a $400,000 participation. Fairway took a security interest in various unsold time share unit weeks, and in the ground lease between Legend and the Government of the Virgin Islands ("GVI"). The background and history of this asset are detailed in the First Receiver's Report to this Court.

The Receiver continues to believe that executing the Lease Control Agreement and moving forwards with the actions contemplated under the Co-Op Agreement represent the best course of action for all parties involved, but no agreement with the GVI has yet been reached, despite the Receiver's best efforts.

Subsequent to this reporting period, the Fairway Receiver has filed with its Receivership Court its recommended disposition of all claims against Fairway, including those of the GVI. The GVI filed an objection to the recommended disposition of its claims. The Fairway Receiver had until June 25, 2005, to file its response to the GVI objection. If no agreement is reached, the Receiver believes the issue will be resolved by this Court based upon the claim disposition papers.

3. Joshua Sears Manor/Vancisin.

Wallace was the lead lender in a $525,000 loan to Kenneth and Christine Vancisin, who were doing business as Joshua Sears Manor, an inn on Cape Cod which was pledged as collateral for the loan. Fairway bought a $200,000 participation in this loan. Moneta's records show that in 1996 Moneta purchased a $121,488 sub-participation from Fairway. Wallace subsequently sold the property and eventually received full payment from the sale. Payment to Fairway from Wallace was made in May 2002. Wallace paid $164,547.85 to Fairway. Moneta had filed a claim against Fairway, in response to Fairway's Notice of Bar Date Claims, for its proportionate share

of the proceeds of the sale, in the amount of $100,793.07. In its recommended disposition of claims filed with the Fairway receivership court, Fairway denied Moneta's claim as the Moneta Receiver could not locate a participation agreement with Fairway. It appears that a participation agreement was never executed on behalf of either Moneta or Fairway (although the Receiver was able to provide other documentary and accounting proof of the transaction), and thus Moneta has become a general unsecured creditor of the Fairway receivership estate. The Receiver has filed a claim against the bankruptcy estate of Kilberg for the amount owed on this asset, as Kilberg was clearly negligent in failing to obtain the participation agreement.

4. Lopes Liquors, Pawtucket RI.

Moneta's records show that in July 1996 Moneta bought a loan Fairway made to Lopes Liquors ("Lopes") in 1991 in the original amount of $100,000. Moneta paid the outstanding principal balance, $77,214, to Fairway to purchase this loan, and Fairway agreed to assign to Moneta its first mortgage on the Lopes property at 151 Benefit Street in Pawtucket, Rhode Island. However, from that point forwards, the official corporate books and records of Moneta in the Receiver's possession are inadequate; the Receiver received from Moneta's former management virtually no records relating to Lopes. Moneta's accounting records show an outstanding principal balance on this loan of $76,174 in March 1999. Lopes continues to make periodic payments to the Receiver. The Receiver investigated this asset and discovered that Fairway never did assign its mortgage to Moneta. The Receiver is currently in the process of having the mortgage assigned to Moneta.

5. Other Asset Items

*Land in Brewster, MA:*

The history of this asset has been reported in previous Receiver's Reports. During this reporting period, the Receiver began the process of requesting that funds being held in the Registry of this Court in the approximate amount of $347,000 be released in order to satisfy the

Receiver's orders of attachment and contempt against Arnold Kilberg and Acropolis Enterprises, Inc.

Also during this reporting period, the Receiver continued with the sales of two parcels of land that had been recovered from Kilberg and Acropolis. With this Court's permission the Receiver advertised the intended sales under the provisions of U.S.C. 28 §2001. A counter-offer was made on both properties, by the same offeror, and a telephone auction was held, with the highest bids coming from the counter-offeror. These bids totalled $110,000 more than the original sales prices, and the sale closed on October 31, 2003, with the Receiver being paid a net total of $254,744 for these properties.

*Marsh Landing:*

Moneta transferred its interest in this asset, the leasehold interest in land supporting two waterfront restaurants and a small marina in Providence, to Governor Financial Center ("Governor"), a company controlled by Kilberg. This transaction was the subject of several items of correspondence and telephone conversations between the Receiver and Kilberg, and the Receiver was still investigating the veracity of Kilberg's assertions when Governor was forced into state court receivership. The receiver has sold this property and certain proceeds are held in escrow. As Moneta still has a valid mortgage on the property and an outstanding loan, the Receiver anticipates substantial proceeds, in excess of $750,000, from the sale transaction, and is dealing with the Governor receiver on this matter.

