**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** **Plaintiff,** **v.** **MONETA CAPITAL CORPORATION** **Defendant.** | **Civil Case No. 99-565-L** **Judge Lagueux** |

**RECEIVER'S POST HEARING MEMORDUNDUM IN SUPPORT OF ITS OBJECTION TO THE MOTION OF PETER M. SCOTTI AND PETER M. SCOTTI & ASSOCIATES FOR REAL ESTATE COMMISSION**

The United States Small Business Administration ("SBA") as Receiver ("the Moneta Receiver") for Moneta Capital Corporation ("Moneta") hereby submits this Post Hearing Memorandum in support of its opposition to the motion ("Scotti's Motion") filed by Peter M. Scotti and Peter M. Scotti & Associates, Inc. (together, "Scotti") seeking allowance of a real estate commission[1] in the above-captioned action.

## I. FACTS:

After its appointment, the Receiver became aware that it held a mortgage encumbering approximately 125 acres of land in Warwick, Rhode Island (the "Property") that was owned by C.R. Amusements, LLC ("C.R. Amusements"). See Hearing Transcript Vol. I at 71. The Receiver also learned that C.R. Amusements had been petitioned into bankruptcy and Andrew

[1] The document filed is entitled as "Appeal of Peter M. Scotti and Peter M. Scotti & Associates, Inc. from Receiver's Denial of Entitlement to Real Estate Commission" but appears to be in the nature of motion seeking an administrative claim for a real estate commission.

Richardson, Esq., had been appointed as the Chapter 7 Trustee. See Hearing Transcript Vol. I at 71. In connection with his efforts to market the Property for sale, the Trustee employed Peter Scotti as his real estate broker. Hearing Transcript Vol. I at 7. At no time did the Receiver ever seek to employ Mr. Scotti or was any form of written agreement, memorandum or other writing entered into between the Mr. Scotti and the Receiver relating in any way to the Property. See Hearing Transcript Vol. I at 22, 77-78.

Prior to foreclosing the Property, the Receiver had several discussions with the Trustee relative to the potential for a sale of the Property in the Bankruptcy Proceeding. See Hearing Transcript Vol. I at 29, 71. During one such discussion on or about November 4, 2002, the question of Mr. Scotti's compensation was raised with Arlene Embrey, Esq. (counsel to the Receiver). Hearing Transcript Vol. I at 12. Mr. Scotti's recollection of the November 4, 2002, conversation was that Ms. Embrey indicated that "if any of Mr. Scotti's buyers comes forth and buys the properties, we'll honor his commission." Hearing Transcript Vol. I at 12. He also testified that both Ms. Embrey and Thomas E. Carlotto, Esq. (local counsel to the Receiver) made such assurances and he was asked to prepare a list of potential purchasers. Hearing Transcript Vol. I at 13. Mr. Scotti later admitted that he was unsure if in fact it was Mr. Carlotto who was present during the November 2002 conversation. Hearing Transcript Vol. I at 43. The Trustee also could not remember whether Mr. Carlotto was present during the November 2002 conversation (Hearing Transcript Vol. I at 59) but he was certain that the Receiver agreed to compensate Scotti if "any party that Mr. Scotti had been dealing with, if they were the ultimate purchaser, that he would get a commission." Hearing Transcript Vol. I at 62.

Ms. Embrey testified that at the November 2002 conversation, in response to a question relative to protecting Mr. Scotti, she conveyed the Receiver's position that it was willing to compensate Mr. Scotti "if one of Mr. Scotti's clients, and I believe that I used 'clients', it may

have been buyers, was the successful purchaser of the property, that we would not oppose him getting a commission." Hearing Transcript Vol. I at 73. She further stated her understanding of what was conveyed was that "if someone who Mr. Scotti represented brought forth an offer, under the terms and conditions satisfactory to the Receiver, entered into a purchase and sale agreement, and was a successful buyer or purchaser of that property, that SBA, or the Receiver, actually, would not oppose Mr. Scotti being paid a commission." Hearing Transcript Vol. I at 76. This testimony was buttressed by that of Michael Carroll, Esq. (formerly local counsel to the Receiver) who was in actuality present at the November 2002 conversation. Mr. Carroll testified that the substance of Ms. Embrey's statement was that "[o]ne of the people that you've brought in, one of the people who's made an offer, one of the bidders on the property ultimately buys it, I don't have a problem with that." Hearing Transcript Vol. II at 4.

