UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


UNITED STATES OF AMERICA,            )
     Plaintiff,                      )
                                     )
                                     )
v.                                   )   C.A. No. 99-565L
                                     )
                                     )
MONETA CAPITAL CORPORATION,          )
     Defendant.                      )


In Re Motion of Peter M. Scotti and Peter M. Scotti & Associates,
Inc. Appealing the Receiver's Denial of Real Estate Commission.

### DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

    This matter comes before the Court on a Motion filed by
Peter M. Scotti and Peter M. Scotti & Associates, Inc.
("Claimants") objecting to the Receiver's disallowance of a real
estate commission for the sale of real property by the Receiver
consisting of 124 acres in Warwick, Rhode Island ("the Property")
to Vanderbilt Capital, LLC ("Vanderbilt"). The Property is
commonly known as Rocky Point Park, an historic amusement park
located on the shores of Narragansett Bay. It now is usable and
very valuable for real estate development.

    Claimants seek to have this Court reverse the Receiver's
decision and determine that Claimants are entitled to a real
estate commission for the sale of the Property to Vanderbilt.
This Court held a two-day evidentiary hearing concerning this

matter in September of 2005, and the parties subsequently
submitted post-hearing briefs. After consideration of the hearing
testimony, the exhibits and the parties' post-hearing
submissions, this Court overrules Claimants' objection to the
Receiver's disallowance of the real estate commission and affirms
the Receiver's decision.

### Facts and Travel

By an Order dated February 2, 2000, this Court appointed the
Small Business Administration ("SBA") as Receiver for Moneta
Capital Corporation ("Moneta"). Subsequent to its appointment,
the Receiver became aware that Moneta held an interest in a loan
made to C.R. Amusements, LLC ("CRA"), the owner of Rocky Point
Park. The loan was collateralized by a mortgage on the Property.
At the time of the Receiver's appointment, CRA had been
petitioned into bankruptcy and the Chapter 7 Trustee appointed
for CRA, Andrew Richardson, Esq. ("the Trustee"), was
administering the Bankruptcy estate which included the Property.
In reality, the Property was the only valuable asset in the
estate. After its appointment as Receiver, the SBA allowed the
Trustee to continue to attempt to sell rather than seek to
foreclose on the mortgage. In connection with his efforts to
market the Property, the Trustee had engaged Claimants as his
real estate broker beginning in February of 1999. The Trustee's
Application to Employ Real Estate Broker, approved by the United

2

States Bankruptcy Court for the District of Rhode Island on February 26, 1999, indicates that the Trustee wished to employ Claimants "to assist the trustee in selling the real estate owned by the debtor located in Warwick, Rhode Island." Ex. 2 to *Affidavit of Peter M. Scotti* ("*Scotti Aff.*")).

Peter M. Scotti ("Scotti") is the president and owner of Peter M. Scotti & Associates, Inc., a Providence, Rhode Island real estate brokerage and appraisal firm. Scotti tried to find a buyer for the Property from February of 1999 to July of 2003. Scotti's marketing efforts included, *inter alia*, researching the Property, developing marketing packages, identifying and soliciting potential buyers, showing the Property to potential buyers and serving as a liaison to the Trustee. During this time, Scotti submitted numerous offers for the Property to the Receiver, since any sale by the Trustee had to be approved by the Receiver. The highest offer made was $12.5 million. None of the offers submitted by Scotti were acceptable to the Receiver. Scotti indicated that the Receiver's "prohibitive conditions, including a non-refundable $500,000 deposit, frustrated any such sales." *Scotti Aff.*, at ¶ 8. Although the Receiver had knowledge of Scotti's efforts to market the Property, the Receiver never attempted to employ Scotti or enter into a written agreement with him relating to the Property. Furthermore, although Scotti was recognized by the Bankruptcy Court as a broker for the Trustee,

3

this Court never authorized the Receiver to employ a broker and never recognized Scotti as a broker for the Receiver.

