**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Case No. 99-565-L** |
| **MONETA CAPITAL CORPORATION** | **Judge Lagueux** |
| **Defendant.** | |

**MEMORDUNDUM IN SUPPORT OF THE RECEIVER'S MOTION FOR DETERMINATION AND ORDER REGARDING THE DEMAND OF THE CITY OF WARWICK TO DEMOLISH CERTAIN STRUCTURES**

In support of its Motion for Determination and Order Regarding the Demand of the City of Warwick to Demolish Certain Structures, the United States Small Business Administration ("SBA") as Receiver ("the Moneta Receiver") for Moneta Capital Corporation ("Moneta") states as follows:

## INTRODUCTION

It is well settled that federal receivers may petition their respective receivership court with respect to the extent of the discharge of that receiver's duties to the receivership estate. See United States v. Johnson, 98 F.2d 462, 465 (8th Cir. 1938); Northern Finance Corp. v. Byrnes, 5 F.2d 11, 12 (8th Cir. 1925); Haines v. Buckeye Wheel Co., 224 Fed. 289, 294 (6th Cir. 1915); 2 Clark, Law of Receivers § 361 (3d. Ed. 1959 & Supp. 1968-69). In accordance with this general principle, the Receiver is moving this Court for (1) a determination that the Receiver is responsible as the owner of that property commonly known as "Rocky Point" to comply with the demands of the City of Warwick to remediate certain unsafe conditions; (2) a determination that that Vanderbilt Capital, LLC (the "Buyer") is responsible for payment of

such remediation under the Purchase and Sale Agreements executed in connection with the sale of the Rocky Point property; and (3) an order requiring the Buyer to pay for such remediation.

## BACKGROUND

By Order dated February 2, 2000 ("the Receivership Order") this Court appointed SBA as receiver for Moneta. The Receiver was made aware that Moneta held an interest in a syndicated loan ("the Loan") made to C.R. Amusements, LLC ("C.R. Amusements"), which loan was collateralized by a mortgage on real property consisting of 124 acres in Warwick, Rhode Island ("the Property"). The Property is the site of the former Rocky Point Amusement Park (the "Amusement Park") and contains numerous buildings the majority of which were erected prior to 1980. The Amusement Park closed in or about 1996 and the structures used in the operation of the Park, located in an area commonly known as the "Midway", have been vacant since that time. The Midway is located adjacent to waterfront and bordered by vacant acreage to the north, west and east.

From 1999 through July 2003, ownership of the property was vested in C.R. Amusements an entity that was under the protection of the United States Bankruptcy Court for the District of Rhode Island. From the inception of the bankruptcy proceeding through July 2003, Andrew Richardson held possession of the Property in his capacity as Chapter 7 Trustee of C.R. Amusements.

### Receiver Becomes Titled Owner After Foreclosure

The Receiver became the titled owner of the Property as the result of a foreclosure sale held on or about July 29, 2003. Title to the Property is currently held for the benefit of the Moneta Receivership Estate and on behalf of various co-investors in a syndicated loan. After the Receiver bid in its outstanding mortgage at the foreclosure sale and became the titled owner, the

Receiver negotiated the sale of the Property to Vanderbilt Capital, LLC for the total price of $25,000,000. Ultimately in May 2004, the Receiver entered into two purchase and sale agreements (the "Purchase and Sale Agreements") for the Property that were approved by the Court on November 10, 2004 (the "Sale Order")[1] . The Sale Order became final on September 2, 2005, by virtue of the dismissal of an appeal filed by the Rocky Beach Association, Inc. From and after September 12, 2005, the Buyer assumed the Operational Costs (a defined term under the Purchase and Sale Agreements) and possession of the Property under the Purchase and Sale Agreements. Both Purchase and Sale Agreements contain the following language at Section 10:

> Buyer shall immediately assume and pay when the same become due and payable all operational responsibilities and all costs and expenses associated with ownership of the Premises (other than those otherwise allocated to Seller hereunder, if any) accruing on or after the Final Court Order Date, including, without limitation, payment of real estate taxes assessed against the Premises, payment of any unpaid betterment assessments, improvement assessments and/or special assessments constituting a lien against the Premises, whether now existing or hereafter arising, payment of all utility costs and water and sewer charges, maintenance of insurance as required by <u>Section 20</u> hereof and performance of maintenance and repairs of the Premises (collectively, the "Operational Costs").

