**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 99-565L** |
| | ) | |
| **MONETA CAPITAL CORPORATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF THOMAS G. MORRIS IN SUPPORT OF RECEIVER'S PETITION FOR AN ORDER FOR LEAVE TO PROCEED WITH A PRIVATE SALE OF REAL PROPERTY**

The undersigned upon oath deposes and states:

1. I, Thomas G. Morris, have served as the Director, Office of SBIC Liquidation for the U.S. Small Business Administration ("SBA" or "Receiver") since March, 1994. In My position as Director, Office of Liquidation, I am responsible for the supervision and liquidation of all SBIC's in receivership, including Moneta Capital Corporation ("Moneta"). Moneta was placed in receivership, and SBA was appointed the Receiver for Moneta, by an Order of this Court dated February 2, 2000.

2. I am familiar with, and have first hand knowledge of, Moneta Capital Corporation and its assets, including 124 acres of real property (the "Property") located in Warwick, Rhode Island. I am familiar with, an have first hand knowledge of, the efforts to sell the Property to various parties, including Rocky Point Partners, LLC.

3. Moneta currently holds title to the Property, formerly titled in the name of C.R. Amusements, LLC that was acquired by the Receiver at a foreclosure sale. Title is held on Moneta's behalf and on behalf of various co-investors in a syndicated loan securing a loan for which the Property was collateral.

4. The Receiver has entered into a purchase and sale agreement (the "City Purchase and Sale Agreement) with the City of Warwick with respect to approximately forty-one acres of the Property (the "City Parcel") for the purchase price of $4,400,000.00 and a purchase and sale agreement with Rocky Point Partners, LLC (the "Rocky Point Purchase and Sale Agreement", together with the City Purchase and Sale Agreement, the "Purchase and Sale Agreements") for the remaining acreage of the Property (the "Rocky Point Parcel"), for the purchase price of $15,600,000.00.

5. Pursuant to the Purchase and Sale Agreements, the Property will be transferred to each buyer by Receiver's Deed. Rocky Point Partners, LLC shall pay a deposit of $250,000.00 within five days of the execution of the Rocky Point Agreement and an additional $750,000.00 upon expiration of a due diligence period. The remaining balance of the purchase price from both the City of Warwick and Rocky Point Partners, LLC will be paid at closing. It is contemplated that the closing will occur on or before March 28, 2008. True and correct copies of the Purchase and Sale Agreements are attached hereto as Exhibits 1 and 2.

6. In accordance with 28 U.S.C. §2001, the Receiver previously commissioned Cushman and Wakefield, Inc., United Appraisal Group and Robert Bargamian to undertake appraisals of the Property. Randell L. Harwood whose Rhode Island License number is 1958 and Mark H. Wolpers completed the appraisal from Cushman and Wakefield, Inc. Paul Bordieri whose State Certification number is A00154R was the representatives that conducted the

appraisal for United Appraisal Group. Robert Bargamian is a R.I. Certified General Appraiser, number A00663G.

7. The appraisals found the value of the parcels to be $5,250,000, $16,000,000 and $16,500,000 respectively. The sales price of $20,000,000 exceeds the average appraised value and therefore fulfills the requirement of 28 U.S.C. §2001(b) that the sale be for not less than two-thirds of the appraised value. The Receiver therefore recommends that the Court approve and confirm the three appraisers, and their respective appraisals, pursuant to 28 U.S.C. §2001.

8. In order to confirm that this proposed sales price is the best that can be reasonably expected, the Receiver will publish the proposed sales in the *Providence Journal, Boston Globe and Wall Street Journal* papers of general circulation, at least 10 days prior to the sales to solicit any higher bids. The notice will provide the relevant terms of sale and that all bids must conform with the required terms and conditions imposed upon either buyer and other prospective purchasers. The notice shall further provide that the Receiver shall qualify bidders in its sole discretion and under such terms as it customarily requires.

9. If no bids greater than 110% over the aggregate original contract price are received pursuant to 28 U.S.C. §2001 and the published notice, the Receiver recommends that the Court approve the sale of the City Parcel for $4,400,000.00 and the Rocky Point Parcel for $15,600,000.00. In the event no objection to the proposed sale are received and no bids are received in compliance with the proposed notice of sale, the Receiver also requests that it be authorized to seek the Court's leave for cancellation of the hearing and entry of an order confirming the proposed sale.

10. The Receiver's obligation is to liquidate the receivership estate, including all assets, real and personal property, in the best interests of the estate. The Receiver believes that

acceptance of the offer for the real property for $20,000,000.00 in the aggregate is in the best interest of the receivership estate.

"I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge."

Executed on this 28th day of September, 2007.

Thomas G. Morris

Subscribed and sworn to me on this 28th day of September, 2007.

Notary Public

My commission expires on:

Abraham A. Speight
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires April 30, 2008

# EXHIBIT 1
# AFFIDAVIT OF THOMAS G. MORRIS

# PURCHASE AND SALES AGREEMENT

This Agreement (the "Agreement") is made and entered into as of the 28th day of September, 2007, by and between the United States Small Business Administration as and only as Receiver of Moneta Capital Corporation (the "Seller") and Rocky Point Partners, LLC, a limited liability company, organized and existing under the laws of the State of Rhode Island (the "Buyer").

**W I T N E S S E T H:**

In consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Premises. Subject to the terms and provisions hereof, the Seller agrees to sell and convey to the Buyer and the Buyer agrees to purchase those certain lots or parcels of land and all improvements and fixtures located thereon in which Seller may claim an interest or owns, located in the City of Warwick, County of Kent, State of Rhode Island, commonly known and numbered as (a) Assessor's Plat 379, Lots 8, 9, 158, 159, 425, 426 and 445, (b) Plat 380, Lot 1, Lot 3, Lot 281 and (c) Plat 381, Lots 38, 39, 40 and 41, Plat 380, more particularly described on Exhibit A excluding therefrom approximately forty-one acres as delineated on Exhibit B, which acreage is the subject of a separate purchase and sale agreement between the Seller and the City of Warwick. (the "Premises"). Subject to the agreement of the parties as set forth in Section 22, the final legal description shall be determined by the Survey, as defined herein, and shall replace the delineation of the Premises contained in Exhibits A and B attached hereto.

2. Title. The Premises are to be conveyed by the Seller by a good and sufficient Receiver's Deed running to Buyer, free from all mortgages or other encumbrances or matters of record, except:

   (a) Real estate taxes and general assessments that constitute a lien against the Premises, current as of the Closing; and

   (b) All easements, restrictions, plat restrictions or other matters of record, if any, to the extent now in force and applicable.

3. Purchase Price. The agreed purchase price (the "Purchase Price") for the Premises is Fifteen Million Six Hundred Thousand and 00/100 Dollars ($15,600,000.00), which shall be paid as follows:

(a) $250,000.00 shall be paid by the Buyer within five days of the Buyer's execution of this Agreement as a deposit (the "Initial Deposit") to be held in escrow in an interest-bearing account, with a financial institution located in the State of Rhode Island mutually agreeable to Seller and Buyer, by Mortgage Guarantee & Title Company, 450 Veterans Memorial Parkway, Suite 700, East Providence, RI 02914 (the "Escrow Agent") and such amount plus the interest accrued thereon shall be accounted for at the time of Closing and credited against the Purchase Price, subject to adjustment in accordance with Section 7 hereof; and

(b) Upon the Expiration Date of the Due Diligence Period (defined in Section 16 below), an additional $750,000.00 shall be paid by the Buyer to the Escrow Agent as an "Additional Deposit" (the Additional Deposit and the Initial Deposit shall hereinafter be collectively referred to as the "Deposit"); and

(c) the balance of the Purchase Price shall be paid by the Buyer at the Closing.

The Buyer acknowledges and agrees that, unless Buyer elects to terminate this Agreement on or prior to the Expiration Date of the Due Diligence Period (defined below), the Deposit (and all interest accrued thereon) shall be non-refundable except as otherwise expressly set forth herein.

