# EXHIBIT 2-A

# TERM LOAN AGREEMENT

TERM LOAN AGREEMENT dated as of the 26th day of September, 1991, by and among ROCKY POINT AMUSEMENTS, INC., CAPTAIN ROCKY, INC., ROCKY POINT AMUSEMENT CORPORATION, CLIFF HOUSE, INC. and KIDDY-PARK, INC., each a Rhode Island corporation having its principal place of business at Rocky Point Park, Warwick, Rhode Island 02889 (whether one or more, the "Company"), and FAIRWAY CAPITAL CORPORATION, a Rhode Island corporation and federal licensee under the Small Business Investment Act of 1958, as amended, having its principal place of business at 99 Wayland Avenue, Providence, Rhode Island 02906 (the "Lender"). Certain other terms used herein are defined in Section 9 hereof.

The Company and the Lender hereby agree as follows:

## Section 1. Amount and Terms of the Credit.

### 1.1 Term Loan.

Subject to the terms and conditions hereof, the Lender will make a term loan to the Company in the principal amount of $5,000,000.00 (the "Term Loan", which together with the "Other Loans" are herein collectively referred to as the "Loan"), by paying the amounts set forth in Schedule 1.1 hereto in immediately available funds to the parties set forth in Schedule 1.1.

### 1.2 Note.

The Loan shall be evidenced by a Term Note (the "Note"), payable to the order of the Lender, duly executed on behalf of the Company, dated the date of issuance thereof and in the principal amount of $5,395,000.00. The Note shall bear interest before maturity (computed on the basis of the actual number of days elapsed over a 360-day year) on the unpaid principal amount thereof at a rate per annum equal to fifteen and one-half percent (15½%). If the Company fails to make any payment of any portion of principal or interest of the Note on the date when the same becomes payable, whether at maturity or at a date fixed for the payment of any installment thereof or by declaration, acceleration or otherwise, the Company shall pay to the Lender or then holder of the Note, on demand of the Lender or of such holder, a late charge equal to five percent (5%) of any payment not received by the Lender and interest on such unpaid amounts from and after such date until paid in full at a rate per annum equal to the greater of (a) twenty percent (20%) or (b) the floating rate equal to five percent (5%) above The First National Bank of Boston's publicly announced Base

Rate as such rate may change from time to time. The principal amount of and interest on the Note shall be payable as set forth in the Note. If under any circumstances whatsoever Lender should receive as a loan charge or as interest under the Note an amount which would exceed the maximum permissible interest under applicable law, such excess amount shall be applied to reduce the principal balance of the indebtedness evidenced by the Note and not to payment of interest.

1.2A <u>Other Loans and Payment Schedule</u>. The Company is indebted to those persons and entities whose names and addresses, and in the amounts, are set forth in Schedule 1.2A (the "Other Loans"), which Other Loans are secured by mortgages encumbering portions of the Real Property. In consideration of the Lender making the Term Loan to the Company without requiring the Company to pay such Other Loans in full and discharge the mortgages securing repayment thereof, the Company agrees to pay to the Bank all principal, interest in advance and other charges due and payable with respect to the Note and Other Loans during the Term as follows:

(a) During year one of the Term interest only shall be due and payable with respect to the Term Loan. During years two through six inclusive of the Term principal and interest in the amount of $71,700.00 per month shall be due and payable with respect to the Term Loan.

(b) During years one through six inclusive of the Term, the Company shall pay to the Lender all amounts of principal and interest at the rates set forth in the respective notes evidencing such Other Loans, and other charges, if any, arising with respect to the Other Loans.

(c) All amounts required to be paid pursuant to Sections 1.2A(a) and (b) above shall be due and payable by the Company to the Lender in advance as follows:

(i) Simultaneously with the execution hereof, the Company shall pay to the Lender from the proceeds of the Term Loan (A) all amounts required to be paid pursuant to Sections 1.2A(a) and (b) hereof with respect to the period commencing on the date hereof through and including May 31, 1992.

(ii) Commencing on June 1 of each of 1992, 1993, 1994 and 1995 and June 3, 1996, and continuing on the same day of each week for eighteen (18) weeks thereafter during each such year of the Term, the Company shall pay to the Lender the amounts required to be paid pursuant to Sections 1.2A(a) and (b) hereof with respect to the period commencing June 1 of the then current year (or June 3 of 1996) through and including May 31 of the subsequent year (except that in 1995 such period shall be through and including June 2, 1996 and in 1996 such period shall be through June 1, 1997) in eighteen (18) equal installments.

(iii) Commencing June 2, 1997 and continuing on the same day of each week thereafter through and including Monday of the week which includes the sixth anniversary of the date of the Closing, the Company shall pay to the Lender in equal installments the amounts required to be paid pursuant to Sections 1.2(a) and (b) hereof with respect to the period commencing June 2, 1997 through and including the day immediately prior to the sixth anniversary of the Closing, such installments to be determined by dividing the aggregate amounts to be paid pursuant to Sections 1.2A(a) and (b) hereof by the number of Mondays between June 2, 1997 and the Monday of the week which includes such sixth anniversary, each inclusive.

(d) In addition to the amounts payable by the Company pursuant to Sections 1.2A(a) and (b) hereof, the Company shall make payment to the Lender with respect to annual estimated real estate and personal property taxes arising with respect to the Real Property and Improvements, and for payment of any betterment assessments, the frequency and amount of such payments to be determined in the same manner as set forth in Section 1.2A(c) with respect to principal and interest payments. Simultaneously with the execution hereof, the Company shall pay to the Lender an amount sufficient to cover accrued and advance payment of such taxes and assessments.