## V. CLOSED ASSETS

The following assets were sold, paid in full or written off prior to the period covered by this Report, as more fully detailed in prior Receiver's Reports to this Court.

William J. O'Brien, Inc.;

50 Clark Point Road, Southwest Harbor, ME;

46 Clark Point Road, Southwest Harbor, ME;

Poppasquash Road, Bristol, RI.

4 Lafayette Avenue, Titusville NJ

Providence Land Company

310 Main Street, East Hartford CT

## VI. RECEIPTS AND DISBURSEMENTS

All receipts and disbursements for the period from June 1, 2003 to December 31, 2004 are detailed in Exhibit A, which is attached hereto.

## VII. CONCLUSION

This Fourth Receiver's Report was prepared by Stephen D. Jones, Principal Agent for the Receiver.

Respectfully submitted,

U.S. SMALL BUSINESS ADMINISTRATION,
RECEIVER FOR MONETA CAPITAL CORPORATION

Stephen D. Jones, Principal Agent

# EXHIBIT A

## SUMMARY OF CASH RECEIPTS AND DISBURSEMENTS

## JUNE 1, 2003 - DECEMBER 31, 2004

SBA, Receiver for Moneta Capital Corporation

| | 02/02/00 to 12/31/04 | 06/01/03 to 12/31/04 |
|---|---|---|
| 1. CASH ON HAND, BEGINNING OF PERIOD | 0.00 | $ 562,195.37 |
| 2. CASH FROM RECEIVERSHIP OPERATIONS | | |
| A. RECEIPTS | | |
| Loan Payments | 1,052,938.78 | 650,089.92 |
| Net Asset Sales | 3,460,306.36 | 608,239.84 |
| Rental Income | 152,170.00 | 0.00 |
| Insurance Settlement | 9,999.48 | 0.00 |
| Interest Earned | 25,630.28 | 8,024.24 |
| Anjoorian Settlement | 76,886.27 | 76,886.27 |
| Miscellaneous – Other | 1,353.43 | 0.00 |
| Sub-Total | $4,779,284.60 | $1,905,435.74 |
| B. DISBURSEMENTS FROM RECEIVERSHIP OPERATIONS | | |
| Legal, Accounting & Agent Fees | 1,260,681.83 | 397,597.51 |
| Other Professional Fees | 10,551.58 | 5,775.38 |
| Real Estate Taxes | 3,502,524.60 | 659,000.39 |
| Insurance | 153,125.87 | 23,690.00 |
| Rent and Overhead Allocation | 169,797.13 | 44,680.68 |
| Utility Expenses, Real Estate Owned | 154,592.56 | 80,951.81 |
| Maintenance & Repair, REO | 92,559.58 | 32,830.30 |
| Administrative Services | 89,209.77 | 6,079.27 |
| Office Expenses | 12,519.58 | 5,085.21 |
| Engineering, Environmental, Demolition | 89,282.19 | 971.60 |
| Appraisal Fees | 41,235.00 | 5,050.00 |
| Advertising | 22,534.36 | 420.52 |
| Property Management Fees | 110,767.85 | 80,750.00 |
| Travel | 34,846.87 | 10,600.06 |
| Security Services | 63,113.39 | 56,368.07 |
| Brokerage Fees | 2,299.20 | 0.00 |
| Corporate Taxes and Compliance | 7,834.32 | 1,849.00 |
| Bank Charges | 6,907.36 | 3,393.20 |
| Furniture and Equipment | 1,550.50 | 960.50 |
| Deposition Fees | 541.50 | 0.00 |
| Miscellaneous | 208.00 | 0.00 |
| Sub-Total | $5,826,773.04 | $1,416,053.50 |
| OTHER DISBURSEMENTS | | |
| Loan Payoff, Ocwen Bank | 1,750,000.00 | 0.00 |
| Funding for Hotel on the Cay | 250,000.00 | 0.00 |
| SBA Disaster Loan Payoff | 138,599.78 | 0.00 |
| Sub-Total | $2,138,599.78 | 0.00 |
| Total Disbursements | $7,965,282.82 | $1,416,053.50 |
| Net Cash (Loss) | ($3,186,088.22) | $489,382.24 |
| 3. BORROWINGS FOR RECEIVERSHIP OPERATIONS | | |
| Receiver's Certificates from SBA | $5,600,000.00 | |
| Receiver's Certificates repaid to SBA | (1,924,529.54) | 0.00 |
| TOTAL CASH ON HAND AT DECEMBER 31, 2004 | $489,382.24 | $489,382.24 |