Subsequent to the November 4, 2002 conversation, the Receiver entertained offers from the Trustee and Mr. Scotti. Hearing Transcript Vol. II at 62. Because the Trustee was unable to procure a buyer agreeable to certain of the Receiver's terms, the Receiver eventually began the foreclosure process in the late winter/early spring of 2003 by first seeking relief in the Bankruptcy Proceeding. See Hearing Transcript Vol. I at 51, 60-61. Scotti concedes that the Receiver's "prohibitive conditions, including a non-refundable deposit, frustrated any such sales."[2] Scotti's Motion at 4. During this same period, Mr. Scotti testified that he met with an individual named Arnold Goodstein and provided Mr. Goodstein with some literature on the Property. Hearing Transcript Vol. I at 20. Mr. Scotti also testified that he arranged to have Mr. Goodstein view the Property. Hearing Transcript Vol. I at 20.

---

[2] It is noteworthy that the type of "prohibitive condition" sought by the Receiver is incorporated in sales agreement entered into by the present Buyer as the Buyer has committed non-refundable sums in the form of carrying costs.

After obtaining relief from the bankruptcy stay, the foreclosure sale of the Property was scheduled for July 29, 2003 and advertising leading up to the auction was placed by the Auctioneer, Irving Shechtman & Co. Hearing Transcript Vol. I at 13, 15. Display advertising ran in the Wall Street Journal, New York Times, Boston Globe, New England Real Estate Journal and Providence Journal relative to the foreclosure auction. Hearing Transcript Vol. II at 13.

Prior to the auction, Scotti's office sent a list of "prospects" identifying those persons who had inquired about the Property to Irving Shechtman & Co. and the Trustee.[3] Manuel C. Ponte (President of Irving Shechtman & Co.) testified that he did receive the list on July 20, 2003, nine days prior to the foreclosure auction. Hearing Transcript Vol. II at 12. Mr. Ponte further indicated that he did nothing with the list as it was provided in such close proximity to the foreclosure sale date that it was useless in his marketing efforts. Hearing Transcript Vol. II at 12.

The Receiver became the titled owner of the Property as the result of the foreclosure sale held on or about July 29, 2003. At the onset of the bidding process, that is prior to November, 2003, the Receiver's principal agent personally asked the representative of Vanderbilt Capital, LLC (the "Buyer"), Arnold Goodstein, whether the Buyer had a broker. He was told by the Buyer that it did not have a broker. Hearing Transcript Vol. I at 86-87. When asked specifically about Scotti, Mr. Goodstein informed the Receiver that he had limited contact with Scotti about the Property and that he was not the Buyer's Broker. Hearing Transcript Vol. I at 86-87. Subsequently, the contracts relative to the prospective sale were exclusively negotiated by the Buyer and Seller. See Hearing Transcript Vol. I at 85-88.

---

[3] The cover to the list of prospects has a notation of a cc: to attorney Stephen Shechtman, however, no testimony was elicited from anyone with knowledge of the mailing to indicate whether it was mailed to Mr. Shechtman or from anyone to verify that Mr. Shechtman ever had the list in his possession.

Ultimately in May 2004, the Receiver entered into two purchase and sale agreements (the "Purchase and Sale Agreements") for the Property. The first purchase and sale agreement in the amount of $11,250,000 relates to approximately 29 acres ("the Rocky Beach Parcel"). The second purchase and sale agreement is in the amount of $13,750,000 and relates to the remaining acres ("the Rocky Point Parcel"). On June 3, 2004, the Receiver filed a motion for approval and confirmation of the sale contemplated by the Purchase and Sale Agreements. (Docket No. 314) which was allowed by Order entered November 10, 2004.