At a hearing on November 4, 2002, this Court granted the Receiver leave to seek relief from the bankruptcy stay in order to foreclose the mortgage on the Property. Immediately following the hearing, the lawyers representing the Receiver and the Trustee engaged in a brief discussion outside the courtroom regarding the Property. Present at this conversation were: Arlene Embrey, as counsel for the Receiver; Michael Carroll, as local counsel for the Receiver; Scotti; and the Trustee. During the evidentiary hearing held on September 22 and September 27, 2005 before this Court, these four individuals offered varied accounts of the exact content of the discussion. This discussion must be viewed in context. The Court had just allowed the Receiver to get on with a foreclosure sale, in effect, over the objection of the Trustee. The Trustee could see that the only real asset of the Bankruptcy estate would soon be out of his hands and he had made great efforts to preserve and sell the Property. He was obviously concerned about getting his Trustee's fee paid and at this discussion, that was the first matter that he broached. He was assured that the Receiver would agree to a reasonable fee being paid from the proceeds of a sale of the Property when that matter would be heard in the Bankruptcy Court. The Trustee then inquired about whether Scotti could get a commission for all his diligent

work in trying to find a buyer for the Property. Embrey
responded, in effect, that the Receiver would not oppose Scotti
receiving a commission if Scotti produced a client he represented
as the successful purchaser of the Property. That was the sum and
substance of the conversation. What Embrey obviously meant was
that if Scotti secured a buyer after the Receiver took control of
the Property who was ready, willing and able to purchase on terms
satisfactory to the Receiver, the Receiver would not object to
Scotti receiving a commission in Bankruptcy Court when the
Trustee made his application for his fees.

Scotti testified that in February of 2003 he met with Arnold
Goodstein, a real estate developer from South Carolina, in
Scotti's office and gave Goodstein brochures regarding the
Property and arranged for Goodstein to visit the Property.
Transcript of 11/22/05 hearing ("Tr. of 11/22/05") at 20. Scotti
also testified to having several subsequent conversations with
Goodstein regarding the Property. Id. Nonetheless, at no time did
Scotti submit an offer to the Receiver on behalf of Goodstein.

On June 2, 2003, the Bankruptcy Court allowed the Receiver's
Motion for relief from the bankruptcy stay to conduct a
foreclosure of the mortgage on the Property. This effectively
ended both the Trustee's authority to market the Property and the
Trustee's employment of Claimants to assist in the sale of the
Property. The Receiver then scheduled a foreclosure sale of the

Property for July 29, 2003. The auctioneer, Irving Shechtman &
Co. ("Auctioneer"), ran advertisements for the foreclosure
auction in the Wall Street Journal, New York Times, Boston Globe,
New England Real Estate Journal and Providence Journal.

On July 18, 2003, Scotti sent a prospect list which
identified those parties that had inquired about the Property to
the Auctioneer's President, Manuel C. Ponte. Ponte received the
prospect list on July 20, 2003. Although Ponte read the names of
the prospects on the list, he did nothing further with the list
as he had received it nine days before the auction and had
already finished advertising for the auction.

The foreclosure sale was held in late July 2003. The
Receiver was the highest bidder at the foreclosure sale, and thus
became the titled owner of the Property. After the foreclosure,
Scotti made no efforts to market the Property. He testified that
he was "frozen out" by the Receiver. Id. at 32. In November of
2003, the Receiver conducted a private telephone auction of the
Property. The Receiver ultimately selected Vanderbilt after it
was identified as the successful bidder in the telephone auction.
The Receiver's principal agent, Steven Jones, was assured by the
manager and representative of Vanderbilt, Arnold Goodstein, that
Vanderbilt did not have a broker. When Jones specifically asked
Goodstein if he had dealt with Scotti, Goodstein replied that he
had limited contact with Scotti.