Since the Amusement Park closed in 1996, several structures located on or around the Midway have been damaged or destroyed by fire. The most recent fire occurred on or about October 16, 2006 and completely destroyed one of the structures located on the Midway.

<u>City of Warwick's Demand for Remediation</u>

Subsequent to the most recent fire, the Receiver received correspondence dated October 19, 2006 from Ted Sarno, Director of Administration for the City of Warwick, declaring that all structures located on the Midway constituted a "hazard" within the meaning of R.I.G.L. §23-27.3-125.5 and demanding demolition of the structures on or before October

[1] Two Purchase and Sale Agreements were executed to permit the Rocky Beach Association, Inc. to exercise a statutory right of first refusal which related only to a portion of the Property.

29, 2006. A copy of Mr. Sarno's correspondence is annexed hereto and incorporated herein as Exhibit A. In response to Mr. Sarno's letter, the Receiver sent correspondence indicating that the City was stayed from taking any action by virtue of the provisions of paragraph 7 of the Receivership Order and further requesting a site visit of the Property with City officials to obtain a better understanding of the alleged "hazards" cited in Mr. Sarno's letter.

On November 3, 2006, representatives of the Receiver and City officials conducted a site visit of the Midway area on the Property. At the site visit, the Receiver was provided with a report from the City's building official (the "Building Official") that identified certain conditions that allegedly violate R.I.G.L. §23-27-124.0 et. seq. A copy of the Building Official's report is annexed hereto and incorporated herein by reference as Exhibit B. At the conclusion of the site visit, the Receiver agreed to provide the City with a letter detailing its intended course of action within three business days and on November 5, 2006, the Receiver sent correspondence to the City's solicitor indicating its intention to seek a determination from this Court relative to the City's demands. In response, the City solicitor provided additional information requested by the Receiver and reiterated that Mr. Sarno had determined that the structures were not only unsafe but "hazardous" as they constitute an immediate danger to the public health, safety and welfare.

## ANALYSIS

"When a court exercising jurisdiction in equity appoints a receiver of all the property of a corporation, the court assumes the administration of the estate; the possession of the receiver is the possession of the court; and the court itself holds and administers the estate, through the receiver as its officer, for the benefit of those whom the court shall ultimately adjudge to be entitled to it." Porter v. Sabin, 149 U.S. 473, 13 S.Ct. 1008, 37 L.Ed. 815 (1893). It is

established that a receivership court will administer corporate assets on the theory that in equity they belong to the creditors and shareholders rather than to the corporation itself. United States v. Butterworth-Judson Corp., 269 U.S. 504, 46 S. Ct. 179, 70 L. Ed. 380, (1926). Accordingly, the primary purpose of this receivership proceeding is to marshal and liquidate corporate assets to maximize the recovery for distribution to the creditors and shareholders. Receivership Order, ¶1; See Small Business Investment Act, 15 U.S.C. §687c.

As in most issues involving the liquidation of receivership estates, the Receivership Court must balance the equities between the weight and purpose of the City's claim and the Receiver's duty before permitting the application and enforcement of the state law as demanded by the City. See United States v. Fairway Capital Corp., 433 F.Supp.2d 226, 239 (D.R.I. 2003)(Lagueux, J)(balancing relevant factors to determine whether abstention to another court of issues involving the Receiver was appropriate); United States v. ESIC Capital Corp., 675 F.Supp. 1462 (D.Md. 1987)(balancing relevant factors to determine whether judicial stay should be lifted for legal proceeding involving receivership estate to proceed). While the Receiver's duty is to provide the maximum recovery to the creditors of the receivership estate, the Receiver believes that in this instance the equities favor the City's interest in providing for the health and safety of the public.

The Rhode Island General Assembly adopted a uniform building code which is codified at Section 23-27.3-100 et. seq. of the Rhode Island General Laws. In Section 23-27.3-100.1.2, the General Assembly expressed that the purpose of the Code was for the protection of the health, safety, and welfare of the citizens of Rhode Island. The Code specifies in § 23-27.3-101 that its provisions apply to all structures and "shall apply with equal force to municipal and state authorities established by the legislature and private buildings and structures; except where such buildings and structures are otherwise specifically provided for by statute." As the Receiver

stands in the shoes of Moneta Capital Corporation it is not free from this statute's application to "private" structures.