4. Closing. Unless otherwise extended by written agreement of the parties hereto, the aforesaid Receiver's Deed is to be delivered at the closing which shall be held at the office of the Seller's counsel, 1080 Main Street, Pawtucket, Rhode Island at 10:00 a.m. Upon the earlier of i) ten (10) days written notice from the Buyer to the Seller, or ii) March 28, 2008. (the "Closing"). Subject to any notice and cure periods contained herein, it is agreed that **time is of the essence of this Agreement**. Seller shall pay or cause to be paid at Closing all of Seller's costs and expenses referenced herein, if any. Seller shall be responsible for any real estate transfer taxes customarily paid by Sellers upon the conveyance of real estate in the State of Rhode Island. Any special assessments levied with respect to the Premises as of the Closing shall be paid by the Seller or credited to the Buyer at the Closing; provided, however, if any such special assessment may be paid in installments, the Seller shall be responsible for all installments due and payable prior to the Closing, and the Buyer shall assume and be

responsible for the balance of installments due from and after the Closing. Any special assessments levied with respect to the Premises subsequent to the Closing shall be the sole responsibility of the Buyer (As of the date hereof, Seller is not aware of any pending special assessment that may impact or otherwise effect the Premises).

5. Conditions to Seller's Obligations. The Seller's obligations under this Agreement are subject to and contingent upon the Seller obtaining an order of the United States District Court for the District of Rhode Island which is final with all appeal periods having expired with no timely appeals being taken therefrom, or with any timely appeals being resolved by a final order of a court of competent jurisdiction (such final and non-appealable order is referred to herein as the "Court Order") authorizing the Seller to enter into this Agreement and approving the terms of the sale of the Premises and the sale of approximately forty-one acres of property adjacent to the Premises (the "outparcel") to the City of Warwick for the purchase price of Four Million Four Hundred Thousand Dollars. Seller agrees to use all reasonable best efforts to obtain the Court Order as soon as is practical. In the event that the Court Order has not been obtained on or before December 5, 2007, notwithstanding Seller's reasonable best efforts to do so (the "Court Order Deadline"), the Deposit and all interest accrued thereon shall be returned to the Buyer and this Agreement shall be deemed null and void and of no further effect without recourse to either party except for any provisions that are expressly stated to survive the expiration or other termination of this Agreement. In the event that the Final Court Order is not obtained by the Court Order Deadline due solely to the approval by the Court of a higher offer for the Premises, the Seller shall pay to the Buyer a break-up fee of Five Hundred Thousand Dollars ($500,000.00) (the "Break-up Fee"), immediately following the latter to occur of (a) provision by the Buyer of all due diligence materials pertaining to the Premises in Buyer's possession or control together with an assignment thereof, or (b) the Closing on contract providing for the sale of the Premises to such other buyer and the receipt from such other buyer of the sale proceeds. Any such third party buyer's purchase and sale agreement shall be in the same form as this Agreement, and for a price not less than 110% of the Purchase Price set forth herein. The terms of this Section pertaining to the Break-up Fee shall survive the termination of this Agreement.

In the event the sale of the outparcel to the City of Warwick is not consummated for any reason whatsoever, the Receiver shall have the absolute right to terminate this Agreement and shall have no obligation to sell the Premises. In the event the Receiver terminates the Agreement due to the failure to consummate the sale of the outparcel to the City of Warwick, the Deposit and all interest accrued thereon shall be returned to the Buyer together with reimbursement of the Buyer's due diligence costs up to

$100,000.00 and this Agreement shall be deemed null and void and of no further effect without recourse to either party except for any provisions that are expressly stated to survive the expiration or other termination of this Agreement. Upon payment of the Deposit, all interest and the due diligence costs by the Seller the Buyer shall provide all due diligence materials pertaining to the Premises in Buyer's possession or control together with an assignment thereof to the Seller.

6. Possession. Possession of the Premises shall be delivered to Buyer on the Closing Date free and clear of any and all tenants, occupants, and other parties in interest.

7. No Extended Time for Closing. If Seller shall be unable to deliver title in accordance with Section 21 hereof, or to make conveyance, or to deliver possession of the Premises, all as herein stipulated, or if on the Closing Date the Premises do not conform with the provisions hereof, then, at the Buyer's option, the Deposit (and all interest which has accrued thereon), and any other amounts paid by the Buyer hereunder as a part of the Deposit, shall be forthwith refunded and all other obligations of all parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto unless the Buyer makes the election referred to below.

The Buyer shall have the election to accept such title as the Seller can deliver to the Premises in its then condition and to pay therefor the Purchase Price without deduction, in which case the Seller shall convey such title. Provided that Buyer is not in default under the terms hereof

8. Wetlands Disclosure. All or part of the Premises have or may have previously been determined to be a coastal wetland, bog, fresh water wetland, pond, marsh, riverbank or swamp, as those terms are defined in Chapter 2-1, R.I.G.L., as amended. The foregoing is intended as the disclosure required by said Chapter 2-1 if and to the extent said Chapter is applicable.

9. Use of Purchase Money. To enable Seller to make conveyance as herein provided, Seller may, on the Closing Date, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests provided that all instruments so procured are recorded simultaneously with the recording of said deed or that provision for prompt recording thereof subsequent to the Closing reasonably satisfactory to the parties are made on the Closing Date.

10. Default. If Buyer shall fail to fulfill Buyer's obligations hereunder Seller shall provide written notice of default via facsimile and mail to the Buyer. The Buyer shall have up to the earlier of i) thirty days from the date of said notice, or ii) the last date upon which the Seller and the City of Warwick

may close on the outparcel to cure such default. In the event the Buyer fails to timely cure such default, the Deposit (and all interest accrued thereon) which is to be held in escrow by the Escrow Agent shall be delivered by the Escrow Agent to the Seller and retained by the Seller, as Seller's sole and exclusive remedy of liquidated damages in lieu of any and all other rights and remedies available to Seller at law and in equity other than Seller's right to seek recompense from the Buyer for the cost of remediation of any environmental damage or other property damage to the extent caused by Buyer's possession of the Premises, and the Seller's right to seek damages and equitable relief relative to the terms of this Agreement that specifically survive termination hereof, which rights may be exercised by the Seller in addition to the retention of the Deposit.

In the event the Seller shall be in default hereunder, Buyer shall be entitled to either (i) a return of the Deposit (and all interest accrued thereon) held in escrow by the Escrow Agent or, (ii) to pursue the remedy of specific performance as Buyer's sole and exclusive remedy at law or in equity for such default.

11. Notices. All notices required or permitted to be given hereunder shall be mailed postage prepaid, by registered or certified mail, addressed to the addresses set forth below:

If to Seller:

United States Small Business Administration
Receiver of Moneta Capital Corporation
666 Eleventh Street, N.W., Suite 200
Washington, D.C. 20001
Attn: Stephen Jones

With a copy to:

Shechtman Halperin Savage, LLP
1080 Main Street
Pawtucket, RI 02860
Attn: Thomas E. Carlotto, Esquire

If to Buyer:

Rocky Point Partners, LLC
c/o Leach Family Trust
One Charles Street - Second Floor
Providence, RI 02903
Attn: James H. Leach

With a copy to:

DarrowEverett LLP
One Turks Head Place, Suite 500
Providence, RI 02903
Attn: Zachary G. Darrow, Esq.