1.2B <u>Deposit Account</u>. The Lender shall establish an interest bearing account (the "Account") in the name of Lender

into which Lender shall deposit all advance payments received from the Company pursuant to the terms hereof and of the Note. The Lender shall pay from the proceeds of the Account all principal, interest and other charges due with respect to the Note to the holder thereof and, prior to an Event of Default, (i) real estate and personal property taxes if prepayment thereof is required and received by Lender, and (ii) all principal and interest and other charges, if any, due with respect to the Other Loans. All interest earned with respect to amounts in the Account shall be paid to the Company on an annual basis, or at the sole election of Lender, credited by Lender to the last installment due pursuant to the Note for the then current year.

The Lender shall have all right, title and interest to and in the Account, and neither the Company nor any other Person, including without limitation, the holders of the notes and mortgages evidencing and securing the Other Loans, shall have any claim thereto or interest therein.

1.3 Prepayments.

(a) In the event that the Company shall prepay any portion of the Term Loan, whether voluntarily or upon acceleration of amounts owed under the Note, the Company shall pay to the Lender with such prepayment amount, a premium determined in accordance with the following schedule:

| Prepayment paid prior to | Premium with respect to Amount Prepaid |
|---|---|
| September 26, 1993 | 4% |
| September 26, 1994 | 3% |
| September 26, 1995 | 2% |
| September 26, 1996 | 1% |

(b) Except for a prepayment of the entire outstanding principal balance of the Term Loan, accrued interest thereon and other charges with respect thereto, no prepayment of the Note shall reduce the amount of weekly installments thereafter becoming due under such Note, provided however, that upon any partial prepayment Lender may elect to reduce the amount of weekly installments thereafter becoming due, and in the absence of any such reduction, no prepayment premium shall apply to that portion of such weekly installments which otherwise would constitute a prepayment.

1.4 Fees and Expenses.

The Company shall pay to the Lender on demand all costs and expenses in connection with the preparation, execution, delivery and administration of this Agreement and the Security Documents (as defined below), including, without limitation, a commitment fee of $125,000.00, $75,000.00 of which has been received prior to the date hereof, out-of-pocket expenses, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto and with respect to advising the Lender as to its rights and responsibilities under this Agreement and the Security Documents, and all reasonable costs and expenses, if any, in connection with the enforcement of this Agreement and the Security Documents or the collection or attempted collection of any amounts owed to the Lender hereunder or thereunder or any Collateral. The Company also shall pay to Holmes Financial Services, Inc. simultaneously with the execution hereof a loan broker's fee of $150,000.00. If the Lender makes payment of all or any portion of the Other Loans with funds from a source other than payments received by the Lender from the Company, the Company shall pay to the Lender on demand an additional commitment fee equal to 2.5% of any such payment, and an additional loan broker's fee equal to 3% of any such payment to Holmes Financial Services, Inc. on demand.

1.5 Limitation.

Notwithstanding any provision contained herein or in the Note or any Security Document, in no event shall any interest payable under the Note exceed the maximum rate permitted by law.

1.6 Security.

The Note, the obligations of the Company hereunder and all other obligations of the Company set forth in other agreements and instruments executed in connection herewith shall be secured by and entitled to the benefits of the following (except to the extent that any thereof may be expressly waived by the Lender in writing):

(a) A mortgage lien of eight (8) lots or parcels of land comprising the Real Property and Improvements in Warwick, Rhode Island, subject only to mortgages securing the Other Loans, and a first priority perfected security interest in all currently owned and after-acquired tangible and intangible personal property and fixtures of the Company other than the property secured by the purchase money security interests specifically permitted by Subsection 6.2 hereof (the "Purchase Money Property") and

property subject to the Capital Leases specifically permitted by Subsection 6.2 hereof (the "Capital Lease Property"), each as further defined and described in a Mortgage and Security Agreement of even date between the Lender and Rocky Point Amusements, Inc. (the "Mortgage"), and a Security Agreement by Captain Rocky, Inc., Rocky Point Amusement Corporation, Cliff House, Inc. and Kiddy-Park, Inc. in favor of Lender (the "Security Agreement");

(b) A second priority perfected security interest in all Purchase Money Property and Capital Lease Property;

(c) An unconditional and unlimited joint and several guaranty (the "Guaranty") from Henry D. Vara, Jr., James C. Callahan and Francis J. DiMento (the "Guarantors");

(d) A participation interest in a $3,000,000.00 loan made by Bank of New England, N.A. to James C. Callahan and Vincent J. DiMento, Trustees (the "Trustees") of One Fifty Three Hamlet Avenue Realty Trust u/d/t dated May 31, 1988, as more fully set forth in a Participation Agreement (the "Participation Agreement") executed simultaneously herewith;

(e) A first and exclusive lien by assignment of all leases and rents and profits, present and future, evidenced by a Conditional Assignment of Leases and Rents executed by the Company of even date; and

(f) A first and exclusive lien by assignment of all contracts, permits, approvals and authorities, plans, licenses and agreements, evidenced by an Assignment of Licenses, Permits and Contract Rights executed by the Company of even date.

All of the agreements and instruments described or referred to in this subsection, together with any and all other agreements and instruments heretofore or hereafter securing the Note and the obligations under the Loan Agreement and specifically including the Loan Agreement and the Hazardous Materials Indemnity Agreement executed by the Company and the Guarantors in connection herewith are sometimes hereinafter referred to collectively as the "Security Documents" and individually as a "Security Document". All of the personal and real property, fixtures, and rights and interests described in the foregoing clauses (a) through (f) of this subsection and the instruments referred to therein, together with any additions thereto or replacements or proceeds thereof, are sometimes hereinafter referred to collectively as the "Collateral". The Company agrees to take such actions as may

be necessary from time to time to cause the Lender to be secured by and entitled to the benefits of the Security Documents as described in this subsection, including, without limitation, the execution and delivery of financing statements, continuations thereof and will exhaust its best efforts to obtain consents of any third parties.