## II. ANALYSIS

### A. R.I. Gen Laws 1956 § 9-1-4(6) Bars Claims For Real Estate Commissions In The Absence Of A Signed Written Agreement

It is well established in Rhode Island that no action shall be brought to enforce a promise for the payment of a real estate commission unless the promise is in writing and signed by the party charged with paying the commission. Metro Properties, Inc. v. Yatsko, 763 A.2d 617, 620 (R.I. 2000). In other words, any claim by a broker for alleged commissions owed must be founded upon some writing that contains evidence of an obligation for the payment of same. Dooley v. Lachut, 234 A.2d 366, 368 (R.I. 1967). This principle is set forth in the Rhode Island statute of frauds, R.I. Gen. Laws 1956 (1969 Reenactment) § 9-1-4, which provides, in relevant part, the following:

> No action shall be brought:
>
> ...* * *
>
> (6) Whereby to charge any person upon any agreement or promise to pay any commission for or upon the sale of any interest in real estate,
>
> unless the promise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing,

> and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized.

R.I. Gen Laws 1956 § 9-1-4 (6).

The legislature enacted §9-1-4(6) "for the purpose of protecting the public against the unfounded claims of a specific class of persons, namely, real estate brokers and agents." Heyman v. Adeack Realty Company, 228 A.2d 578, 580-81 (R.I. 1967). Brokers are "presumed to know that contracts for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged." Heyman, 228 A.2d at 582 (quoting Pacific Southwest Development Corp. v. Western Pacific R.R., 301 P.2d 825, 831 (Cal. App.2d 1956). Because of the nature of the abuse §9-1-4(6) seeks to protect against it must be strictly construed and applied against brokers. Dooley, 234 A.2d at 368.

The strict application of the directive in the statute of frauds that "[n]o action shall be brought," precludes claims in law or equity for commissions based on an oral agreement. Id. at 368. Claims founded upon estoppel, quantum meruit, performance, and part performance will not save a broker's claim from the bar provided in the statute of frauds. Metro Properties, Inc. v. Yatsko, 763 A.2d at 9 (rejecting brokerage commission claim founded in fraud and doctrines of equitable relief and implied or oral contract); Heyman, 228 A.2d at 582 (denying claim for estoppel and quantum meruit); Dooley, 234 A.2d at 368 (denying claim for performance and part performance). In Heyman, the Supreme Court held that §9-1-4(6) acted as a complete bar to estoppel and quantum meruit claims because "the overriding public policy of the statute requires that it be strictly construed and enforced. To do otherwise would defeat the basic purpose of the statute." 228 A.2d at 581-82. In Dooley, the Supreme Court barred a claim for commissions based on theories of performance or part performance and held that a contrary holding "would completely frustrate the legislature's intent to protect the public and thereby render ineffective the very purpose for which the sixth clause of the statute was enacted." Dooley, 234 A.2d at

368. Even a broker's claims of fraud or deceit provide no refuge from the strict requirement of a written agreement for commissions. Metro Properties, Inc. v. Yatsko, supra; Dooley, supra. In so holding, the Supreme Court provided the following warning:

> Real estate brokers who enter into oral agreements in contravention of clause sixth of our statute of frauds can expect no assistance from the courts in their effort to extricate themselves from their own folly. If a real estate broker fails to obtain a written contract of employment from his customer, he proceeds at his own peril.

Id. at 368.