In May of 2004, the Receiver and Vanderbilt entered into two purchase and sale agreements for the Property for a total purchase price of $25,000,000. The first purchase and sale agreement in the amount of $11,250,000 relates to approximately 29 acres of the Property, and the second in the amount of $13,750,000 relates to the remaining acres. The purchase and sale agreements for the Property, which were negotiated by the Receiver and Vanderbilt, state that neither party dealt with a broker. Specifically, paragraph 32 of the second purchase and sale agreement states, "[e]ach party represents to the other that such party has not dealt with any real estate broker or agent with respect to the Premises and hereby agrees to indemnify each other party from any claims made by any such agent or broker claiming to have dealt with such indemnifying party." Claimants' Ex. 6.

At a hearing on September 17, 2004, this Court denied Claimants' Motion to intervene in the Receivership. They wanted to object to confirmation of the sale unless a commission was paid. The Court advised Claimants that if they thought they were entitled to a commission, they could file a claim for such as an administrative expense with the Receiver. The Court's Order dated November 10, 2004 granted the Receiver's Motion for approval and confirmation of the sale contemplated by the purchase and sale agreements. On December 16, 2004, Claimants submitted a claim for

7

a commission to the Receiver. The Receiver rejected the claim on May 2, 2005, and on May 26, 2005, Claimants, in effect, appealed the Receiver's decision to this Court.

## Standard of Review

In accepting or rejecting the claims of creditors, a receiver acts like a master. 3 Ralph Ewing Clark, Clark on Receivers § 650, 657 (3d ed. 1959). A district court must decide de novo all objections to findings of fact and conclusions of law made or recommended by a master before ruling on the master's recommendations. Fed. R. Civ. P. 53(g)(1), (3)-(4). A full discussion by this writer of this subject matter can be found in United States v. Fairway Capital Corp., C.A. No. 00-035L, 2006 WL 1554593, at *2 (D.R.I. June 8, 2006). Consistent with the standard of review required under Fed. R. Civ. P. 53(g), this Court will proceed to apply a de novo standard of review to the Receiver's decision to reject the claim for a real estate commission.

## Analysis

Claimants argue that they are entitled to a real estate commission of four percent on all sums received by the Receiver for the sale of the Property to Vanderbilt. In the absence of a written agreement between the parties, Claimants argue that they are entitled to a commission because the Receiver has admitted that an oral agreement existed that defined its essential terms.

8

Alternatively, Claimants argue that they are entitled to a commission as a matter of equity. Finally, Claimants argue that they are owed a commission because of their role as a procuring cause of the sale of the Property to Vanderbilt.

**Statute of Frauds**

In analyzing a claim for a real estate broker's commission, this Court begins by considering the statute of frauds. The Rhode Island statute of frauds provides, in relevant part:

> No action shall be brought . . . [w]hereby to charge any person upon any agreement or promise to pay any commission for or upon the sale of any interest in real estate, unless the promise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized.

R.I. Gen. Laws § 9-1-4(6) (1997 Reenactment). The Rhode Island legislature enacted § 9-1-4(6) to protect the public against the "unfounded claims of a specific class of persons, namely, real estate brokers and agents." Heyman v. Adeack Realty Co., 102 R.I. 105, 108, 228 A.2d 578, 580-81 (1967). Given that this statute was enacted to protect against the groundless claims of real estate brokers, it must be strictly construed and applied. Heyman, 228 A.2d at 581; Dooley v. Lachut, 103 R.I. 21, 23-24, 234 A.2d 366, 368 (1967).

Although Claimants acknowledge that no written agreement exists between the parties in this case, Claimants contend that

they are party to an oral agreement with the Receiver that
satisfies the singular well-established exception to the statute
of frauds recognized under Rhode Island law. In <u>Adams-Riker, Inc.</u>
<u>v. Nightingale</u>, 119 R.I. 862, 383 A.2d 1042 (1978), the Rhode
Island Supreme Court adopted the rule that the writing
requirement under the statute of frauds is satisfied if the party
to be charged admits in a pleading or on the witness stand that
an oral agreement exists and defines all of its essential terms.
383 A.2d at 1044-45. Without such an admission, however, the
requirements of the statute of frauds as codified by § 9-1-4(6)
must be satisfied in their entirety. <u>MacKnight v. Pansey</u>, 122
R.I. 774, 785, 412 A.2d 236, 243 (1980).