The enforcement of State and local ordinances for the protection of public safety are a fundamental police power of the States and their municipalities. The primary purpose of the Building Code is to promote public safety by ensuring that structures to be occupied (whether for residential or commercial purposes) do not pose a danger to the public. See R.I.G.L. §23-27.3-100.1.2. A secondary but no less important goal of the Building Code is to ensure that structures do not pose a general threat to the public safety by virtue of an inherent likelihood of the structure to cause damage to neighboring property or bodily harm. See R.I.G.L. §§23-27.3-124.0 through 23-27.3-125.7.

The Building Code recognizes two separate classes of structures that fall within the ambit of the State's secondary goal of ensuring public safety by preventing the existence of inherently dangerous structures. The first class of structures are those that are deemed to be "unsafe" under Section 23-27.3-124.0 and the second class are those structures that pose such an immediate danger to the public to be classified as "hazardous" under Section 23-27.3-125.0. The Code provides some detail as to what constitutes an unsafe structure and limits the classification of a building as hazardous to those situations where there is an immediate threat to the public because of a building's potential as a fire hazard or its danger from collapse. See R.I.G.L. §23-27.3-124.1 (Unsafe Conditions) and R.I.G.L. §23-27.3-125.5 (Hazardous Buildings).

Under Section 23-27.3-108.1 it is the local building official that is charged with the enforcement of the Building Code. The City's Building Official has provided the Receiver with a report detailing his findings relative to the structures on the Midway and the conditions he deemed as unsafe within the meaning of Section 23-27.3-124.1. The Building

Official's report did not find or describe any condition as a hazard under Section 23-27.3-125.5. However, the Director of Administration for the City did conclude that all the structures on the Midway posed a hazard under this latter statutory provision. While the Director of Administration appears to be without authority to make such a determination and does not have statutory enforcement authority under the Building Code, the Receiver believes that the result is the same whether the structures are deemed unsafe or hazardous.

The Midway area of the Amusement Park has stood vacant for more than nine years. During this time, several fires have been set by criminal trespassers resulting in damage or destruction of structures on the midway. At least one such fire that occurred prior to the Receiver's possession of the Property left buildings partially collapsed and such structures have remained is such condition for years.

Under Section 23-27.3-124.2, the City is entitled to require an owner to abate unsafe conditions by ordering demolition of structures. Given the condition and nature of the structures it is not feasible to remediate the unsafe conditions by making the buildings fit for use and occupancy. Thus, the Receiver as the owner of the Property is obligated to demolish the structures in compliance with the City's demands and pursuant to the Purchase and Sale Agreements, the Buyer is obligated to pay for such remediation.

In Rhode Island, contracts are to be construed according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed. See Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 19 (1st Cir. 2002)(holding that under Rhode Island law, unambiguous language in a contract is to be accorded its plain and natural meaning, and its interpretation presents a question of law); Fleet National Bank v. 175 Post Road, LLC.851 A.2d 267, 274 (R.I. 2004)(holding that in Rhode Island, contracts are to be construed according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed).

The Purchase and Sale Agreements provide that the Buyer shall "assume and pay when the same become due and payable all operational responsibilities and all costs and expenses associated with ownership of the Premises". Consequently, the Buyer is responsible to pay for the remediation and therefore, the Receivership Estate would not be diminished by the Receiver's compliance with the City's demands. Furthermore, the Receiver is of the opinion that the public interest in this case, the safety and health of the neighboring community, outweighs any cost to be born by the Receivership Estate notwithstanding the Buyer's obligation to pay for the costs of remediation.

**CONCLUSION**

Based upon the foregoing, the Receiver requests that the Court (1) determine that as of November, 2006 the Receiver has the responsibility as the owner of the Property to comply with the City's demands; (2) determine that the Buyer is obligated under the Purchase and Sale Agreements to pay for the remediation demanded by the City; and (3) order that the Buyer pay for such remediation as demanded by the City.

Respectfully submitted,

_/s/Thomas E. Carlotto___________

Thomas E. Carlotto, Esquire
Shechtman Halperin Savage, LLP
As Attorneys for the Receiver of
Moneta Capital Corporation
1080 Main Street
Pawtucket, RI 02860
Telephone: (401) 272-1400
Facsimile: (401) 272-1403

Dated: November 21, 2006