12. No Recording. This Agreement may not be recorded in the Records of Land Evidence of the city, town or county wherein the Premises are located. In the event the Buyer records or causes the Agreement to be recorded in violation of the foregoing prohibition, the Buyer, at the Seller's election at any time thereafter, shall conclusively be deemed in default hereunder entitling the Seller to all the remedies provided herein for the Buyer's default including, without limitation, the right to retain the Deposit and all interest which has accrued thereon, if any. In addition, in the event this Agreement is recorded in violation of the foregoing prohibition against recording, the Seller is hereby authorized and empowered as the true and lawful attorney-in-fact for the Buyer to record in said Land Evidence Records an affidavit of the Seller stating that the Seller has elected to hold the Buyer in default hereunder and all third parties may conclusively rely upon the recording by the Seller of such an affidavit as establishing that the Buyer has released to the Seller and no longer has any right, title or interest in and to this Agreement or the Premises and this Agreement will be deemed terminated and discharged of record with the same force and effect as if it had never been recorded. The foregoing power of attorney shall be deemed irrevocable and coupled with an interest. The Buyer further agrees to execute, acknowledge and deliver, in recordable form, any further documents, assurances or instruments as the Seller may request (following Buyer's default and the termination of Buyer's rights hereunder) in order to further confirm that the Buyer no longer has any right, title or interest in and to this Agreement or the Premises and in the event that the Buyer refuses or fails to forthwith execute same, the Seller is hereby appointed the true and lawful attorney-in-fact as aforesaid of the Buyer to execute same, which power of attorney shall be deemed irrevocable and coupled with an interest. Notwithstanding the foregoing, upon the request of the Buyer, the Seller shall execute and deliver to the Buyer a Memorandum of Agreement in recordable form satisfactory to Seller, which Memorandum of Agreement may be recorded in the Land Evidence Records for the City of Warwick and County of Kent, Rhode Island. Any such Memorandum of Agreement shall include, *inter alia*, a provision appointing Seller as Buyer's true and lawful attorney-in-fact for the purpose of executing a Memorandum of Termination of Agreement in the event this Agreement expires or is terminated. The foregoing power of attorney shall be deemed irrevocable and coupled with an interest.

13. Court Approval. This Agreement is contingent upon the

approval of its terms by the federal court referenced in Section 5 hereof in connection with the Receivership of Moneta Capital Corporation ("Receivership").

14. Seller's Closing Deliveries. The Seller hereby agrees to deliver to the Escrow Agent the following documents at or before the Closing:

(a) A certified copy of the Court Order;

(b) The Receiver's Deed referred to in Section 2 hereof;

(c) All documents reasonably required to comply with the provisions of the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"); and

(d) Such other documentation as is reasonably and customarily required by Buyer and Buyer's title insurance company in the case of a sale of real estate by a Receiver.

Items (a) - (d) are sometimes collectively referred to herein as the "Closing Deliveries".

15. Buyer's Closing Deliveries. The Buyer agrees to deliver the following to the Seller on or before the Closing

(a) Copies of the organizational documents of Buyer, certified by the Secretary of State of organization;

(b) Evidence of authority and incumbency;

(c) Settlement statement;

(d) Payment of the Purchase Price.

The cost of recording the documents called for in this Agreement shall be paid for by the Buyer.

16. Due Diligence Period; Buyer's Access, Indemnity; Prohibition Against Liens.

(a) From and after the effective date of this Agreement, and subject to the terms and conditions of subsection 16(b) below, Buyer shall have the right to undertake such investigations of the Property as Buyer deems appropriate. If, on or prior to the date (such date being the "Expiration Date of the Due Diligence Period") which shall be 90 days following the court

approval described in Section 13 and elsewhere herein, Buyer shall have the right in Buyer's sole and absolute discretion to terminate this Agreement upon written notice to Seller for any reason. Upon exercise of such termination right, the Deposit shall be returned to Buyer, this Agreement shall terminate, and the parties shall have no further rights or liabilities hereunder except for such matters which are expressly stated to survive hereunder.

(b) Buyer and its agents, contractors, and invitees shall be afforded access to the Premises at all times during the pendency of this Agreement. Buyer may perform or cause to be performed, at Buyer's sole cost and expense except as otherwise expressly set forth herein, tests, inspections, environmental audits and surveys of the Premises at all reasonable times prior to the Closing, including, without limitation, a Phase I Environmental Site Assessment and a Phase II Environmental Site Assessment (collectively, the "Environmental Site Assessments"). The Buyer shall promptly repair any damage to the Premises caused by the Buyer's activities in connection with this Agreement, and the Buyer agrees to indemnify, defend and hold the Seller harmless from and against any and all claims, demands, actions, causes of action or other liabilities arising out of or in connection with the Buyer's activities under this Agreement. Buyer shall prevent the placement or attachment of any mechanic's, materialman's, laborer's or other lien on the Premises arising out of or resulting from this Agreement and shall indemnify and hold harmless the Seller from and against any damages, losses, costs or liabilities connected therewith, and shall immediately discharge or bond any such lien that may be so placed or attached against the Premises. Buyer hereby agrees to indemnify and save harmless the Seller from and against all claims of whatever nature arising from any act, omission, or negligence of the Buyer or the Buyer's contractors, licensees, agents, servants or employees or arising from any accident, damage or injury whatsoever caused to any person or to the property of any person, or from any violation of any applicable law in or about the premises, or arising from any accident, where such accident, damage, injury or violation results or is claimed to have resulted from an act or omission on the part of Buyer or Buyer's contractors, licensees, agents, servants or employees. The foregoing indemnification shall include indemnity against all costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof, including, without limitation, attorneys' fees. The provisions of this

Section 16 shall survive the Closing and any termination of this Agreement.

17. FIRPTA. The Seller represents to the Buyer that FIRPTA withholding is not required.

18. Risk of Loss; Insurance Requirements. The risk of loss shall be borne by the Seller and the Seller shall maintain liability insurance through the date of the Closing. In the event of any damage and/or condemnation of the Premises, the Buyer shall remain obligated to purchase the Premises pursuant to the terms of this Agreement without reduction in the Purchase Price, provided, however, any insurance proceeds paid or payable in connection with any such damage or closing shall be paid and/or assigned to Buyer at Closing.

19. Escrow Agent. The Escrow Agent, by executing this Agreement, acknowledges receipt of the Deposit paid by the Buyer to be held under the terms hereof. The Escrow Agent agrees to hold, keep and deliver the Deposit and all other sums delivered to it pursuant hereto in accordance with the terms and provisions of this Agreement. The Escrow Agent shall not be entitled to any fees or compensation for its services hereunder. The Escrow Agent shall be liable only to hold said sums and deliver the same to the parties named herein in accordance with the provisions of this Agreement, it being expressly understood that by acceptance of this Agreement the Escrow Agent is acting in the capacity of a depository only and shall not be liable or responsible to anyone for any damages, losses or expenses unless same shall have been caused by the negligence or willful malfeasance of the Escrow Agent. In the event of any disagreement among the parties to this Agreement, or among them or any of them and any other party resulting in any adverse claims and demands being made in connection with or for the monies involved herein or affected hereby, the Escrow Agent shall be entitled to refuse to comply with any such claims or demands so long as such disagreement may continue; and in so refusing the Escrow Agent shall make no delivery or other disposition of any of the monies then held by it under the terms of this Agreement and in so doing the Escrow Agent shall not become liable to anyone for such refusal; the Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of the adverse claimants shall have been finally settled by the Federal District Court for the District of Rhode Island, or (b) all differences shall have been adjusted by agreement between or among the parties and the Escrow Agent shall have been notified in writing of such agreement signed by the parties hereto. Further, the Escrow Agent shall have the right at all times to pay all sums held by it (i) to the appropriate party under the terms hereof, or (ii) into any court of competent jurisdiction after a dispute between or among the parties hereto has arisen, whereupon Escrow Agent's obligations hereunder shall terminate.