1.7 Notations.

Prior to any sale or other disposition of the Note by the Lender, and at such other times as the Lender may determine, the Lender shall make a notation on such Note (or on a paper annexed thereto) of the unpaid principal amount thereof at the time outstanding, the last date to which interest has been paid thereon, and the amount of unpaid interest accrued thereon to the date of such sale or disposition. In the absence of apparent error, such notation shall constitute, *prima facie*, evidence of the amount of the unpaid principal amount thereof and unpaid interest accrued thereon; provided, however, that any failure to make such notation shall not affect the obligation of the Company to make any payment of principal or interest on such Note in accordance with its terms.

Section 2. Use of Proceeds.

The Company will use the proceeds of the Loan towards the payment obligations of the Company set forth in Section 1.2A hereof, the refinancing of the Real Property and the Trustees' property, transactional costs in connection therewith and herewith, and to satisfy at the Closing all obligations and liabilities which the Company, the Guarantors and the Trustees owe to Bank of New England, N.A., its successors and assigns (the "BNE Liabilities") other than those BNE Liabilities in which the Lender is to receive a participation interest as set forth in the Participation Agreement and those BNE Liabilities which the Lender permits, in its sole discretion, to remain outstanding after the Closing. The Company will not, directly or indirectly, use any part of such proceeds (i) for the purpose of making any Restricted Payment, or (ii) for any other purpose which would violate any provision of any applicable statute, regulation, order or restriction.

Section 3. Representations and Warranties.

In order to induce the Lender to enter into this Agreement and to make the Loan provided for hereunder, the Company makes the following representations and warranties, as of the date hereof, each of which, except as expressly provided, shall be deemed made by each entity within the definition of "Company" set forth herein:

3.1 Organization, Standing, etc. of the Company.

The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Rhode Island and has all requisite corporate power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, to enter into this Agreement, the Security Documents to which it is a party and all other documents to be executed by it in connection with the transactions contemplated hereby, to issue the Note and to carry out the terms hereof and thereof.

3.2 Subsidiaries.

Except as set forth in Schedule 3.2 hereof, the Company has no Subsidiaries.

3.3 Qualification.

The Company is duly qualified or licensed and in good standing as a foreign corporation duly authorized to do business in each other jurisdiction in which the character of the properties owned or the nature of the activities conducted makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing would not have a material adverse impact on the operations or financial condition of the Company. Such jurisdictions are listed in Schedule 3.3 attached hereto.

3.4 Consents.

No approval, authorization, consent or other action by, and no notice to, or filing with, any person is required for the due execution, delivery or performance by the Company of this Agreement and the Security Documents to which the Company is a party and the consummation of the transactions contemplated hereby and thereby.

3.5 Tax Returns and Payments.

The Company has filed all federal, state and local tax reports and returns required by law to be filed and have paid all taxes, assessments and other governmental charges levied upon any of its properties, assets, income or franchises, other than those not yet delinquent and those, not substantial in aggregate amount, being or about to be contested as provided in Subsection 5.4. The charges, accruals and reserves on the books of the Company in respect of its taxes are adequate in the opinion of the Company, and the Company knows of no unpaid

assessment for additional taxes or of any basis therefor. Neither the Company nor any Guarantor is currently the subject of any audit.

3.6 Title to Properties; Liens.

Except as disclosed on Title Commitments accepted by the Lender, none of the Company's properties or assets or the Trustees' Property or assets is subject to any mortgage, pledge, lien, security interest, charge or encumbrance. Exhibit 3.6 hereto sets forth (i) all Leases to which the Company or the Trustees are a party or by which the Company or the Trustees may be bound, whether as lessor, lessee, assignor, assignee, sublessor, sublease, or otherwise, and whether oral or written, and (ii) the location to which such Lease relates. Neither Company nor the Trustees is in default of any of their respective obligations pursuant to any such Lease, and no event has occurred, which with notice or the lapse of time or both, would constitute a default pursuant to any such Lease. The Company enjoys quiet possession under all Leases to which it is a party as lessee, and all of such Leases are valid and in full force and effect. None of such Leases contains any provision restricting the incurrence of Indebtedness by the lessee or any unusual or burdensome provision adversely affecting the current and proposed operations of the Company.

3.7 Litigation, etc.

Except as set forth in Schedule 3.7 attached hereto, there is no action, suit, proceeding or investigation pending or threatened (or any basis therefor known to the Company) at law or in equity or before any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentally which might result, either in any case or in the aggregate, in any material adverse change in the business, operations, affairs or condition of the Company, Trustees or any Guarantor or any of its or their respective properties or in any material liability on the part of the Company, the Trustees or any Guarantor. There are no judgments outstanding against the Company, the Trustees or any Guarantor.