There is no dispute that Scotti was never engaged in writing by the Receiver as a real estate broker. See Hearing Transcript Vol. I at 22-24, 78, 87. Scotti has provided no contracts, documents, or other materials other than a list of prospects to support his claim to a real estate commission. Mr. Scotti has failed to demonstrate in any way how the provision of the list of prospects exempts him from the statute of frauds and has failed to demonstrate how the provision of this prospect list was in any way beneficial to the Receiver.[4] There is also no dispute that Scotti and the Receiver never discussed or agreed to any specific amount of a commission or any specific terms under which Scotti would be compensated. Hearing Transcript Vol. I at 23-24, 72-79. As no written agreement exists between the parties, Scotti's claimed commission is barred by the statute of frauds unless he can meet the singular exception set out by the Rhode Island Supreme Court in Adams-Riker, Inc. v. Nightingale, 383 A.2d 1042, 1044-45 (R.I. 1978). *See* Section B, below.

---

[4] The only person connected to the Receiver who has any recollection of receiving the list prior to the foreclosure was Mr. Ponte who testified that he did nothing with the list. Mr. Jones the principal agent and negotiator for the Receiver post-foreclosure testified that he had never seen the list and never spoken to Mr. Scotti.

**B. Unless the Receiver Admits the Existence Of A Commission Agreement, Scotti's Claims Must Fail.**

The Rhode Island Supreme Court has created one exception to the requirement that a contract for a real estate commission must be in writing. If the party to be charged admits in a pleading or on the witness stand that an oral agreement exists, and its essential terms defined, then the condition that there be a "writing" is satisfied under the statute of frauds. Adams-Riker, Inc. v. Nightingale, 383 A.2d 1042, 1044-45 (R.I. 1978).

Scotti asserts that he was assured of a commission if one of his prospects purchased the Property. Contrary to Scotti's assertions, the Receiver claims that the only discussion with Scotti took place in November 2002, months prior to the foreclosure sale at which time the Receiver told Scotti that it would pay an unspecified amount of compensation in the event that Scotti's efforts resulted in one of Scotti's clients or buyers purchasing the Property as a result of Scotti's efforts. Hearing Transcript Vol. I at 72-81. The Receiver denies that it agreed to compensate Scotti in the event that a potential prospect with whom Scotti had contact was the ultimate buyer of the Property, nor was there any discussion of a commission being paid as a result of an auction following the foreclosure sale. Hearing Transcript Vol. I at72-81. Under Rhode Island law, the Receiver's denial of an oral agreement to pay a commission to Scotti is dispositive of Scotti's claims. "In the absence of such an admission, there is no substitute for complete compliance with the requirements of § 9-1-4 [the statute of frauds]." Robert MacKnight et al v. Antoinette Pansey, et al, 122 R.I. 774, 786; 412 A.2d 236 (1980).

Regardless of whether this Court accepts Scotti's or the Receiver's version of the discussion regarding a commission being paid by the Receiver to Scotti, as a matter of law, Scotti's claims are barred by the Statute of Frauds. The Receiver does not admit to having made an agreement to pay Scotti in the event that a "prospect" was the ultimate buyer. In addition the essential terms of the purported brokerage agreement (most notably the amount of a commission)

with the Receiver were never agreed discussed or agreed upon.[5] See Peacock Realty Company v. E. Thomas Crandall Farm, Inc., 108 R.I. 593; 278 A.2d 405 (1971) (written agreement, along with judicial admission as to the amount of commission held to satisfy statute of frauds). Without an agreement in writing or via judicial admission as to the amount of its compensation, Scotti cannot prevail as a matter of law. Id. Moreover, to the extent that Scotti relies on equitable theories such as estoppel, reliance, unjust enrichment and quantum meruit, Rhode Island law is clear that such theories cannot form the basis of any recovery of a real estate commission. Heyman v. Adeack Realty Company, 228 A.2d 578, 580-81 (R.I. 1967); Dooley v. Lachut, 234 A.2d 366, 368 (R.I. 1967).