 Claimants argue that there was an oral agreement in this
matter which qualifies as an exception to the statute of frauds
according to <u>Adams-Riker</u> because the Receiver admitted to the
essence of such a contract both in its brief dated June 8, 2005
and through Embrey's testimony before this Court. In its brief,
the Receiver asserted that it informed Scotti that if a client of
his was the successful purchaser of the Property as a result of
his efforts, he would be entitled to some form of compensation.
Receiver's June 8, 2005 Brief, at 2. During the evidentiary
hearing before this Court, Embrey testified that at the November
4, 2002 meeting in the Courthouse, she stated the Receiver's
position that if one of Scotti's clients successfully purchased

the Property, the Receiver would not oppose Scotti getting a commission. Tr. of 11/22/05 at 73. There was no discussion of the amount of any such commission. Contrary to Claimants' assertions, these statements do not constitute an admission that the Receiver agreed to pay Scotti a commission in the event that any party with whom Scotti had contact happened to be the ultimate buyer of the Property. In any event, there was no oral agreement since an essential term was missing -- the amount of the commission. See Peacock Realty Co. v. E. Thomas Crandall Farm, Inc., 108 R.I. 593, 602, 278 A.2d 405, 410 (1971) (holding that where the defendant provided a judicial admission as to the amount of commission agreed upon, all terms essential to the validity of the commission agreement were undisputed and the statute of frauds was satisfied). At no point did Scotti and the Receiver discuss or agree upon the amount of any such commission. Tr. of 11/22/05 at 22-24. At best, Embrey's statements were an offer to enter into a unilateral contract which could be accepted by Scotti's performance, i.e., producing a buyer. See Nat'l Educ. Ass'n-R.I. v. Ret. Bd. of R.I. Employees' Ret. Sys., 890 F. Supp. 1143, 1157 (D.R.I. 1995) (citing B & D Appraisals v. Gaudette Machinery Movers, Inc., 733 F. Supp. 505, 508 (D.R.I. 1990)) ("A unilateral contract consists of a promise made by one party in exchange for the performance of another party, and the promisor becomes bound in contract when the promisee performs the

11

bargained for act."); <u>Judd Realty, Inc. v. Tedesco</u>, 400 A.2d 952,
956 (R.I. 1979) (citing <u>Marchiondo v. Scheck</u>, 78 N.M. 440, 432
P.2d 405 (1967)) (noting that "an offer to pay a commission to a
broker upon production of a purchaser is an offer to enter into a
unilateral contract and the offer is for an act to be
performed"). After the Receiver took control of the Property,
Scotti failed to produce a buyer for the Property. He admitted
that he did nothing in that regard. Tr. of 11/22/05 at 32.
Therefore, there was no judicial admission by the Receiver that
an oral contract to pay a commission came into existence. In
short, there was no oral contract that could be enforced by
Scotti in the absence of a statute of frauds. Therefore the
requirements of the statute of frauds § 9-1-4(6) are applicable
to this case. Since no written agreement exists between the
parties, the statute of frauds bars Claimants' claim for a real
estate commission.

**Equitable theories**

Claimants argue that even if their claim for a real estate
commission does not satisfy the statute of frauds, the claim is
justified under equitable principles of promissory estoppel,
reliance, unjust enrichment and quantum meruit. Given the strict
application of § 9-1-4(6), however, the Rhode Island Supreme
Court has consistently rejected claims for real estate
commissions based upon equitable theories. <u>See</u> <u>Metro Props., Inc.</u>

v. Yatsko, 763 A.2d 617, 620 (R.I. 2000) (citing Wright v. Smith,
105 R.I. 1, 2, 249 A.2d 56, 57 (1969) (per curiam)) (concluding
that "[d]octrines of equitable relief, such as *quantum meruit*,
are unavailable in an action to recover a real estate
commission"); Heyman, 228 A.2d at 580-82 (holding that strict
construction and enforcement of § 9-1-4(6) prohibits a claim for
real estate commission based upon estoppel and quantum meruit);
Dooley, 234 A.2d at 368 (barring a claim for real estate
commission based on equitable theories of performance and part
performance). As noted by the Rhode Island Supreme Court in
strictly applying § 9-1-4(6):