20. AS-IS. Except as otherwise expressly set forth herein, the Buyer acknowledges and agrees that the Premises are being sold in their "AS IS" and "WHERE IS" condition and "WITH ALL FAULTS". Notwithstanding anything contained in this Agreement to the contrary or which might be construed to the contrary, the Buyer acknowledges and agrees that the Buyer has not been influenced to enter into this transaction nor is the Buyer relying upon any representations, warranties or other statements, whether verbal or in writing, in connection with the Premises and the transactions contemplated hereunder except as otherwise expressly set forth herein, and the Buyer further acknowledges and agrees that the Buyer is relying solely upon its own independent inspection and examination of the Premises, title to same and economic matters and as to whether the Premises or any use thereof is or would be in compliance with any and all applicable laws, ordinances and regulations including, without limitation, zoning, building codes or other laws, ordinances or regulations. Without limiting the generality of the foregoing, Seller shall not be obligated to perform any environmental remediation or demolition at the Premises nor shall Buyer be entitled to any credits or offsets for any costs related thereto. In addition, any verbal or written statement or other information or materials supplied or alleged to have been supplied to the Buyer on behalf of the Seller shall be deemed to have been supplied or made available to the Buyer for informational purposes only and the Buyer may make whatever use of such information and materials the Buyer deems appropriate.

21. Title Insurance and Title Examination. The Buyer shall promptly cause title to the Premises to be examined and Buyer shall cause an owner's title insurance commitment in the amount of the purchase price ("Commitment") to be issued by a title insurance company licensed to do business in the State of Rhode Island and delivered to Buyer at Buyer's sole cost and expense within sixty (60) days following the date of this Agreement. On or before 5:00 p.m. on the fifth(5th) day following the hereinafter defined Survey Completion Deadline, Buyer shall notify Seller in writing of any objection to the items disclosed on the Commitment, together with a copy of said Commitment and (if available) legible copies of any exceptions to title to which Buyer objects. Seller shall have up to the date of Closing to cure the same at Seller's option, but without obligation to do so except that Seller shall be obligated at Closing to cure any such title objections which are monetary in nature (such as delinquent taxes, assessments, interest and/or penalties, tax liens, mechanics' liens, provided that such matters were not caused or created by Buyer, Buyer's agents and/or consultants and mortgage indebtedness) which may be removed by the Seller's tender of a specific ascertainable amount of money ("Monetary Title Exceptions") and any record claims. If the objections, other than the Monetary Title Exceptions which Seller shall cure at Closing, are not satisfied within such time period, Buyer may (a) terminate this Agreement and receive a refund of the Deposit together with all interest accrued thereon and in such event, neither party

shall have any further rights or obligations under this Agreement other than as stated in this Agreement, or (b) waive the unsatisfied objection and close this transaction without adjustment to the Purchase Price with respect to such objection. If Seller is not given timely written notice that Buyer is terminating the Agreement within the specified time period by reason of any title objection, than any such title objections shall be deemed as waived by the Buyer. Seller agrees not to further encumber the Premises during the pendency of this Agreement.

22. Survey. , Buyer shall obtain a Class I ALTA survey of the Premises incorporating a delineation of all wetlands on the Premises (the "Survey") by a Registered Land Surveyor in the State of Rhode Island at Buyer's sole cost and expense, with said Survey to be certified to Buyer and the title insurance company referenced herein. On or before December 10, 2007 (the "Survey Completion Deadline"), the Buyer shall provide to the Seller the Surveyor's proposed legal description for the Premises together with a copy of the Survey. Within five (5) days thereafter, the Seller shall notify the Buyer in writing of any matters the Seller reasonably determines are unacceptable in said legal description. In the event the Seller shall fail to timely notify the Buyer in writing of the unacceptability of the legal description, Seller shall be conclusively deemed satisfied with the legal description of the Premises. In the event the parties are unable to agree upon a legal description after notice from the Seller, this Contract shall be deemed terminated as of the date provided for the Closing and Buyer shall receive a refund of the Deposit together with all interest accrued thereon. Contemporaneously with the provision of the legal description, the Buyer shall notify the Seller in writing of any matters reflected in the Survey which the Buyer reasonably determines are unacceptable to Buyer because such matters will adversely and materially affect Buyer's ability to develop and sell the Premises in accordance with its development and business plans therefor. In the event the Buyer does not accept the Survey and provides the written notice provided hereinabove to Seller on a timely basis, then, subject to the parties' respective rights to elect to cure and/or waive as set forth in the preceding Section 21, this Contract shall be deemed as terminated and Buyer shall receive a refund of the Deposit together with all interest accrued thereon. In the event the Buyer shall fail to timely notify the Seller in writing of any such unacceptable Survey matters, Buyer will be conclusively deemed satisfied with the Survey of the Premises and all conditions shown thereon as of the date of the Survey. The Buyer shall have the right to obtain and use any and all materials owned by the Seller by virtue of that certain assignment given by Vanderbilt Capital, LLC and Toll Brothers relating to a survey completed by Garafolo & Associates, Inc.

23. Attorneys Fees. In the event of any default hereunder, the non-defaulting party may recover from the defaulting party all

reasonable attorneys fees incurred in enforcing the terms of this Agreement.

24. Successors and Assigns. The Buyer shall not assign, transfer or convey all or any portion of the Buyer's rights and/or obligations under this Agreement without the prior written consent of the Seller, which consent may be given or withheld in the sole and absolute discretion of the Seller. Notwithstanding the foregoing, Buyer shall have the right without consent of Seller to take title at Closing in the name of any entity in which either James H. Leach or Robert N. Dale is a partner, member, shareholder or principal.

25. Entire Agreement; Modification of Agreement. This Agreement may not be amended or modified except pursuant to a written instrument executed by both Buyer and Seller. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and is subject to no other understandings, conditions or agreements other than those expressly contained herein.

26. Governing Law. The parties further agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island.

27. No Brokerage. Each party represents to the other that such party has not dealt with any real estate broker or agent with respect to the Premises and hereby agrees to indemnify each other party from any claims made by any such agent or broker claiming to have dealt with such indemnifying party. The aforesaid indemnification shall survive the Closing Date and the delivery of the deed.

28. Merger in the Deed. The acceptance of a deed by the Buyer shall be deemed full performance and satisfaction of all obligations of the Seller under this Agreement except for those provisions which are stated to expressly survive the Closing.

29. No Financial Assistance. The Buyer acknowledges and agrees that the City of Warwick has no obligation to make City financial assistance available to the Buyer in connection with the development of the Premises.

30. Financial Condition. Promptly upon the written request of the Seller, the Buyer shall provide such written information as may reasonably be required to satisfy the Seller that the Buyer has the financial capacity to consummate the purchase of the Premises.

31. Conveyance of Assessor's Plat 379, Lot 159. The Seller shall, at its sole cost and expense, obtain a Class 1 ALTA survey of Assessor's Plat 379, Lot 159 (the "Perry Lot"). In the event that such survey confirms that the Perry Lot is a part of the real

estate described on Exhibit A, but is not contiguous with the balance of the real estate described on Exhibit A, then notwithstanding anything contained herein, at the Closing, if the Perry Lot can be conveyed apart from the balance of the real estate described on Exhibit A in accordance with all applicable rules, laws and ordinances, the Seller shall convey via Receiver's Deed in its AS-IS condition with no representations or warranties except disclosures required by applicable law, which disclosures shall be limited to Seller's knowledge, that certain land designated as Assessor's Plat 379, Lot 159 to Kenneth J. Perry as the Buyer's nominee. The purchase price to be paid by Kenneth J. Perry for Assessor's Plat 379, Lot 159 shall be an amount equal to the average of three appraisals to be prepared by three (3) appraisers mutually acceptable to Buyer and Kenneth J. Perry to be obtained at the expense of Kenneth J. Perry prior to entry of the Court Order by Seller. The purchase price for the Perry Lot and a general release in form and substance reasonably satisfactory to Buyer shall be delivered to the Buyer at the Closing, and the Buyer shall remain responsible for the payment of the entire Purchase Price to Seller.

32. Operational Costs: Upon the Expiration Date of the Due Diligence Period, the Buyer shall pay all taxes, utilities and insurance expenses (the "Operational Costs"), in an amount not to exceed $1,650.00 per day, accrued from January 1, 2008 through said Expiration Date and shall thereafter pay the sum of $49,500.00 on the 15th of each month through the Closing Date. The Operational Costs shall be adjusted at Closing with the Buyer responsible for any Operational Costs accrued for the period from January 1, 2008 through the Closing in excess of the payments made by the Buyer under this Section 32. The Buyer shall receive a credit at Closing for any amounts paid as Operational Costs, which exceed the actual Operational Costs accrued from January 1, 2008 through the date of the Closing. In the event the Receiver terminates the Agreement due to the failure to consummate the sale of the outparcel to the City of Warwick, the Operational Costs paid by the Buyer shall be returned to the Buyer.