3.8 Authorization; Compliance with Other Instruments.

The execution, delivery and performance of this Agreement, the Note and the Security Documents have been duly authorized by all necessary corporate action on the part of the Company, or by all necessary action on the part of the Trustees, as applicable, will not result in any violation of or be in conflict with or constitute a default under any term of (a) the charter or by-laws of the Company or the Declaration of Trust,

or of (b) any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to the Company, the Guarantors, or the Trustees or their respective property, or result in the creation of any mortgage, lien, charge or encumbrance upon any of the properties or assets of the Company, the Guarantors, or the Trustees (except pursuant to the Security Documents). The Company is not in violation of any term of its charter or by-laws, or of any material term of any agreement or instrument to which it is a party, or of any judgment, decree, order, statute, rule or actions of other governmental authorities applicable to it. This Agreement, the Note and the Security Documents are and will be valid and legally binding obligations of the Company, the Guarantors or the Trustees, as applicable, enforceable in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency or similar laws relating to or affecting generally the enforcement of creditor's rights, and except to the extent that the availability of equitable remedies with respect to such obligations may be subject to the discretion of the court before which any proceedings for such remedies may be brought.

3.9 Employee Retirement Income Security Act of 1974.

Without limiting the scope of subsection 3.8, the Company has not incurred (a) any accumulated funding deficiency within the meaning of the Employee Retirement Income Security Act of 1974 or (b) any liability to the Pension Benefit Guaranty Corporation established under such Act (or any successor thereto under such Act) in connection with any employee benefit plan established or maintained by the Company; nor has the Company had any tax assessed against it by the Internal Revenue Service for any alleged violation under Section 4975 of the Internal Revenue Code. No prohibited transaction within the meaning of such Section 4975 has occurred with respect to any employee benefit plan established or maintained by the Company.

3.10 Ownership of Company.

Schedule 3.10 attached hereto correctly sets forth the number of shares of the Company's capital stock of each class authorized and the number thereof outstanding, the name of each of the Company's shareholders and the number of shares of each class of such capital stock owned by such shareholders. All of said outstanding shares are validly issued, fully paid and nonassessable and are owned by such shareholders as specified in such Schedule, free of any assignment, pledge, lien, security interest, charge, option or other encumbrance except as set forth in such Schedule. Such shareholders, as well as any other Person that may become a shareholder of the Company

after the date hereof, shall be referred to herein individually as a "Shareholder" and collectively as "Shareholders". Except as otherwise set forth in Schedule 3.10, the Company is not obligated in any manner to issue any additional shares of its capital stock.

3.11 Solvency, etc.

After giving effect to the Term Loan and the use of the proceeds thereof, (a) the current fair market value and present fair saleable value of the assets of the Company exceeds its liabilities, both direct and contingent, (b) the Company has the ability to pay all of its debts as they become due, (c) the Company has capital sufficient to conduct its business and all business in which it is about to engage, and (d) the Company does not have any intent to hinder, delay or defraud any Person or to incur Indebtedness beyond its ability to repay such Indebtedness in accordance with the terms thereof.

3.12 Places of Business.

The principal place of business of the Company and the Trustees, and the office where the Company and the Trustees keep their respective records concerning the Collateral is located at Rocky Point Park, Warwick, Rhode Island. All other places of business of the Company and the Trustees or locations of Collateral are listed on Schedule 3.12 hereto.

3.13 Financial Statements.

The Company has furnished to the Lender financial statements of Captain Rocky, Inc. and its subsidiaries as of December 31 of each of 1986, 1987, 1988 and 1989 prepared by Fred G. Pastore, Certified Public Accountant (for years ending December 31, 1986 and 1987), and by Fred G. Pastore Associates, Inc. (for years ending December 31, 1988 and 1989), consisting of a balance sheet, statement of income and retained earnings and statement of cash flows (the "Financial Statements"). The Financial Statements were prepared in accordance with the books and records of Captain Rocky, Inc. and its subsidiaries and fairly present the consolidated financial condition of Captain Rocky, Inc. and its subsidiaries at the date thereof and the results of operations for the period indicated. The Financial Statements have been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the Financial Statements there has been no material adverse change in the financial condition, results of operations or business of the Company.

3.14 Indebtedness.

Except as disclosed on Schedule 3.14, or as set forth on the Financial Statements, and except for trade payables arising in the ordinary course of the Company's business since the date of the latest financials provided to the Lender, neither the Company nor the Trustees are obligated on any Indebtedness.

3.15 No Defaults.

The Company is not in default under any material contract, lease, or commitment to which it is a party or by which it is bound, a default under which could have a material adverse effect on the financial condition, results of operation or business of the Company. As of the date hereof, the Company does not know of any dispute regarding any contract, lease or commitment which is material to the financial condition, results or operation or business of the Company.

3.16 Compliance.

Except for those matters described in Schedule 3.16 hereof and Section 5.13 below, each of the Company and the Trustees (i) has complied in all material respects with all federal, state and local statutes, rules, regulations, ordinances, by-laws, orders, injunctions, writs, decrees, decisions or awards relating to health, safety and environmental matters (the "Environmental Laws") regarding transfer, construction on and operation of their respective businesses and property, including but not limited to notifying authorities, observing restrictions on use, transferring, modifying or obtaining permits, licenses, approvals and registrations, making required notices, certifications and submissions, complying with financial liability requirements, complying with all Environmental Laws in the generation, handling, manufacturing, processing, treatment, storage, use, transportation or disposal of hazardous substances and materials, hazardous wastes, oil, gasoline, and other petroleum products, all as defined or described in any Environmental Law and responding to the release thereof; (ii) does not have any material contingent liability with respect to the aforementioned; and (iii) has not received any notice of any noncompliance by it with any Environmental Law.

3.17 Small Concern Status.

The Company is a small business concern (a "Small Concern") as defined in Section 103(5) of the Small Business Investment Act of 1958, as amended, 15 U.S.C. § 632, and regulations promulgated pursuant thereto (the "SBIA").