**C. Scotti Has Failed to Prove His Entitlement to a Commission.**

Prior to the amendment of the statute of frauds, the Rhode Island Supreme Court "established as the law of this state that a real estate broker, acting on authority expressed or implied, is entitled to a commission for his services *if and when* they are the procuring cause of obtaining a purchaser ready, willing and able to buy at a price or terms satisfactory to the seller." Fine v. Hoffman, 88 R.I. 1, 4, 143 A.2d 294, 296 (1958). The Receiver has maintained and stands by its position that had Mr. Scotti been the "procuring cause" of the sale of the Property that he would be entitled to some form of compensation.[6] The determination of whether a broker was the procuring cause is one of fact. Id. In the present case, Scotti has failed in all respects to

[5] It is evident from the letter from Andrew Richardson to the Receiver, that the Trustee was attempting to negotitate a commission for Mr. Scotti as of April 2003 and that no definitive terms existed between the Receiver and Mr. Scotti relative to the payment of compensation.

[6] Because Mr. Scotti played absolutely no role in the post-foreclosure sale process and had no involvement with the Receiver's telephone auction or the negotiation of the purchase and sale agreements, there obviously was no reason for the Receiver and Mr. Scotti to discuss more definitively the form and amount of compensation to which he would be entitled.

show that he was the procuring cause of obtaining a purchaser ready, willing and able to buy at a price or terms satisfactory to the Receiver.

Scotti claims he was the broker for the Trustee prior to the Receiver taking title to the Property, however, that relationship has no bearing on either the Receiver or the Buyer. The Receiver never engaged Scotti as a broker or sought his employment through the Receivership Court. Prior to the foreclosure, the Receiver did consistently inform Scotti that if any client of his was the successful purchaser as a result of Scotti's efforts, he would be entitled to some form of compensation. The Receiver continues to stand by this position, however, Scotti has failed to substantiate any claim for any type of fee due.

Scotti has come forth with no contracts, documents, or other materials indicating his relationship with the Buyer other than the list of contacts forwarded to the auctioneer in advance of the foreclosure sale of the Property. Scotti never submitted any offer on behalf of the Buyer and the Receiver was never presented with any offer from Scotti that was acceptable to the Receiver. Scotti admittedly was unable to procure a buyer that would meet the Receiver's "prohibitive conditions, including a non-refundable deposit . . ." Both of the letters sent on Scotti's behalf seeking a commission were devoid of any supporting documentation. In fact, the letter sent by Mr. Richardson preceded Scotti's provision of his list of prospects by some three months and generally claimed that Scotti's marketing efforts on behalf of the Trustee entitled Scotti to a commission. Additionally, Mr. Scotti played no role on behalf of the Receiver in connection with the foreclosure sale, the subsequent marketing of the Property, the telephonic auction, or the negotiation of the Purchase and Sale Agreements approved by the Court. Therefore, the Receiver is of the opinion that the Purchase and Sale Agreements resulted in no way from the efforts of Peter Scotti and therefore he is not entitled to any compensation.

## III. CONCLUSION

Scotti has failed to set forth facts sufficient to justify an administrative claim in this proceeding. The statute of frauds prevents any recovery by Scotti as the Receiver does not admit that it would pay Scotti any defined amount of compensation if one of his "prospects" was the successful purchaser of the Property. Additionally, Scotti did not procure a buyer for the Receiver and therefore, has no entitlement to any real estate commission.

Respectfully submitted,

Dated: October 26, 2005

Thomas E. Carlotto, Esquire
Shechtman Halperin Savage, LLP
As Attorneys for the Receiver of
Moneta Capital Corporation
86 Weybosset Street
Providence, RI 02903
Telephone: (401) 272-1400
Facsimile: (401) 272-1403

## CERTIFICATE OF SERVICE

*I HEREBY CERTIFY*, that a true and correct copy of the foregoing Receiver's Post Hearing Memorandum in Support of its Objection to the Motion of Peter M. Scotti and Peter M. Scotti & Associates For Real Estate Commission was furnished via facsimile and U.S. Mail, postage pre-paid to the following counsel of record on this 26th day of October, 2005:

Harris K. Weiner, Esquire
Law Office of Jeffrey B. Pine, P.C.
321 South Main Street, Ste. 302
Providence, RI 02903

Gina-Marie Ciaccio, Paralegal