> Real estate brokers who enter into oral
> agreements in contravention of clause sixth
> of our statute of frauds can expect no
> assistance from the courts in their effort to
> extricate themselves from their own folly. If
> a real estate broker fails to obtain a
> written contract of employment from his
> customer, he proceeds at his own peril.

Dooley, 234 A.2d at 368. Therefore, Claimants cannot prevail on
the claim for a real estate commission under such equitable
remedies where the statute of frauds otherwise bars such a claim.

**Procuring Cause**

Claimants further contend that they are entitled to a real
estate commission because they served as a procuring cause of
Vanderbilt's purchase of the Property. A broker is regarded as a
procuring cause when the broker "is the first broker to interest
the prospective purchaser in the property, . . . causes such

13

purchaser to inspect or view the property, and . . . conducts
negotiations concerning a sale thereof with the prospective
purchaser." <u>Griffin v. Zapata</u>, 570 A.2d 659, 663 (R.I. 1990)
(quoting <u>Rustigian v. Celona</u>, 478 A.2d 187, 190 (R.I. 1984)). A
broker who is considered the procuring cause by having "produced
a prospective purchaser who is ready, willing, and able to
purchase at the price and terms of the seller" is entitled to
compensation. <u>Griffin</u>, 570 A.2d at 663 (quoting <u>Rustigian</u>, 478
A.2d at 190). Claimants have the burden of proving by a fair
preponderance of the evidence that they produced a buyer who was
ready, willing, and able to buy on the Receiver's terms. <u>See</u> <u>Judd</u>
<u>Realty</u>, 400 A.2d at 956.

The evidence of record fails to demonstrate that Claimants
were a procuring cause of Vanderbilt's purchase of the Property.
The Receiver never attempted to employ Scotti or enter into any
agreement (oral or written) with him relating to the Property,
and this Court never recognized Scotti as broker for the
Receiver. Regarding the relationship between Claimants and
Vanderbilt, the list of contacts which contains Goodstein's name
that was forwarded to Ponte immediately before the foreclosure
sale is the sole document that provides an attenuated link
between Claimants and Vanderbilt. At no time did Scotti submit
any offer to the Receiver on behalf of Goodstein or Vanderbilt.
In fact, Scotti conceded that he failed to present an offer on

14

behalf of any client that was acceptable to the Receiver and that he was unable to procure a buyer that would meet the Receiver's conditions. *Scotti Aff.*, at ¶ 8. After the foreclosure, it is clear that Claimants did not even attempt to market the Property. The mere fact Scotti had limited contact with Goodstein before the foreclosure cannot serve as a basis for claiming that he was the moving force in producing the sale. Scotti was not involved in the July 2003 foreclosure sale, the November 2003 telephone auction or the negotiation of the purchase and sale agreements in May of 2004 between Vanderbilt and the Receiver. As a result, Claimants have not demonstrated that they served as the procuring cause of the sale to a purchaser who was ready, willing, and able to purchase the Property at the price and on the terms acceptable to the Receiver. Under any view of this case, the Claimants are not entitled to a commission on the sale made by the Receiver.

**Conclusion**

For the foregoing reasons, the objection of Peter M. Scotti and Peter M. Scotti & Associates to the Receiver's decision to disallow a real estate commission for the sale of the Property to Vanderbilt Capital, LLC is overruled and the Receiver's decision hereby is affirmed.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
August  3  , 2006

15