33. Counterparts: This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same Agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

**IN WITNESS WHEREOF** this Agreement has been executed as a sealed instrument the day and year first set forth above.

WITNESS:

______________________

Buyer:

By: ______________________

Seller:

United States Small Business Administration, as and only as Receiver of Moneta Capital Corporation

WITNESS:

______________________

By: ______________________
Name: Thomas G. Morris
Title: Dir, office of SBIC Liquidation

Escrow Agent:

By: ______________________

IN WITNESS WHEREOF this Agreement has been executed as a sealed instrument the day and year first set forth above.

WITNESS:

______________________________

Buyer:

By: ______________________________
James H. Leach
Managing Director

Seller:

United States Small Business Administration, as and only as Receiver of Moneta Capital Corporation

WITNESS:

______________________________

By: ______________________________
Name: ____________________________
Title: ___________________________

Escrow Agent:

By: ______________________________

# EXHIBIT A
# ROCKY POINT PARTNERS, LLC
# PURCHASE AND SALE
# AGREEMENT

EXHIBIT A

Parcel I:

That parcel of land, situated on the easterly side of Palmer Avenue in the City of Warwick in the State of Rhode Island, bounded and described as follows:
Beginning at a point in the southerly line of land now or lately of Alfred F. Varone, said point being approximately fourteen hundred and fifty (1450') feet easterly from the easterly line of Palmer Avenue; thence turning an angle of 90° and running northerly bounded westerly by other land of this grantor, a distance of one hundred and seventy-five (175') to a point; thence turning an interior angle of 90° and running easterly still bounded northerly by other land of this grantor to the high water mark of Narragansett Bay; thence turning and running generally southerly along said high water mark of Narragansett Bay to the northerly line of land owned by Rocky Point Amusement Park, Inc., thence turning and running westerly, bounded southerly by said land owned by Rocky Point Amusement Park, Inc., a distance of five hundred and fifty (550') more or less to the point and place of beginning. Meaning and intending to convey a parcel of land containing 2.21 acres more or less.

PARCEL II:

That parcel of land, situated on the easterly side of Palmer Avenue in the City of Warwick in the State of Rhode Island, Bounded and described as follows: Beginning at a point in the easterly line of Palmer Avenue at the northwesterly corner of land now or lately of Vincent Ferla and the southwesterly corner of said parcel; thence easterly bounding southerly on the last mentioned land nine hundred twenty-six and 2/10 (926.2) feet to a stone bound set in the ground; thence continuing easterly bounding southerly on said Ferla land to Narragansett Bay; thence northerly bounding easterly on Narragansett Bay to land now or lately of Mary Blatty; thence westerly bounding northerly in part on the last named land, in part on a street, in part on land now or lately of Harry A. Stowell, Jr. and wife, in part on land now or lately of Mary J. McGovern et al. in part on land now or lately of Robert Kindley Estate, in part on land now or lately of Samie Shaken, in part on land now or lately of Theodore C. Kanelos and wife, in part on land now or lately of Helma C. Evans, in part on land now or lately of Wilmer T. Cudworth and wife, in part on land now or lately of Francis Chapman and wife, in part on land now or lately of John E. Goulding and wife, in part on land now or lately of Annie Vesey et al., in part on land now or lately of John J. Callan and wife, in part on land now or lately of Frank Acella, in part on land now or lately of Walter E. Marshall, in part on land now or lately of Margaret Marshall et al., in part on land now or lately of Dumenico Buccini et al., in part on land now or lately of Ovid Monacelli et al., in part on land now or lately of Domenic Ballettio, in part on land now or lately of Erminio Fascitelli et al., in part on land now or lately of Angelo Caputo and wife and in part on land now or lately of Armen H. Johnson about sixteen hundred eighty (1680) feet to Palmer Avenue; thence southerly bounding westerly on Palmer Avenue seven hundred thirty two (732) feet, more or less, to said Ferla land and the point and place of beginning; BUT EXCEPTING THEREFROM Parcel I described above.

Parcels I and II are conveyed together with all right, title and interest of the grantor in and to any buildings and improvements located on the hereinabove described premises, but subject to all right, title and interest of others in and to buildings and improvements located on the said premises.

Exhibit A

PARCEL III

That certain tract of land, with all buildings and improvements thereon, situated at the easterly ends of Rocky Point Avenue and Aldrich Avenue and on the easterly side of Palmer Avenue in the City of Warwick and State of Rhode Island, bounded and described as follows:

Beginning at the most southwesterly corner of said tract, being the southeasterly corner of land formerly of Stuart M. Aldrich, now or lately of the Estate of Martha L. A. Hoge, also being a point in the northwesterly shore line of Narragansett Bay;

thence generally northeasterly, northerly and northwesterly, bounding on Narragansett Bay, to land formerly of Jessica M. Fournier et al, now or lately of Rocky Beach Corporation;

thence southwesterly bounding northwesterly on said Fournier land to land now or lately of Rhode Island Suburban Railway Company;

thence generally southeasterly, westerly and northwesterly bounding on the last mentioned land to other land formerly of said Jessica M. Fournier and now or lately of said Rocky Beach Corporation;

thence southwesterly bounding northwesterly on the last mentioned land to Palmer Avenue, so-called, formerly called Rocky Point Road;

thence southerly bounding westerly on Palmer Avenue in part, in part on land formerly of Nicola Caldarone, now or lately of Thomas A. Scotti and wife, and in part on the Fountain Lot, so-called, to land formerly of said Stuart M. Aldrich, now or lately of said Estate of Martha L. A. Hoge;

thence generally southeasterly bounding generally southwesterly on said land of said Hoge Estate in part, in part on Aldrich Avenue and in part on the first mentioned land of said Hoge Estate to Narragansett Bay at the point and place of beginning.

ALSO the Fountain Lot, so-called, and a narrow strip of land leading thereto, bounding easterly on the tract hereinbefore described and southerly on said Hoge Estate land.

ALSO all of the grantor's right, title and interest in and to the land formerly occupied by said Rhode Island Suburban Railway Company adjoining said tract.

Together with all the grantor's riparian rights, privileges and appurtenances.

PARCEL IV

That certain tract or parcel of land with all the buildings and improvements thereon, situated in the City of Warwick, County of Kent, State of Rhode Island bounded and described as follows:

Beginning at a point in the southerly line of Rocky Point Avenue, which said point is three hundred (300) feet westerly of a stone bound set in the ground at the southwestly corner of Rocky Point Avenue and Palmer Avenue, said point of beginning being the northeasterly corner of land now or lately of Conrad and Anita Ferla, and is the northwesterly corner of the within described parcel; thence running southerly bounding westerly on said Ferla land a distance of three hundred fifty-eight and 37/100 (358.37) feet to land now or lately of Rocky Point Amusements, Inc.; thence turning and running easterly bounding southerly on said last-named land two hundred ninety-two and 3/10 (292.3) feet to other land of Rocky Point Amusements, Inc.; thence turning and running northerly bounding easterly on said last-named land one hundred seventy (170) feet, more or less, to the southerly terminus of Palmer Avenue; thence turning and running westerly bounding northerly on said terminus of Palmer Avenue to the westerly line of Palmer Avenue; thence turning and running northerly bounding easterly on said Palmer Avenue, one hundred seventy (170) feet, more or less, to said Rocky Point Avenue; thence turning and running westerly bounding northerly on said Rocky Point Avenue three hundred (300) feet to land now or lately of Conrad and Anita Ferla and the point and place of beginning.