3.18 Information and Certificates.

All statements and information contained in any certificate, report or statement by the Company, the Guarantors or the Trustees delivered to the Lender pursuant hereto will be true and complete as of the date thereof and all documents delivered to the Lender in respect of any Collateral, will be valid and genuine. No information provided or statements made by the Company, any Guarantor or the Trustees, or any of the representations and warranties to the Lender made by the Company, any Guarantor or the Trustees, contain any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Company, the Trustees and the Guarantors have disclosed to the Lender in writing every fact of which it or they is or are aware which might materially and adversely affect the respective business prospects, operations or financial condition of the Company or the Trustees, or the ability of the Company or the Trustees to perform their respective obligations hereunder or under the Security Documents.

Section 4. Conditions of Lending.

The obligation of the Lender to make the Term Loan hereunder is subject to the following conditions and the condition that the liens and security interests in favor of Lender as provided herein and in the Security Documents have been perfected:

4.1 Information and Documents.

On and as of the date of the Term Loan hereunder, the Lender shall have received all other information and documents which the Lender or its counsel may reasonably have requested in connection with the transactions contemplated by this Agreement, including but not limited to appropriate documents evidencing the Company's, the Guarantor's and the Trustees' respective capacity, good standing and qualification to enter into the transactions contemplated hereby, such information and documents where appropriate to be certified by the proper officers or governmental authorities.

4.2 No Default; Representations and Warranties, etc.

On the date of the Term Loan:

(a) the representations and warranties contained in Section 3 of this Agreement shall be true on and as of such dates as if they had been made on such dates (except to the

extent that such representations and warranties expressly relate to an earlier date or are affected by the consummation of transactions permitted under this Agreement);

(b) the Company, the Guarantors and the Trustees shall be in compliance in all material respects with all of the terms and provisions set forth herein on their respective part to be observed or performed on or prior to such dates; and

(c) after giving effect to the Term Loan, no Event of Default specified in Section 7 hereof, nor any event which with the giving of notice or expiration of any applicable grace period or both would constitute such an Event of Default, shall have occurred and be continuing.

4.3 <u>Taxes etc.</u>

All taxes and assessments affecting the Real Property, the Collateral and the Trustees' Property as that term is defined in Section 8 hereof or any part thereof and payable on or before the date of the Term Loan shall have been paid and all special assessments affecting the Real Property, the Collateral and the Trustees' Property or any part thereof shall have been paid and discharged, whether they constitute a lien against the Real Property, the Collateral or the Trustees' Property or any part thereof, other than betterment assessments payable in installments, which are not then in default.

4.4 <u>No Citations, etc.</u>

The Company, the Guarantors and the Trustees shall certify to Lender that there are no known citations, warrants or notices from any federal, state or local government concerning the Real Property, the Collateral or the Trustees' Property.

4.5 <u>Opinions.</u>

Opinions in form, substance and scope satisfactory to Lender and its counsel shall have been delivered to the Lender.

4.6 <u>Appraisal - Real Estate.</u>

The Lender shall have received an appraisal report of the Real Estate and improvements thereon prepared in a narrative format, and acceptable to the Lender.

4.7 Engineering Report - Lender.

The Lender shall have received an acceptable written report by a licensed professional engineer or other person designated by the Lender to determine whether there exists any structural and/or physical deficiencies required to be corrected in order to place the Real Property and improvements thereon in good physical and structural condition not requiring repair, and if any deficiencies are shown to exist, the Company shall have satisfied Lender that funds are available to the Company from sources other than the Term Loan to correct all such deficiencies.

Section 5. Affirmative Covenants.

Until the principal of and interest on the Note and other amounts due hereunder or under the Security Documents shall have been paid in full, the Company agrees that:

5.1 Financial Statements, etc.

The Company will furnish or cause to be furnished to the Lender:

(a) Within ninety (90) days after the end of each fiscal year of the Company, a consolidated and consolidating balance sheet of the Company and as at the end of such year and a consolidated and consolidating profit and loss statement and statement of income and retained earnings in respect of the Company for such year audited by Arnold Kilberg & Company, Certified Public Accountants, or another accounting firm reasonably acceptable to the Lender, and prepared in accordance with generally accepted accounting principles consistently applied and on a basis consistent with that of the preceding fiscal year;

(b) Within sixty (60) days after the end of each fiscal quarter of the Company, the unaudited consolidated and consolidating balance sheet of the Company as at the end of such period, and the profit and loss statement showing year-to-date cumulative results, in each case in reasonable detail and prepared in accordance with generally accepted accounting principles consistently applied and on a basis consistent with that of the preceding fiscal year and certified to be true and correct in all material respects by the chief financial officer of the Company subject to normal year-end adjustments;

(c) Together with the financial statements delivered pursuant to subparagraph (a) above, a statement signed by the respective chief financial officer of the Company, of the Trustees, and of each Guarantor to the effect that in connection with the examination of such financial statements they have reviewed the provisions of this Agreement and have no knowledge of any event or condition which constitutes an Event of Default or which, after notice or expiration of any applicable grace period or both, would constitute such an Event of Default or, if they have such knowledge, specifying the nature and period of existence thereof;

(d) Forthwith upon the chairman of the board, president, treasurer, or any officer of the Company, the Trustees, or any Guarantor obtaining knowledge of any condition or event which constitutes an Event of Default or which, after notice or lapse of time or both, would constitute an Event of Default, a certificate signed by such officer or person specifying in reasonable detail the nature and period of existence thereof and the action the Company has taken or proposes to take with respect thereto;

The Company will also furnish or cause to be furnished to the Lender such other information regarding the business, affairs and condition of the Company or of the Trustees as the Lender may from time to time reasonably request. The Company will permit the Lender to inspect the books and any of the properties or assets of the Company, and to conduct an audit of the books of the Company in accordance with the Lender's customary procedures at such times as the Lender may from time to time request during regular business hours and upon reasonable advance oral or written notice. The Company and the Trustees will not remove their respective records to another location, nor change their respective principal place of business, nor terminate the retention by the Company and the Trustees of Arnold Kilberg & Company as their accountant without the retention of another accounting firm reasonably acceptable to Lender.