Exhibit A

PARCEL V

That certain parcel of land situated at the intersection of Palmer Avenue and Rocky Point Avenue in the City of Warwick, County of Kent, State of Rhode Island, bounded and described as follows:

Beginning at a point, said point being the intersection of the westerly line of Palmer Avenue and the northerly line of Rocky Point Avenue; thence running northerly bounding easterly on Palmer Avenue, One hundred fifty-eight and 2/10 (158.2) feet to land now or lately of Vincent Morelli et ux; thence running westerly bounding northerly on said last named land, Two hundred forty-nine and 03/100 (249.03) feet to land now or lately of Richard L. Greene et ux; thence southerly bounding westerly on said Greene land, One hundred sixty-three (163) feet more or less to Rocky Point Avenue; thence easterly bounding southerly on Rocky Point Avenue, Two hundred fifty (250) feet more or less to Palmer Avenue at the point and place of beginning.

PARCEL VI

That certain parcel of land with all buildings and improvements thereon, situated in the City of Warwick, County of Kent and State of Rhode Island and bounded and described as follows:

Beginning at a point in the southerly line of Rocky Point Avenue, which said point is three hundred (300) feet westerly along the southerly line of Rocky Point Avenue from a stone bound set in the ground at the southwesterly corner of Rocky Point Avenue and Palmer Avenue, said point being the point of beginning, thence continuing westerly along the southerly line of Rocky Point Avenue a distance of four hundred three and 30/100 (403.30) feet to a point in the southerly line of Rocky Point Avenue, thence turning an angle of 90° with said avenue and running southerly in a straight line a distance of one hundred fifty two and 88/100 (152.88) feet to a tangent point of a curve thence running south and southeasterly on a curved line with an arc distance of one hundred seven and 99/100 (107.99) feet and a radius of seventy-five (75) feet to another tangent point and end of curve in said line, thence running easterly slightly southerly in a straight line a distance of fifty two and 64/100 (52.64) feet to a corner, thence turning an interior angle of 262° and 26' with last mentioned line and running southerly in a straight line one hundred twenty four and 29/100 (124.29) feet to a point in the northerly line of a narrow strip of land reserved for a water channel, thence turning an interior angle of 89° 58' and running easterly in a straight line along said water channel a distance of two hundred ninety three and 77/100 (293.77) feet, thence turning an interior angle of 88° 47' and running northerly in a straight line a distance of three hundred fifty eight and 37/100 (358.37) feet to Rocky Point Avenue and the point and place of beginning, said last line forming an interior angle of 91° 15' with Rocky Point Avenue and containing 129,704 square feet more or less.

Subject to a right of way over the westerly and southwesterly portion (of land) fifty (50) feet wide from Rocky Point Avenue and fifty two and 64/100 (52.64) feet easterly from the last point of tangent as set forth in prior deeds of record.

Exhibit A

PARCEL VII

That certain tract or parcel of land with all buildings and improvements thereon, situated on the northerly side of Aldrich Avenue in the City of Warwick, County of Kent, State of Rhode Island, bounded and described as follows:

Beginning at an iron pipe set in the northerly line of Aldrich Avenue at the southeast corner of lot seven (7) on that plat entitled "Plan of Land for David F. LaRoche Warwick, R.I. June, 1982 Scale 1" = 100' Bristol Associates" said plat being recorded in the Records of Land Evidence of said City of Warwick in File 2, Drawer 2, Card 82-2695, and said point of beginning also being the southwesterly corner of the parcel herein conveyed and a point in the arc of a curve being the northerly and northeasterly line of Aldrich Avenue having a radius of one hundred sixty and 00/100 (160.00) feet and a central angle of 128° 21' 34"; thence running easterly and southeasterly in the arc of said curve in the northerly and northeasterly line of Aldrich Avenue two hundred eight and 45/100 (208.45) feet, more or less, to the point of tangency of the reverse curve having a radius of two hundred twenty-five and 20/100 (225.20) feet and a central angle of 20° 28' 00"; thence running southeasterly in the arc of said last described curve, being the northeasterly line of Aldrich Avenue eighty and 44/100 (80.44) feet to the point of tangency of said curve; thence running southeasterly in the northeasterly line of Aldrich Avenue forty-one and 44/100 (41.44) feet to the point of curvature of a curve having a radius of one hundred seventy-seven and 50/100 (177.50) feet and a central angle of 69° 32' 00"; thence running southeasterly and easterly in the arc of said curve being the northeasterly and northerly line of Aldrich Avenue two hundred fifteen and 41/100 (215.41) feet to the point of tangency of said curve; thence running easterly in the northerly line of Aldrich Avenue thirty and 00/100 (30) feet to the point of curvature of a curve having a radius of one hundred nineteen and 79/100 (119.79) feet and a central angle of 36° 55' 44"; thence running northeasterly in the arc of said curve being the northwesterly line of Aldrich Avenue seventy-seven and 21/100 (77.21) feet to the point of tangency of said curve; thence running northeasterly in the northwesterly line of Aldrich Avenue three hundred forty-seven and 80/100 (347.80) feet to an angle point in the said road; thence turning an interior angle of 197° and running northeasterly in the northwesterly line of Aldrich Avenue one hundred thirty-four and 25/100 (134.25) feet to a point: said point being the southeasterly corner of the hereindescribed parcel and being in the southwesterly line of land now or formerly owned by Rocky Point Amusements, Inc.; thence turning an interior angle of 84° 27' 15" and running northwesterly bounding northeasterly on said Rocky Point Amusements, Inc. land four hundred twenty-one and 87/100 (421.87) feet to an angle point; thence turning an interior angle of 206° 15' 00" and running northerly bounding easterly on said Rocky Point Amusements, Inc. land one hundred eighty-four and 80/100 (184.80) feet to a point at the northeasterly corner of the hereindescribed parcel; thence turning an interior angle of 83° 45' 00" and running westerly bounding northerly on a strip of land twenty (20) feet in width owned by Rocky Point Amusements, Inc., two hundred ninety-two (292) feet to an angle point; thence turning an interior angle of 184° and running westerly still bounding northerly on said twenty (20) foot strip to the northeasterly corner of lot seven (7) on the above-referenced David F. LaRoche plat, said point also being the northwesterly corner of the herein conveyed parcel; thence turning an interior angle of 90° 38' 28" and running southerly bounding westerly on said lot seven (7) on David F. LaRoche plat four hundred twenty-three and 92/100 (423.92) feet, more or less, to Aldrich Avenue and the point and place of beginning.

Subject to and with the benefit of all restrictions, conditions, privileges and rights-of-way of record.

Exhibit A

Parcel VIII

That certain parcel of land with all buildings and improvements thereon situated on the westerly side of Palmer Avenue and the southerly side of Boylston Street in the City of Warwick and State of Rhode Island, bounded and described as follows:

Beginning at the intersection of the southerly line of Boylston Street with the westerly line of Palmer Avenue at the northeasterly corner of the herein described parcel;

Thence southerly bounded easterly on said Palmer Avenue one hundred twenty two and 36/100 (122.36) feet to the southerly line of a ten foot driftway laid out and delineated on a plat entitled: "Plat of the Subdivision of lots on the Rosalind Plat Recorded in Plat Book 4 page 6 Warwick Records Numbered 256, 257, 258, 259, 260 Belonging to John M. Colavecchio Scale 40 ft per inch By Richard W. Greene Jan 1924" which plat is recorded in the Records of Land Evidence in said City of Warwick on Plat Card 332;

Thence westerly along the southerly line of said driftway one hundred eighteen and 03/100 (118.03) feet to the northwesterly corner of Lot No. 1 on said plat;

Thence turning an interior angle of 90° and running northerly bounded westerly on land now or lately of John R. Finegan and Mildred A. Finegan one hundred and twenty (120) feet to the southerly line of Boylston Street;

Thence easterly bounded northerly on said Boylston Street one hundred sixty two and 01/100 (162.01) feet to Palmer Avenue at the point and place of beginning.