5.2 Legal Existence; Franchises; Compliance with Laws, etc.

The Company will: maintain its corporate existence and business; take all actions necessary to maintain and keep in full force and effect its rights and franchises; and comply with all applicable statutes, rules, regulations and orders of, and all applicable restrictions imposed by, all governmental authorities in respect of the conduct of its business and the ownership of its properties, except where any circumstances of

noncompliance will not, individually or in the aggregate, have a material adverse effect on the operations or financial condition of the Company; provided that if no Event of Default (as hereinafter defined) shall exist, the Company shall not be required by reason of this subsection to comply therewith at any time while the Company shall be contesting its obligations to do so in good faith by appropriate proceeding or other appropriate actions promptly initiated and diligently conducted, and if it shall have set aside on its books such reserves, if any, with respect thereto as are required by generally accepted accounting principles. The Company shall not, without the prior written consent of the Lender, engage in any business other than the business currently engaged in by it and activities incidental thereto.

5.3 Insurance.

Subject to the provisions of Rhode Island General Laws § 27-29-4(9) and (10), the Company and the Trustees will maintain or cause to be maintained and in full force and effect with financially sound and reputable insurance companies at their respective expense all necessary insurance in adequate amounts with companies satisfactory to the Lender covering fire and extended coverage of the Real Property and Trustees' Property, as applicable, and all personal property, public and flood hazard insurance and such other insurance as may be required by the Lender. Notwithstanding any term or provision to the contrary set forth in any Security Document, the Company and the Trustees are hereby notified in accordance with, and subject to, the provisions of Rhode Island General Laws §27-29-4(9)-(10) by the Lender that each has the right of free choice in the selection of the agent and insurer through or by which such insurance is to be placed. Subject to the provisions of Rhode Island General Laws §27-5-6, the Company and the Trustees will furnish to the Lender copies of such policies upon execution and delivery of this Agreement and upon the renewal of each such policy. Each insurance policy shall:

(i) name the Lender as a loss payee/mortgagee pursuant to a so-called "standard mortgagee clause";

(ii) provide that no action of the Company or the Trustees shall void such policy as to the Lender; and

(iii) provide that the Lender shall be notified in writing of any proposed cancellation of such policy at least twenty (20) days in advance of such proposed cancellation and will have sufficient time to correct any deficiencies justifying such proposed cancellation.

5.4 Payment of Taxes.

The Company and the Trustees will pay and discharge promptly as they become due and payable all taxes, assessments and other governmental charges or levies imposed upon them or the Lender (in respect of the Lender's security interest in the Collateral) or their respective income or upon any of their respective property or assets, or upon any part thereof, as well as all lawful claims of any kind which, if unpaid, might by law become a lien or a charge upon their respective property; provided that if no Event of Default (as hereinafter defined) shall exist, the Company and the Trustees shall not be required to pay any such tax, assessment, charge, levy or claim if the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings or other appropriate actions promptly initiated and diligently conducted and if the Company and the Trustees shall have set aside on their respective books such reserves, if any, with respect thereto as are required by generally accepted accounting principles and deemed appropriate by the Company's independent public accountants and provided that such contest does not have a material adverse effect on the financial condition of the Company or the Trustees, the ability of the Company or the Trustees to pay or perform their respective obligations hereunder and under the Note or the Security Documents or the priority or value of the Lender's security interest in the Collateral.

5.5 Payment of Other Indebtedness, etc.

Except as to matters being contested in good faith and by appropriate proceedings or as may be specifically agreed to with creditors in writing, and subject to any subordination agreement to which it may be or become a party, the Company and the Trustees shall pay promptly when due, or in conformance with customary trade terms, all other Indebtedness and obligations incidental to the conduct of their respective business.

5.6 Further Assurances.

From time to time hereafter, the Company and the Trustees will execute and deliver, or will cause to be executed and delivered, such additional instruments, applications, certificates or documents, and will take all such actions, as the Lender may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement, the Security Documents or the Note, or of more fully perfecting or renewing the Lender's rights with respect to the Collateral pursuant hereto or thereto. Insofar as any covenant, term,

condition or obligation herein is imposed upon or made applicable to the Guarantors or the Trustees, the Company shall cause such Guarantors or Trustees, as applicable, to perform and comply with each such covenant, term, condition and obligation, unless waived in writing by the Lender.

5.7 Litigation.

The Company shall notify the Lender in writing promptly upon knowledge by it of any pending or threatened litigation and unasserted claims against the Company, the Guarantors or the Trustees, which shall, on its face or in the Company's good faith estimation, involve an amount in controversy in excess of $20,000.00 (individually or in the aggregate with other claims within a three-month period).

5.8 Death, Retirement, etc.

The Company shall promptly notify the Lender in writing upon the death of any Guarantor.