Said parcel comprises Lots Nos. five (5), six (6), and seven (7) on the plat referred to above together with the ten foot driftway. Said premises are also described as Lots Nos. 257, 259, and 260 on "The Rosalind Warwick, R.I. Shedd and Sarle Engineers 1898" recorded in Plat Book 4 at page 6 and (copy) on Plat Card 186.

Said premises are conveyed subject to the rights of others to use said ten foot driftway.

# EXHIBIT B
# ROCKY POINT PARTNERS, LLC
# PURCHASE AND SALE
# AGREEMENT


PRISCILLA
CHAPIN
BRINTON
STANDISH
BURNETT
MEADOW VIEW
CONCORD
CLIFF
SURF
RIDGE
CHANNING
SABLE
CAMP
OGDEN
WILTON
WEST
PALMER
ROCKY BEACH
5 Acres
BOYLSTON
MEDFORD
10 Acres
ROCKY POINT
26 Acres
Subject Property
41 Acres Total
ALDRICH
TEA HOUSE
1:6,000

# EXHIBIT 2
# AFFIDAVIT OF THOMAS G. MORRIS

# PURCHASE AND SALE AGREEMENT

1. SALES AGREEMENT: This agreement ("Agreement") is made and entered into as of this 7th day of August, 2007, by and among the U.S. SMALL BUSINESS ADMINSTRATION, as and only as Receiver for Moneta Capital Corporation ("Seller"), with its principal office involving this transaction located at 409 3rd Street, S.W., 7th Floor, Washington, D.C. 20416, by and through its duly authorized agent, the CITY OF WARWICK, a duly organized and validly existing municipal corporation under the laws of the State of Rhode Island, whose mailing address is 3275 Post Road, Warwick, Rhode Island 02886 ("Buyer"). The Seller agrees to SELL and the Buyer to BUY, upon the price and terms set forth herein, the property located in Warwick, Rhode Island, as shown and described in Exhibit A, attached hereto. The legal description shall be determined by the Survey, as defined herein, and shall replace the delineation contained on Exhibit A (the "Property"").

2. CONDITIONS PRECEDENT : **This Agreement is subject to and wholly conditional upon: (a) consummation of the sale of all remaining acreage owned by Seller adjacent to the Property on or before September 15, 2007; (b) approval by the United States District Court for the District of Rhode Island; (c) approval of the City Council of the City of Warwick; (d) funding requirements as set forth in paragraph 6 herein and (e) final approval of the subdivision of the Property from the appropriate local authorities under all applicable subdivision and land development ordinances and regulations. Buyer shall prepare, file and diligently prosecute the required City Council approval and subdivision and land development application at Buyer's sole cost and expense.**

3. PURCHASE PRICE: The Purchase Price for the Property is FOUR MILLION FOUR HUNDRED THOUSAND DOLLARS ($4,400,000.00). No deposit is required from the Buyer upon their execution of this Agreement.

4. CLOSING DATE/PLACE: Closing is to be held on or before September 15, 2007. The Closing shall occur at the office of the City Clerk of the City of Warwick or at such other time and place as may be agreed to by the parties. The Purchase Price shall be paid by cash, certified check, wire transfer, and/or bank check in the amount of FOUR MILLION FOUR HUNDRED

THOUSAND DOLLARS ($4,400,000.00). Payment of the Purchase Price and delivery of deed shall occur at the Closing.

5. SURVEY: The Buyer shall promptly obtain a Class I ALTA survey of the Property (the "Survey") to be completed by a Registered Land Surveyor in the State of Rhode Island at Buyer's sole cost and expense, with said Survey to be certified to Buyer.

6. **GRANT / FUNDING CONTINGENCY: This Agreement is specifically contingent upon Buyer's ability to obtain grant funding in the amount of not less than TWO MILLION TWO HUNDRED THOUSAND DOLLARS ($2,200,00.00) from the National Oceanic & Atmospheric Administration, U.S. Department of Commerce and ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000.00) from the State of Rhode Island at or prior to the Closing. Other sources willing and able to participate in providing the Buyer with said grant funding to consummate this transaction may be identified and/or used subsequent to the execution of this Agreement to meet this grant funding contingency. The remaining EIGHT-HUNDRED THOUSAND DOLLARS ($800,000.00) balance of the purchase price is the responsibility of the Buyer.**

7. INSURANCE/RISK OF LOSS: Seller shall remain responsible for any losses and/or claims related to the Property which may occur during the pendency of this Agreement.

8. PRESERVATION OF PROPERTY. Seller agrees that the Property herein described shall remain as it now is until closing, and that Seller will prevent and refrain from any use of the Property for any purpose or in any manner that would adversely affect the Buyer's intended use of the property. Specifically, but without limitation, Seller shall make no alterations to any improvements, timber resources, other vegetation, topography, wetlands or watercourses, or other natural resources. In the event of such actions, the Buyer may, without liability, either (a) refuse to accept the conveyance of title to the Property, in which case all monies deposited under this Agreement shall be promptly refunded, or (b) the Buyer may elect to accept conveyance of title

to the Property or a portion thereof, in which case there may be an equitable adjustment of the purchase price based on the change in circumstances.

9. TITLE: Seller shall deliver to Buyer a good and marketable title to the Property, free and clear of all defects and encumbrances, except easements and restrictions of record, if any, that do not materially interfere with the Buyer's intended use of the Property. Title to the property shall be transferred from the Seller to the Buyer by receiver's deed from the Seller as full performance of Seller's obligations hereunder and in consideration of payment of the Purchase Price in full. Buyer may conduct, or cause to be conducted, an examination of title to the Property at Buyer's sole expense prior to the Closing. Buyer shall notify Seller in writing of any defects in the title disclosed by such examination at least forty-five (45) days in advance of the Closing. If Seller, at Seller's sole discretion, is unable or unwilling to remove such defects, Seller will notify Buyer of such decision in writing Buyer at least thirty (30) days in advance of the Closing date, in which event Buyer shall have the option to: (a) accept such title as Seller is able or willing to convey without abatement or reduction of the Purchase Price; or (b) cancel this Agreement by written notice to Seller prior to the Closing. The Property will be conveyed to the Buyer by the Seller, conveying all of Seller's interest, in and to the Property, subject to easements, and restrictions of record, if any.

10. TAXES, ADJUSTMENTS, OTHER ASSESSMENTS:

All taxes, assessments, and encumbrances (including agricultural transfer taxes and other rollback taxes incurred as a result of a preferential tax assessment program, but excluding real estate taxes for the then current fiscal year) that may be a lien against the Property at the time of conveyance to the Buyer shall be satisfied of record by Seller at or before the transfer of title. Real estate taxes not yet a lien (if any) will be prorated as of the date of closing. Seller shall pay any transfer, conveyance, recordation or documentary revenue stamp tax, assessment or charge. To enable Seller to make conveyance as herein provided, Seller may, on the Closing Date, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests provided that all instruments so procured are recorded simultaneously with the recording of said

deed or that provision for prompt recording thereof subsequent to the Closing reasonably satisfactory to the parties are made on the Closing Date.

11. BUYERS/SELLER INFORMATION:

(a) Ordinances: Buyers of real estate in the State of Rhode Island are legally obligated to comply with all local real estate ordinances; including, but not limited to, ordinances on the number of unrelated persons who may legally reside in a dwelling, as well as ordinances on the number of dwelling units permitted under the local zoning ordinances.

(b) Wetlands: All or part of the Property has or may have previously been determined to be a coastal wetland, bog, fresh water wetland, pond, marsh, riverbank or swamp, as those terms are defined in Chapter 2-1, R.I.G.L., as amended. The foregoing is intended as the disclosure required by said Chapter 2-1 if and to the extent said Chapter is applicable.

(c) Radon Gas: Radon has been determined to exist in the State of Rhode Island. Testing for the Presence of radon in residential real estate prior to Purchase is advisable.

(d) Lead Contamination: "Every Purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead Poisoning. Lead Poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced Intelligence Quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide the Buyer with any information on lead-based paint hazards from risk assessments or inspections in Seller's possession and notify the of any known lead-based paint hazards. A risk assessment inspection is recommended prior to purchase.