5.9 Personal Property.

The Company and the Trustees shall keep and maintain their respective equipment and fixtures in good order condition and repair, provided, however, that subject to Section 6.2 hereof, the Company and the Trustees shall have the right to replace their respective equipment and fixtures with new or used equipment of similar quality if such replacement occurs in the ordinary course of business. The Company and the Trustees will not change the location of their respective equipment and fixtures unless the Company or Trustees, as applicable, has given the Lender five (5) days' prior written notice of any such change. Without the written consent of the Lender, the Company and the Trustees will not sell, assign or transfer their respective equipment and fixtures or any other asset except in the ordinary course of business. The Company shall deliver to the Lender within five days after receipt thereof all certificates of title evidencing ownership of their respective equipment, whether now owned or hereafter acquired, for recording the lien of the Lender in such equipment. If any equipment is or is to be attached to real property, the Company and the Trustees, as applicable, shall give the Lender the name of the record owner and a general description of the property to which the equipment is attached.

5.10 Accounts Receivable.

Upon an Event of Default, the Company will, when and in the manner reasonably requested by the Lender, promptly notify its

respective account debtors on all accounts receivable of the Lender's security interest therein and instruct such account debtors to make all future payments thereon directly to the Lender.

5.11 Access to Collateral.

During regular business hours and upon reasonable advance oral or written notice, the Company and the Trustees will permit the Lender, its officers, agents, employees, accountants, auditors, attorneys or other representatives to make such examination and inspection of the Company's and the Trustees' respective books, accounts, orders, correspondence and other records, including the making of copies thereof or extracts therefrom as the Lender may request, and to arrange for verification of accounts receivable under reasonable procedures, directly with account debtors or by other methods. The Company and the Trustees shall, during regular business hours and upon reasonable advance notice, and from time to time, permit the Lender, its officers, employees and designees, to inspect the Collateral, the Real Property and the Trustees' Property, as applicable. The Company shall use its equipment only in a lawful manner not inconsistent with the Agreement and the terms and conditions of any policy of insurance regarding such equipment. The Company shall not enter into any Lease of real property as a lessee or tenant thereof without notifying the Lender prior thereto and obtaining the release of all interests in any item of Collateral of any landlord or lessor thereof by operation of law or otherwise and providing Lender with the right of access to the real property and such other rights in order to exercise its rights in respect of the Collateral, all in form and substance reasonably required by the Lender.

5.12 Books and Records.

The Company and the Trustees shall keep proper books of record and account in which full and true entries will be made of all dealings or transactions of or in relation to the business and affairs of the Company or the Trustees, in accordance with generally accepted accounting principles.

5.13 Operation of Business.

The Company and the Trustees shall operate in the ordinary course of business, maintain in full force and effect all licenses, permits, authorizations, bonds, franchises, leases, patents, contracts, and other rights necessary or desirable to the profitable conduct of its business. During the term of the Agreement, the Company and the Trustees shall comply with all

Environmental Laws and the Company and the Trustees shall take prompt action in full compliance with Environmental Laws to respond to the on-site or off-site release or threatened release of Hazardous Substances connected with the operation of their respective business or property. The Company and the Trustees shall also comply with all other applicable laws, except for such laws the violation of which would not, in the aggregate, have a material adverse effect on the Company's or the Trustees' financial condition, results of operations or business. The Company shall notify the Lender of the receipt of any notice of violation of law or alleged violation of law relating to the sale or consumption of alcoholic beverages, and of any notice of a hearing concerning the suspension, modification or revocation of any license held by the Company relating to the sale of alcoholic beverages.

5.14 Leases.

The Company agrees that it will use reasonable efforts in good faith to secure from each landlord under its existing Leases, if any, of real property such landlord's release of all interests in all items of Collateral by operation of law or otherwise and providing Lender with the right of access to the real property and such other rights in order to exercise its rights in respect of the Collateral, all in form and substance required by the Lender.

5.15 Indemnification of Lender.

The Company agrees to indemnify and hold the Lender harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, and expenses (including reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation or control of any of the Company's properties and assets. The Company and the Trustees shall pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and pay or cause to be paid all of the Company's and the Trustees' real and personal property taxes, assessments, and charges and all of the Company's and the Trustees' franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and other governmental charges assessed against the Company and the Trustees, or payable by the Company and the Trustees, at such times and in such manner as to prevent any penalty from accruing or any lien from attaching to their respective properties or assets, provided that the Company and the Trustees shall have the right to contest in good faith, by an appropriate proceeding promptly initiated and diligently conducted, the validity, amount or imposition of any such tax, assessment or charge, and upon such good faith contest to delay

or refuse payment thereof, if (i) the Company or the Trustees establish adequate reserves, satisfactory to the Lender, to cover such contested taxes, assessments or charges, and (ii) such contest does not have a material adverse effect on the financial condition of the Company or the Trustees, the ability of the Company or the Trustees to pay any of its obligations, or the priority or value of the Lender's security interest in the Collateral.

5.16 Maintenance of Status.

The Company shall at all times during the term of this Agreement maintain its status as a Small Concern, and cooperate with Lender in providing reports, certificates and other documents required to be provided by Lender pursuant to the SBIA with respect to the Loan or the Company.

Section 6. Negative Covenants.

Until the principal of and interest on the Note and other amounts due hereunder or under the Security Documents shall have been paid in full, the Company agrees that:

6.1 Indebtedness.

The Company will not create, incur, assume, become or remain liable in respect of any Indebtedness, except:

(a) Indebtedness of the Company to the Lender;

(b) Current liabilities of the Company (other than for borrowed money) incurred in the ordinary course of its business and in accordance with customary trade practices;

(c) Existing Indebtedness, if any, of the Company referred to in Schedule 3.14 attached hereto, in not more than the respective unpaid principal amounts thereof specified in such Schedule; and

(d) Indebtedness of the Company secured as permitted by, and subject to the proviso to, subparagraph (c) of subsection 6.2.