(e) Restrictions or Legislative/Governmental Action: Buyer is responsible for investigating whether there are any restrictions or legislative/governmental actions, present or proposed, which affect or would affect the use of the Property.

12. <u>ADDITIONAL SELLER OBLIGATIONS:</u>

a. Foreign Investment in Real Property Tax Act ("FIRPTA"): The Seller represents that the Seller is not a foreign person or foreign corporation as defined in FIRPTA and accordingly, that the Buyer will not be required to comply with the withholding requirements of FIRPTA at the closing.

b. Non-Residential Withholding Tax. If Seller is not a resident of the State of Rhode Island or will not be a resident at the time of the closing, the Buyer must withhold six percent of the total payment to the Seller (9% if the Seller is a corporation), in accordance with R.I.G.L. Section 44-30-71.3, as same may be amended from time to time, and pay such amount to the Division of Taxation as a non-resident withholding tax. In order to have such tax based on gain rather than net proceeds of sale, Seller must submit an election form to the Division of Taxation at least 20 days prior to closing. Seller agrees to pay the entire amount of such tax found to be due at or after the closing, whether or not such tax was correctly calculated at the Closing, it being understood that the tax shall not exceed the amount of the net proceeds to Seller. This provision shall survive the transfer of title to the Property.

c. Right Of Entry And Inspection. The Buyer may enter upon the Property at reasonable times for surveying, and other reasonable purposes related to this transaction. The Buyer shall have the right to conduct an environmental inspection and assessment of the Property and to update that inspection and assessment prior to closing. Based upon said inspection or update, the Buyer may, at its discretion, terminate this Agreement, in which event any payments made under this Agreement shall be forthwith refunded and all other obligations of the parties shall cease and this Agreement shall be void without recourse to the parties. The Buyer agrees to indemnify and hold harmless the Seller from any and all injuries or property damage incurred while upon the Property.

13. <u>POSSESSION:</u> Possession of the Property is to be delivered free and clear to the Buyer at the time of delivery of the deed. At closing, the Property is to be conveyed in the same condition in which it now is, except for reasonable use and wear.

14. <u>DOCUMENTS TO BE DELIVERED BY SELLER AT CLOSING</u>: At the Closing Seller shall deliver the following documents to Buyer:

(a) The Deed (with payment by Seller of any required state and/or local documentary stamps, if any to be affixed hereto) in form reasonably acceptable to Buyer or Buyer's counsel.

(b) A non-foreign affidavit executed by Seller, containing such information as is required by Internal Revenue Code and the regulations thereunder.

15. <u>DOCUMENTS TO BE DELIVERED BY BUYER AT CLOSING:</u> At the Closing Buyer shall deliver to the Seller the Purchase Price, in cash, or in the form of a Cashier's or Treasurer's check of a Rhode Island bank or credit union or by check certified by a Rhode Island bank or credit union, and such other instruments and documents to which Seller may be reasonably entitled under any provision of this Agreement..

16. <u>WRITTEN NOTICE OF VIOLATIONS AND CHANGE IN OWNERSHIP:</u> If there is any notice or violation order outstanding against the Property, Seller shall immediately provide written notice to the Buyer with a true copy of any notice of violations or orders issued and notify the enforcing officer in writing of Seller's intent to transfer the Property.

17. <u>FURTHER ASSURANCES:</u> Each of the parties hereto agrees to execute and deliver such other documents, instruments, and affidavits as may reasonably be required to effect the transaction contemplated herein, including without limitation, any affidavits and agreements which may be required by Buyer's title insurance company.

18. <u>NOTICES:</u> All notices as required in this Agreement shall be in writing. All notices are to be conveyed by mail, personal delivery, or fax. Notices shall be effective when postmarked, upon personal delivery, or upon fax transmittal date. Notices to the Seller shall be sent or delivered to the Seller at the address in Section 1 of this Agreement, with a copy to Thomas E. Carlotto,

Shechtman Halperin Savage, LLP, 1080 Main Street, Pawtucket, RI 02860. Notices to the Buyer shall be sent or delivered to the address that appears in Section 1 of this Agreement, with a copy to Peter D. Ruggiero, Warwick Assistant City Solicitor, 20 Centerville Road, Warwick, RI 02886.

19. DEFAULT: Upon default by the Buyer or the Seller in the performance of this Agreement, the non-defaulting party may terminate this Agreement by written notice to the defaulting party as its sole and exclusive remedy, and this Agreement shall thereupon become void and of no further force or effect whatsoever.

20. ASSIGNMENT AND SURVIVORSHIP: This Agreement may not be assigned by either party without written consent of the other, and shall be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

21. MERGER IN THE DEED: The acceptance of a deed by the Buyer shall be deemed full performance and satisfaction of all obligations of the Seller under this Agreement except for those provisions which are stated to expressly survive the Closing.

22. CONSTRUCTION OF AGREEMENT: This Agreement has been executed in one or more counterparts and each shall be deemed to be an original. If two or more persons are named herein as Buyer, their obligations hereunder shall be joint and several. All references to time periods shall be counted in calendar days.

23. NO RECORDING: This Agreement may not be recorded in the Land Evidence Records of the City of Warwick.

24. GOVERNING LAW: This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of Rhode Island and the Code of Ordinances of the City of Warwick.

25. WAIVERS AND EXTENSIONS: No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

26. BROKERS: Buyer and Seller each represent and warrant to the other that they have dealt with no brokers or real estate sale persons with respect to the transaction contemplated by this Agreement, and that no person is entitled to claim a commission or other fee in connection with the transaction contemplated herein. Buyer and Seller further agree to indemnify and hold harmless the other party and its respective successors and assigns against and from all claims, losses, liabilities and expenses including attorney's fees arising out of any claim by any brokers, consultants, finders or like agents, which are based upon alleged dealings with said parties. The provisions of this section shall survive the Closing.

27. ENTIRE AGREEMENT: We, the parties hereto, each declare that this instrument contains the entire Agreement between us, subject to no understandings, conditions, or representations other than those expressly stated here. This Agreement may not be changed, modified, or amended in whole or in part except in writing, signed by all parties.

28. AS-IS. The Buyer acknowledges and agrees that the Property is being sold in its "AS IS" and "WHERE IS" condition and "WITH ALL FAULTS". Notwithstanding anything contained in this Agreement to the contrary or which might be construed to the contrary, the Buyer acknowledges and agrees that the Buyer has not been influenced to enter into this transaction nor is the Buyer relying upon any representations, warranties or other statements, whether verbal or in writing, in connection with the Property and the transactions contemplated hereunder and the Buyer further acknowledges and agrees that the Buyer is relying solely upon its own independent inspection

and examination of the Property, title to same and economic matters and as to whether the Property or any use thereof is or would be in compliance with any and all applicable laws, ordinances and regulations including, without limitation, zoning, building codes or other laws, ordinances or regulations. Without limiting the generality of the foregoing, after the Closing, the Buyer shall be responsible for all costs of environmental remediation required at the Premises, if any, and for all demolition costs. In addition, any verbal or written statement or other information or materials supplied or alleged to have been supplied to the Buyer on behalf of the Seller, shall be deemed to have been supplied or made available to the Buyer for informational purposes only and the Buyer may make whatever use of such information and materials the Buyer deems appropriate.

WITNESS the signatures of the above parties on the date(s) set forth below.

Witness:

Susan E. Baker

Buyer:
City of Warwick

By: [signature]
~~Treasurer~~ Mayor
Date: 7 August 2007

Witness:

[signature]

Seller:
U.S. Small Business Administration as and only as Receiver of Moneta Capital Corporation

By: Thomas G. Morris
Duly Authorized Director, Office of Liq., SBA
Date: August 7, 2007

# EXHIBIT A
# CITY OF WARWICK
# PURCHASE AND SALE AGREEMENT


5 Acres
10 Acres
26 Acres
Subject Property
41 Acres Total