6.2 Mortgages, Liens, etc.

The Company will not, directly or indirectly, create, incur, assume or suffer to exist, any mortgage, lien, charge or encumbrance on, or security interest in, or pledge of, or conditional sale or other title retention agreement (including

any Capital Lease) with respect to, any property or asset now owned or hereafter acquired by the Company except:

(a) Any lien securing Indebtedness to the Lender;

(b) The existing mortgages and security interests referred to in Exhibit 6.2(b) attached hereto, or any renewal, extension or refunding of any such mortgage or security interest in an amount not exceeding the amount thereof remaining unpaid immediately prior to such renewal, extension or refunding;

(c) Purchase money mortgages, liens and other security interests, including Capital Leases, created in respect of property acquired by the Company after the date hereof or existing in respect of property so acquired at the time of acquisition thereof, provided that (i) each such lien shall at all times be confined solely to the item or items of property so acquired, and (ii) the aggregate principal amount of Indebtedness secured by all such liens as to which the Company shall become obligated in any year shall at no time exceed an amount equal to fifty percent (50%) of the Company's net after tax income for the preceding fiscal year without the prior written approval of the Lender, which approval may be withheld by the Lender in its sole discretion; and

(d) Liens arising in the ordinary course of business in respect of obligations which are not yet due or which are being contested in good faith; and other liens or encumbrances incidental to the conduct of the business of the Company or to the ownership of its properties or assets, which were not incurred in connection with the borrowing of money or the obtaining of credit and which do not materially detract from the value of the properties or assets of the Company or materially affect the use thereof in the operation of its business.

6.3 Restricted Payments.

The Company will not, directly or indirectly, declare, order, pay or make any Restricted Payment or set aside any sum or property therefor. For purposes of this Agreement, Restricted Payment shall mean (a) any loan to any Person, including any Guarantor or Shareholder of the Company or any dividend or other distribution, direct or indirect, to any Shareholder of the Company other than normal monthly salaries, including without limitation, any contribution to any pension plan for the benefit of the Company's employees (except that the Company may pay any amount necessary to avoid penalties

under the Internal Revenue Code), or (b) any redemption, purchase or other acquisition, direct or indirect, of any shares of any class of stock of the Company now or hereafter outstanding or of any warrants or rights to purchase any such stock, (including without limitation the repurchase of any such stock or warrant or any refund of the purchase price thereof in connection with the exercise by the holder thereof of any right of rescission or similar remedies with respect thereto). Notwithstanding the foregoing, the Company may make principal and interest payments to James C. Callahan as and when due and payable with respect to a $250,000.00 loan by Mr. Callahan to the Company if the Company realizes cash flow, after the payment of principal, interest and other charges due with respect to the Term Loan, of more than $250,000.00 per year and if no Event of Default has occurred and is then continuing.

6.4 Acquisitions, Mergers, Consolidations and Subsidiaries.

The Company will not acquire the assets of any other Person, other than in the ordinary course of business, acquire the capital stock of any Person, enter into any merger or consolidation with any Person or sell, lease or otherwise dispose of all or any substantial part of the Company's properties or assets without the prior written consent of the Lender, or purchase any capital assets or enter into any Capital Lease if the purchase price for such capital assets or all payments due or to become due during the term of such Capital Lease is in excess of fifty percent (50%) of the net after tax income of the Company for the prior fiscal year, as such net after tax income is shown on the audited financial statements of the Company for and with respect to such fiscal year. The Company shall not form any additional Subsidiaries.

6.5 ERISA.

The Company will not permit any employee pension benefit plan, as that term is defined in the Employee Retirement Income Security Act of 1974 ("ERISA") maintained by it to (a) engage in any prohibited transaction as that term is defined in Section 4975 of the Internal Revenue Code of 1986, (b) incur any "accumulated funding deficiency" as that term is defined in ERISA, whether or not waived, or (c) terminate in any manner which could result in the imposition of a lien or encumbrance on the assets of the Company or any Subsidiary pursuant to Section 4058 of ERISA.

Section 7. Defaults; Remedies.

7.1 Events of Default; Acceleration.

If any of the following events (each an "Event of Default") shall occur:

(a) The Company shall default in the payment, as and when due and payable, of principal of or premium, if any, or interest on the Note and such default shall continue for ten days after the due date thereof, or the Company shall default in the payment of any amount due with respect to the Other Loans (other than principal and interest) whether at maturity or at a date fixed for the advance payment of any installment or prepayment thereof or by acceleration or otherwise;

(b) The Company shall default in the performance of or compliance with any term contained in Section 6; or

(c) The Company shall default in the performance of or compliance with any term contained herein other than those referred to above in this Section 7 and such default (if susceptible to cure) shall not have been remedied within thirty (30) days after written notice thereof shall have been given to the Company by the Lender; or

(d) The Company, any Guarantor or the Trustees shall default in the performance of or compliance with any term contained in any Security Document to which it is a party, or in the performance of or compliance with any term contained in any other written agreement with the Lender, and such default shall continue for more than the period of grace, if any, specified therein and shall not have been waived pursuant thereto. Notwithstanding the foregoing, nothing herein contained shall be construed as relieving the Company of its obligations to pay to Lender all late charges and default interest due and payable under the Note with respect to any payment due under the Note which is not timely made; or

(e) Any representation or warranty made by or on behalf of the Company, the Guarantors or the Trustees herein or by the Company, any Guarantor or the Trustees in any Security Document or pursuant hereto or thereto shall prove to have been false or incorrect in any material respect when made or furnished; or

(f) The Company, a Guarantor or the Trustees shall default in any payment due on any Indebtedness in respect