# EXHIBIT 2-O

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,

Plaintiff,

v.

MONETA CAPITAL CORPORATION

Defendant.

Civil Case No. 99-565(L)

**ORDER**

This matter having come for hearing before the Court on the Receiver's Motion to Confirm Private Sale of Real Property and it appearing to this Court that (1) notice of the proposed private sale having been published in the *Wall Street Journal, The Boston Globe* and *The Providence Journal*, (the "Publications"), newspapers of general circulation, pursuant to this Court's Order dated October 24, 2007; (2) that due and timely notice of said Motion having been given to all parties of record in this matter, loan participants and by publication to all other persons; and (3) that no objection having been filed and two qualifying competing bids were received by the Receiver by the deadline established by the Publications; and (3) that after conducting an auction between the qualifying bidders

**IT IS HEREBY ORDERED**

1. That the Receiver's Motion is granted with respect to that certain purchase and sale agreement attached hereto as Exhibit A ("Agreement"), which Agreement is hereby approved, and the specific terms and conditions of which shall be complied with;

2. That the private sale of the approximately 83 acres of real property located inWarwick, Rhode Island which is the subject matter of the Agreement (the "Property") is approved and confirmed pursuant to the specific terms and conditions of the Agreement;

3. That the Court finds and hereby rules that the sale of Property under the terms of the Agreement is fair and commercially reasonable, that the Property has been marketed in a fair and commercially reasonable manner, and that the purchaser under the Agreement is a good faith purchaser.

4. That the Property is vacant and transferred free from the claims of any former occupants with such residential structures that remain on the Property being deemed abandoned;

5. That a break-up fee in the amount of Five Hundred Thousand 00/100 Dollars ($500,000.00) payable to Rocky Point Partners, LLC is approved but shall only be payable in the event of a closing under the Agreement to Atlantic American Rocky Point Partners Group, LLC for the stated purchase price.

6. That Rocky Point Partners, LLC is approved as the second highest bidder for the Property and in the event of a termination of the Agreement, the Receiver may proceed to sell the Property to Rocky Point Partners, LLC upon the same terms and conditions as set forth in the Agreement for the sum of Fifteen Million Six Hundred Thousand 00/100 Dollars ($15,600,000.00) without the necessity of seeking further Order of this Court.

7. That the Receiver is hereby authorized to execute and deliver a Receiver's Deed conveying the Property and is further granted leave to take all actions to conclude such sale in accordance with this Order and the terms of the Agreement without further order of this Court.

**SO ORDERED:**

This 19th day of December, 2007, in Providence, Rhode Island.

Ronald R. Lagueux

THE HONORABLE RONALD LAGUEUX
SENIOR UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT A

# PURCHASE AND SALES AGREEMENT

This Agreement (the "Agreement") is made and entered into as of the 17th day of December, 2007, by and between the United States Small Business Administration as and only as Receiver of Moneta Capital Corporation (the "Seller") and Atlantic American Rocky Point Partners Group, LLC, a Limited Liability Company organized and existing under the laws of the State of Florida (the "Buyer").

W I T N E S S E T H:

In consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Premises. Subject to the terms and provisions hereof, the Seller agrees to sell and convey to the Buyer and the Buyer agrees to purchase those certain lots or parcels of land and all improvements and fixtures located thereon in which Seller may claim an interest or owns, located in the City of Warwick, County of Kent, State of Rhode Island, commonly known and numbered as (a) Assessor's Plat 379, Lots 8, 9, 158, 159, 425, 426 and 445, (b) Plat 380, Lot 1, Lot 3, Lot 281 and (c) Plat 381, Lots 38, 39, 40 and 41, Plat 380, more particularly described on Exhibit A excluding therefrom approximately forty-one acres as delineated on Exhibit B, which acreage is the subject of a separate purchase and sale agreement between the Seller and the City of Warwick. (the "Premises"). Subject to the agreement of the parties as set forth in Section 22, the final legal description shall be determined by the Survey, as defined herein, and shall replace the delineation of the Premises contained in Exhibits A and B attached hereto.

2. Title. The Premises are to be conveyed by the Seller by a good and sufficient Receiver's Deed running to Buyer, free from all mortgages or other encumbrances or matters of record, except:

> (a) Real estate taxes and general assessments that constitute a lien against the Premises, current as of the Closing; and
>
> (b) All easements, restrictions, plat restrictions or other matters of record, if any, to the extent now in force and applicable.

3. Purchase Price. The agreed purchase price (the "Purchase Price") for the Premises Seventeen Million One Hundred Sixty-One Thousand 00/100 Dollars ($17,161,000.00), which shall be paid as follows:

(a) $250,000.00 has been paid by the Buyer prior to the execution of this Agreement as a deposit (the "Initial Deposit") to be held in escrow in an interest-bearing account, with a financial institution located in the State of Rhode Island mutually agreeable to Seller and Buyer, by Mortgage Guarantee & Title Company, 450 Veterans Memorial Parkway, Suite 700, East Providence, RI 02914 (the "Escrow Agent") and such amount plus the interest accrued thereon shall be accounted for at the time of Closing and credited against the Purchase Price, subject to adjustment in accordance with Section 7 hereof; and

(b) Upon the Expiration Date of the Due Diligence Period (defined in Section 16 below), an additional $750,000.00 shall be paid by the Buyer to the Escrow Agent as an "Additional Deposit" (the Additional Deposit and the Initial Deposit shall hereinafter be collectively referred to as the "Deposit"); and

(c) the balance of the Purchase Price shall be paid by the Buyer at the Closing.

The Buyer acknowledges and agrees that, unless Buyer elects to terminate this Agreement on or prior to the Expiration Date of the Due Diligence Period (defined below), the Deposit (and all interest accrued thereon) shall be non-refundable except as otherwise expressly set forth herein.

4. Closing. Unless otherwise extended by written agreement of the parties hereto, the aforesaid Receiver's Deed is to be delivered at the closing which shall be held at the office of the Seller's counsel, 1080 Main Street, Pawtucket, Rhode Island at 10:00 a.m. upon the earlier of i) ten (10) days written notice from the Buyer to the Seller, or ii) March 28, 2008. (the "Closing"). Subject to any notice and cure periods contained herein, it is agreed that time is of the essence of this Agreement. Seller shall pay or cause to be paid at Closing all of Seller's costs and expenses referenced herein, if any. Seller shall be responsible for any real estate transfer taxes customarily paid by Sellers upon the conveyance of real estate in the State of Rhode Island. Any special assessments levied with respect to the Premises as of the Closing shall be paid by the Seller or credited to the Buyer at the Closing; provided, however, if any such special assessment may be paid in installments, the Seller shall be responsible for all installments due and payable prior to the Closing, and the Buyer shall assume and be responsible for the balance of installments due from and after the

Closing. Any special assessments levied with respect to the Premises subsequent to the Closing shall be the sole responsibility of the Buyer (As of the date hereof, Seller is not aware of any pending special assessment that may impact or otherwise effect the Premises).

5. Conditions to Seller's Obligations. The Seller's obligations under this Agreement are subject to and contingent upon the Seller obtaining an order of the United States District Court for the District of Rhode Island which is final with all appeal periods having expired with no timely appeals being taken therefrom, or with any timely appeals being resolved by a final order of a court of competent jurisdiction (such final and non-appealable order is referred to herein as the "Court Order") authorizing the Seller to enter into this Agreement and approving the terms of the sale of the Premises and the sale of approximately forty-one acres of property adjacent to the Premises (the "outparcel") to the City of Warwick for the purchase price of Four Million Four Hundred Thousand Dollars. Seller agrees to use all reasonable best efforts to obtain the Court Order as soon as is practical. In the event that the Court Order has not been obtained on or before January 30, 2008, notwithstanding Seller's reasonable best efforts to do so (the "Court Order Deadline"), at the election of either Buyer or Seller the Deposit and all interest accrued thereon shall be returned to the Buyer and this Agreement shall be deemed null and void and of no further effect without recourse to either party except for any provisions that are expressly stated to survive the expiration or other termination of this Agreement.

In the event the sale of the outparcel to the City of Warwick is not consummated for any reason whatsoever, the Receiver shall have the absolute right to terminate this Agreement and shall have no obligation to sell the Premises. In the event the Receiver terminates the Agreement due to the failure to consummate the sale of the outparcel to the City of Warwick, the Deposit and all interest accrued thereon shall be returned to the Buyer together with reimbursement of the Buyer's due diligence costs up to $100,000.00 and this Agreement shall be deemed null and void and of no further effect without recourse to either party except for any provisions that are expressly stated to survive the expiration or other termination of this Agreement. Upon payment of the Deposit, all interest and the due diligence costs by the Seller the Buyer shall provide all due diligence materials pertaining to the Premises in Buyer's possession or control together with an assignment thereof to the Seller.

6. Possession. Possession of the Premises shall be delivered to Buyer on the Closing Date free and clear of any and all tenants, occupants, and other parties in interest.

7. No Extended Time for Closing. If Seller shall be unable

to deliver title in accordance with Section 21 hereof, or to make conveyance, or to deliver possession of the Premises, all as herein stipulated, or if on the Closing Date the Premises do not conform with the provisions hereof, then, at the Buyer's option, the Deposit (and all interest which has accrued thereon), and any other amounts paid by the Buyer hereunder as a part of the Deposit, shall be forthwith refunded and all other obligations of all parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto unless the Buyer makes the election referred to below.

The Buyer shall have the election to accept such title as the Seller can deliver to the Premises in its then condition and to pay therefor the Purchase Price without deduction, in which case the Seller shall convey such title. Provided that Buyer is not in default under the terms hereof

8. Wetlands Disclosure. All or part of the Premises have or may have previously been determined to be a coastal wetland, bog, fresh water wetland, pond, marsh, riverbank or swamp, as those terms are defined in Chapter 2-1, R.I.G.L., as amended. The foregoing is intended as the disclosure required by said Chapter 2-1 if and to the extent said Chapter is applicable.

9. Use of Purchase Money. To enable Seller to make conveyance as herein provided, Seller may, on the Closing Date, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests provided that all instruments so procured are recorded simultaneously with the recording of said deed or that provision for prompt recording thereof subsequent to the Closing reasonably satisfactory to the parties are made on the Closing Date.

10. Default. If Buyer shall fail to fulfill Buyer's obligations hereunder Seller shall provide written notice of default via facsimile and mail to the Buyer. The Buyer shall have up to the earlier of i) thirty days from the date of said notice or ii) March 27, 2008 but not with respect to the provisions of Section 22 hereof pertaining to the outparcel, to cure such default. In the event the Buyer fails to timely cure such default, the Deposit (and all interest accrued thereon) which is to be held in escrow by the Escrow Agent shall be delivered by the Escrow Agent to the Seller and retained by the Seller, as Seller's sole and exclusive remedy of liquidated damages in lieu of any and all other rights and remedies available to Seller at law and in equity other than Seller's right to seek recompense from the Buyer for the cost of remediation of any environmental damage or other property damage to the extent caused by Buyer's possession of the Premises, and the Seller's right to seek damages and equitable relief relative to the terms of this Agreement that specifically survive termination hereof, which rights may be exercised by the Seller in addition to the retention of the Deposit.

In the event the Seller shall be in default hereunder, Buyer shall be entitled to either (i) a return of the Deposit (and all interest accrued thereon) held in escrow by the Escrow Agent or, (ii) to pursue the remedy of specific performance as Buyer's sole and exclusive remedy at law or in equity for such default.

11. Notices. All notices required or permitted to be given hereunder shall be mailed postage prepaid, by registered or certified mail, addressed to the addresses set forth below:

If to Seller:

United States Small Business Administration
Receiver of Moneta Capital Corporation
666 Eleventh Street, N.W., Suite 200
Washington, D.C. 20001
Attn: Stephen Jones

With a copy to:

Shechtman Halperin Savage, LLP
1080 Main Street
Pawtucket, RI 02860
Attn: Thomas E. Carlotto, Esquire

If to Buyer:
Atlantic American Rocky Point Partners Group, LLC
C/O Uiversal Properties Group, Inc.
207 Quaker Lane, Suite 300
West Warwick, RI 02893
Attn: Nicholas Cambio

With a copy to:

Winograd, Shine & Zacks, P.C.
123 Dyer Street
Providence, RI 02903
Attn: Diane Finkle, Esq.

12. No Recording. This Agreement may not be recorded in the Records of Land Evidence of the city, town or county wherein the Premises are located. In the event the Buyer records or causes the Agreement to be recorded in violation of the foregoing prohibition, the Buyer, at the Seller's election at any time thereafter, shall conclusively be deemed in default hereunder entitling the Seller to all the remedies provided herein for the Buyer's default including, without limitation, the right to retain the Deposit and all interest which has accrued thereon, if any. In addition, in the event this Agreement is recorded in violation

of the foregoing prohibition against recording, the Seller is hereby authorized and empowered as the true and lawful attorney-in-fact for the Buyer to record in said Land Evidence Records an affidavit of the Seller stating that the Seller has elected to hold the Buyer in default hereunder and all third parties may conclusively rely upon the recording by the Seller of such an affidavit as establishing that the Buyer has released to the Seller and no longer has any right, title or interest in and to this Agreement or the Premises and this Agreement will be deemed terminated and discharged of record with the same force and effect as if it had never been recorded. The foregoing power of attorney shall be deemed irrevocable and coupled with an interest. The Buyer further agrees to execute, acknowledge and deliver, in recordable form, any further documents, assurances or instruments as the Seller may request (following Buyer's default and the termination of Buyer's rights hereunder) in order to further confirm that the Buyer no longer has any right, title or interest in and to this Agreement or the Premises and in the event that the Buyer refuses or fails to forthwith execute same, the Seller is hereby appointed the true and lawful attorney-in-fact as aforesaid of the Buyer to execute same, which power of attorney shall be deemed irrevocable and coupled with an interest. Notwithstanding the foregoing, upon the request of the Buyer, the Seller shall execute and deliver to the Buyer a Memorandum of Agreement in recordable form satisfactory to Seller, which Memorandum of Agreement may be recorded in the Land Evidence Records for the City of Warwick and County of Kent, Rhode Island. Any such Memorandum of Agreement shall include, *inter alia*, a provision appointing Seller as Buyer's true and lawful attorney-in-fact for the purpose of executing a Memorandum of Termination of Agreement in the event this Agreement expires or is terminated. The foregoing power of attorney shall be deemed irrevocable and coupled with an interest.

13. Court Approval. This Agreement is contingent upon the approval of its terms by the federal court referenced in Section 5 hereof in connection with the Receivership of Moneta Capital Corporation ("Receivership").

14. Seller's Closing Deliveries. The Seller hereby agrees to deliver to the Escrow Agent the following documents at or before the Closing:

(a) A certified copy of the Court Order;

(b) The Receiver's Deed referred to in Section 2 hereof;

(c) All documents reasonably required to comply with the provisions of the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"); and

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 11 of 26

(d) Such other documentation as is reasonably and customarily required by Buyer and Buyer's title insurance company in the case of a sale of real estate by a Receiver.

Items (a) - (d) are sometimes collectively referred to herein as the "Closing Deliveries".

15. Buyer's Closing Deliveries. The Buyer agrees to deliver the following to the Seller on or before the Closing

(a) Copies of the organizational documents of Buyer, certified by the Secretary of State of organization;

(b) Evidence of authority and incumbency;

(c) Settlement statement;

(d) Payment of the Purchase Price.

The cost of recording the documents called for in this Agreement shall be paid for by the Buyer.

16. Due Diligence Period; Buyer's Access, Indemnity; Prohibition Against Liens.

(a) From and after the effective date of this Agreement, and subject to the terms and conditions of subsection 16(b) below, Buyer shall have the right to undertake such investigations of the Property as Buyer deems appropriate. If, on or prior to the date (such date being the "Expiration Date of the Due Diligence Period") which shall be March 27, 2008, Buyer shall have the right in Buyer's sole and absolute discretion to terminate this Agreement upon written notice to Seller for any reason. Upon exercise of such termination right, the Deposit shall be returned to Buyer, this Agreement shall terminate, and the parties shall have no further rights or liabilities hereunder except for such matters which are expressly stated to survive hereunder.

(b) Buyer and its agents, contractors, and invitees shall be afforded access to the Premises at all times during the pendency of this Agreement. Buyer may perform or cause to be performed, at Buyer's sole cost and expense except as otherwise expressly set forth herein, tests, inspections, environmental audits and surveys of the Premises at all reasonable times prior to the Closing, including, without limitation, a Phase I Environmental Site Assessment and a Phase II Environmental Site Assessment (collectively, the

"Environmental Site Assessments"). The Buyer shall promptly repair any damage to the Premises caused by the Buyer's activities in connection with this Agreement, and the Buyer agrees to indemnify, defend and hold the Seller harmless from and against any and all claims, demands, actions, causes of action or other liabilities arising out of or in connection with the Buyer's activities under this Agreement. Buyer shall prevent the placement or attachment of any mechanic's, materialman's, laborer's or other lien on the Premises arising out of or resulting from this Agreement and shall indemnify and hold harmless the Seller from and against any damages, losses, costs or liabilities connected therewith, and shall immediately discharge or bond any such lien that may be so placed or attached against the Premises. Buyer hereby agrees to indemnify and save harmless the Seller from and against all claims of whatever nature arising from any act, omission, or negligence of the Buyer or the Buyer's contractors, licensees, agents, servants or employees or arising from any accident, damage or injury whatsoever caused to any person or to the property of any person, or from any violation of any applicable law in or about the premises, or arising from any accident, where such accident, damage, injury or violation results or is claimed to have resulted from an act or omission on the part of Buyer or Buyer's contractors, licensees, agents, servants or employees. The foregoing indemnification shall include indemnity against all costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof, including, without limitation, attorneys' fees. The provisions of this Section 16 shall survive the Closing and any termination of this Agreement.

17. FIRPTA. The Seller represents to the Buyer that FIRPTA withholding is not required.

18. Risk of Loss; Insurance Requirements. The risk of loss shall be borne by the Seller and the Seller shall maintain liability insurance through the date of the Closing. In the event of any damage and/or condemnation of the Premises, the Buyer shall remain obligated to purchase the Premises pursuant to the terms of this Agreement without reduction in the Purchase Price, provided, however, any insurance proceeds paid or payable in connection with any such damage or closing shall be paid and/or assigned to Buyer at Closing.

19. Escrow Agent. The Escrow Agent, by executing this Agreement, acknowledges receipt of the Deposit paid by the Buyer to be held under the terms hereof. The Escrow Agent agrees to hold, keep and deliver the Deposit and all other sums delivered to it pursuant hereto in accordance with the terms and provisions of

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 13 of 26

this Agreement. The Escrow Agent shall not be entitled to any fees or compensation for its services hereunder. The Escrow Agent shall be liable only to hold said sums and deliver the same to the parties named herein in accordance with the provisions of this Agreement, it being expressly understood that by acceptance of this Agreement the Escrow Agent is acting in the capacity of a depository only and shall not be liable or responsible to anyone for any damages, losses or expenses unless same shall have been caused by the negligence or willful malfeasance of the Escrow Agent. In the event of any disagreement among the parties to this Agreement, or among them or any of them and any other party resulting in any adverse claims and demands being made in connection with or for the monies involved herein or affected hereby, the Escrow Agent shall be entitled to refuse to comply with any such claims or demands so long as such disagreement may continue; and in so refusing the Escrow Agent shall make no delivery or other disposition of any of the monies then held by it under the terms of this Agreement and in so doing the Escrow Agent shall not become liable to anyone for such refusal; the Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of the adverse claimants shall have been finally settled by the Federal District Court for the District of Rhode Island, or (b) all differences shall have been adjusted by agreement between or among the parties and the Escrow Agent shall have been notified in writing of such agreement signed by the parties hereto. Further, the Escrow Agent shall have the right at all times to pay all sums held by it (i) to the appropriate party under the terms hereof, or (ii) into any court of competent jurisdiction after a dispute between or among the parties hereto has arisen, whereupon Escrow Agent's obligations hereunder shall terminate.

20. <u>AS-IS</u>. Except as otherwise expressly set forth herein, the Buyer acknowledges and agrees that the Premises are being sold in their "AS IS" and "WHERE IS" condition and "WITH ALL FAULTS". Notwithstanding anything contained in this Agreement to the contrary or which might be construed to the contrary, the Buyer acknowledges and agrees that the Buyer has not been influenced to enter into this transaction nor is the Buyer relying upon any representations, warranties or other statements, whether verbal or in writing, in connection with the Premises and the transactions contemplated hereunder except as otherwise expressly set forth herein, and the Buyer further acknowledges and agrees that the Buyer is relying solely upon its own independent inspection and examination of the Premises, title to same and economic matters and as to whether the Premises or any use thereof is or would be in compliance with any and all applicable laws, ordinances and regulations including, without limitation, zoning, building codes or other laws, ordinances or regulations. Without limiting the generality of the foregoing, Seller shall not be obligated to perform any environmental remediation or demolition at the Premises nor shall Buyer be entitled to any credits or offsets for any costs related thereto. In addition, any verbal or written

statement or other information or materials supplied or alleged to have been supplied to the Buyer on behalf of the Seller shall be deemed to have been supplied or made available to the Buyer for informational purposes only and the Buyer may make whatever use of such information and materials the Buyer deems appropriate.

21. Title Insurance and Title Examination. The Buyer shall promptly cause title to the Premises to be examined and Buyer shall cause an owner's title insurance commitment in the amount of the purchase price ("Commitment") to be issued by a title insurance company licensed to do business in the State of Rhode Island and delivered to Buyer at Buyer's sole cost and expense within sixty (60) days following the date of this Agreement. On or before 5:00 p.m. on the fifth(5th) day following the hereinafter defined Survey Completion Deadline, Buyer shall notify Seller in writing of any objection to the items disclosed on the Commitment, together with a copy of said Commitment and (if available) legible copies of any exceptions to title to which Buyer objects. Seller shall have up to the date of Closing to cure the same at Seller's option, but without obligation to do so except that Seller shall be obligated at Closing to cure any such title objections which are monetary in nature (such as delinquent taxes, assessments, interest and/or penalties, tax liens, mechanics' liens, provided that such matters were not caused or created by Buyer, Buyer's agents and/or consultants and mortgage indebtedness) which may be removed by the Seller's tender of a specific ascertainable amount of money ("Monetary Title Exceptions") and any record claims. If the objections, other than the Monetary Title Exceptions which Seller shall cure at Closing, are not satisfied within such time period, Buyer may (a) terminate this Agreement and receive a refund of the Deposit together with all interest accrued thereon and in such event, neither party shall have any further rights or obligations under this Agreement other than as stated in this Agreement, or (b) waive the unsatisfied objection and close this transaction without adjustment to the Purchase Price with respect to such objection. If Seller is not given timely written notice that Buyer is terminating the Agreement within the specified time period by reason of any title objection, than any such title objections shall be deemed as waived by the Buyer. Seller agrees not to further encumber the Premises during the pendency of this Agreement.

22. Survey. Buyer shall obtain a Class I ALTA survey of the Premises incorporating a delineation of all wetlands on the Premises (the "Survey") by a Registered Land Surveyor in the State of Rhode Island at Buyer's sole cost and expense, with said Survey to be certified to Buyer and the title insurance company referenced herein. On or before January 30, 2008 (the "Survey Completion Deadline"), the Buyer shall provide to the Seller the Surveyor's proposed legal description for the Premises together with a copy of the Survey. Within five (5) days thereafter, the Seller shall notify the Buyer in writing of any matters the Seller reasonably determines are unacceptable in said legal description.

In the event the Seller shall fail to timely notify the Buyer in writing of the unacceptability of the legal description, Seller shall be conclusively deemed satisfied with the legal description of the Premises. In the event the parties are unable to agree upon a legal description after notice from the Seller, this Contract shall be deemed terminated as of the date provided for the Closing and Buyer shall receive a refund of the Deposit together with all interest accrued thereon. Contemporaneously with the provision of the legal description, the Buyer shall notify the Seller in writing of any matters reflected in the Survey which the Buyer reasonably determines are unacceptable to Buyer because such matters will adversely and materially affect Buyer's ability to develop and sell the Premises in accordance with its development and business plans therefor. In the event the Buyer does not accept the Survey and provides the written notice provided hereinabove to Seller on a timely basis, then, subject to the parties' respective rights to elect to cure and/or waive as set forth in the preceding Section 21, this Contract shall be deemed as terminated and Buyer shall receive a refund of the Deposit together with all interest accrued thereon. In the event the Buyer shall fail to timely notify the Seller in writing of any such unacceptable Survey matters, Buyer will be conclusively deemed satisfied with the Survey of the Premises and all conditions shown thereon as of the date of the Survey. The Buyer shall have the right to obtain and use any and all materials owned by the Seller by virtue of that certain assignment given by Vanderbilt Capital, LLC and Toll Brothers relating to a survey completed by Garafolo & Associates, Inc.

Within seven days after the delivery to the Buyer or its counsel of record identified herein a copy of the proposed final Class I ALTA Survey and the metes and bounds legal description of the outparcel being sold to the City of Warwick, Buyer shall notify Seller in writing of any objection to said survey and legal description of the outparcel that is reasonably inconsistent with Exhibit B to this Agreement. The Buyer will state with particularity each such objection. In the event the Buyer shall fail to timely notify the Seller in writing of the unacceptability of the proposed legal description or the Survey for the outparcel in accordance with the terms herein, Buyer shall be conclusively deemed satisfied with such legal description and survey of the outparcel. In the event the parties are unable to agree upon a legal description and survey of the outparcel after proper notice from the Buyer, this Contract shall be deemed terminated as of December 31, 2007, unless the parties agree to extend such date in an effort to resolve such issues. In the event of such termination the Buyer shall receive a refund of the Deposit together with all interest accrued thereon.

23. Attorneys Fees. In the event of any default hereunder, the non-defaulting party may recover from the defaulting party all reasonable attorneys fees incurred in enforcing the terms of this Agreement.

24. Successors and Assigns. The Buyer shall not assign, transfer or convey all or any portion of the Buyer's rights and/or obligations under this Agreement without the prior written consent of the Seller, which consent may be given or withheld in the sole and absolute discretion of the Seller.

25. Entire Agreement; Modification of Agreement. This Agreement may not be amended or modified except pursuant to a written instrument executed by both Buyer and Seller. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and is subject to no other understandings, conditions or agreements other than those expressly contained herein.

26. Governing Law. The parties further agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island.

27. No Brokerage. Each party represents to the other that such party has not dealt with any real estate broker or agent with respect to the Premises and hereby agrees to indemnify each other party from any claims made by any such agent or broker claiming to have dealt with such indemnifying party. The aforesaid indemnification shall survive the Closing Date and the delivery of the deed.

28. Merger in the Deed. The acceptance of a deed by the Buyer shall be deemed full performance and satisfaction of all obligations of the Seller under this Agreement except for those provisions which are stated to expressly survive the Closing.

29. No Financial Assistance. The Buyer acknowledges and agrees that the City of Warwick has no obligation to make City financial assistance available to the Buyer in connection with the development of the Premises.

30. Financial Condition. Promptly upon the written request of the Seller, the Buyer shall provide such written information as may reasonably be required to satisfy the Seller that the Buyer has the financial capacity to consummate the purchase of the Premises.

31. Conveyance of Assessor's Plat 379, Lot 159. The Seller shall, at its sole cost and expense, obtain a Class 1 ALTA survey of Assessor's Plat 379, Lot 159 (the "Perry Lot"). In the event that such survey confirms that the Perry Lot is a part of the real estate described on Exhibit A, but is not contiguous with the balance of the real estate described on Exhibit A, then notwithstanding anything contained herein, at the Closing, if the Perry Lot can be conveyed apart from the balance of the real estate described on Exhibit A in accordance with all applicable rules, laws and ordinances, the Seller shall convey via Receiver's

Deed in its AS-IS condition with no representations or warranties except disclosures required by applicable law, which disclosures shall be limited to Seller's knowledge, that certain land designated as Assessor's Plat 379, Lot 159 to Kenneth J. Perry as the Buyer's nominee. The purchase price to be paid by Kenneth J. Perry for Assessor's Plat 379, Lot 159 shall be an amount equal to the average of three appraisals to be prepared by three (3) appraisers mutually acceptable to Buyer and Kenneth J. Perry to be obtained at the expense of Kenneth J. Perry prior to entry of the Court Order by Seller. The purchase price for the Perry Lot and a general release in form and substance reasonably satisfactory to Buyer shall be delivered to the Buyer at the Closing, and the Buyer shall remain responsible for the payment of the entire Purchase Price to Seller.

32. Operational Costs: Unless this Agreement is terminated in accordance with the terms herein, on March 28, 2008, the Buyer shall pay all taxes, utilities and insurance expenses (the "Operational Costs"), in an amount not to exceed $1,650.00 per day, accrued from January 1, 2008 through said date. The Operational Costs shall be adjusted at Closing with the Buyer responsible for any Operational Costs accrued for the period from January 1, 2008 through the Closing in excess of the payments made by the Buyer under this Section 32. The Buyer shall receive a credit at Closing for any amounts paid as Operational Costs, which exceed the actual Operational Costs accrued from January 1, 2008 through the date of the Closing. In the event the Receiver terminates the Agreement due to the failure to consummate the sale of the outparcel to the City of Warwick, the Operational Costs paid by the Buyer shall be returned to the Buyer.

Counterparts: This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same Agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

**IN WITNESS WHEREOF** this Agreement has been executed as a sealed instrument the day and year first set forth above.

WITNESS:

[signature]
Sara L Delaney

Buyer:

By: [signature]
Robert Moreyra

Seller:

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 18 of 26

United States Small Business Administration, as and only as Receiver of Moneta Capital Corporation

WITNESS:

______________________
Arlene Embrey

By: ______________________
Name: ______________________
Title: Acting Director, SBA Office of Liquidation

Escrow Agent:

By: ______________________

EXHIBIT A
LEGAL DESCRIPTION

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 20 of 26

EXHIBIT A

Parcel I:

That parcel of land, situated on the easterly side of Palmer Avenue in the City of Warwick in the State of Rhode Island, bounded and described as follows:
Beginning at a point in the southerly line of land now or lately of Alfred F. Varone, said point being approximately fourteen hundred and fifty (1450') feet easterly from the easterly line of Palmer Avenue; thence turning an angle of 90° and running northerly bounded westerly by other land of this grantor, a distance of one hundred and seventy-five (175') to a point; thence turning an interior angle of 90° and running easterly still bounded northerly by other land of this grantor to the high water mark of Narragansett Bay; thence turning and running generally southerly along said high water mark of Narragansett Bay to the northerly line of land owned by Rocky Point Amusement Park, Inc., thence turning and running westerly, bounded southerly by said land owned by Rocky Point Amusement Park, Inc., a distance of five hundred and fifty (550'±) more or less to the point and place of beginning. Meaning and intending to convey a parcel of land containing 2.21 acres more or less.

PARCEL II:

That parcel of land, situated on the easterly side of Palmer Avenue in the City of Warwick in the State of Rhode Island, Bounded and described as follows: Beginning at a point in the easterly line of Palmer Avenue at the northwesterly corner of land now or lately of Vincent Ferla and the southwesterly corner of said parcel; thence easterly bounding southerly on the last mentioned land nine hundred twenty-six and 2/10 (926.2) feet to a stone bound set in the ground; thence continuing easterly bounding southerly on said Ferla land to Narragansett Bay; thence northerly bounding easterly on Narragansett Bay to land now or lately of Mary Blatty; thence westerly bounding northerly in part on the last named land, in part on a street, in part on land now or lately of Harry A. Stowell, Jr. and wife, in part on land now or lately of Mary J. McGovern et al. in part on land now or lately of Samia Shaken, Robert Kindley Estate, in part on land now or lately of Theodore C. Kanelos and wife, in part on land now or lately of Helma C. Evans, in part on land now or lately of Wilmer T. Cudworth and wife, in part on land now or lately of John E. Francis Chapman and wife, in part on land now or lately of Annie Vesey et al., Goulding and wife, in part on land now or lately of John J. Callan and wife, in part on land now or lately of Frank Acella, in part on land now or lately of Walter E. Marshall, in part on land now or lately of Margaret Marshall et al., in part on land now or lately of Dumenico Buccini et al., in part on land now or lately of Ovid Monacelli et al., in part on land now or lately of Domenic Ballettio, in part on land now or lately of Erminio Fascitelli et al., in part on land now or lately of Angelo Caputo and wife and in part on land now or lately of Armen H. Johnson about sixteen hundred eighty (1680) feet to Palmer Avenue; thence southerly bounding westerly on Palmer Avenue seven hundred thirty two (732) feet, more or less, to said Ferla land and the point and place of beginning; BUT EXCEPTING THEREFROM Parcel I described above.

Parcels I and II are conveyed together with all right, title and interest of the grantor in and to any buildings and improvements located on the hereinabove described premises, but subject to all right, title and interest of others in and to buildings and improvements located on the said premises.

Exhibit A

PARCEL III

That certain tract of land, with all buildings and improvements thereon, situated at the easterly ends of Rocky Point Avenue and Aldrich Avenue and on the easterly side of Palmer Avenue in the City of Warwick and State of Rhode Island, bounded and described as follows:

Beginning at the most southwesterly corner of said tract, being the southeasterly corner of land formerly of Stuart H. Aldrich, now or lately of the Estate of Martha L. A. Hoge, also being a point in the northwesterly shore line of Narragansett Bay;

thence generally northeasterly, northerly and northwesterly, bounding on Narragansett Bay, to land formerly of Jessica H. Fournier et al, now or lately of Rocky Beach Corporation;

thence southwesterly bounding northwesterly on said Fournier land to land now or lately of Rhode Island Suburban Railway Company;

thence generally southeasterly, westerly and northwesterly bounding on the last mentioned land to other land formerly of said Jessica H. Fournier and now or lately of said Rocky Beach Corporation;

thence southwesterly bounding northwesterly on the last mentioned land to Palmer Avenue, so-called, formerly called Rocky Point Road;

thence southerly bounding westerly on Palmer Avenue in part, in part on land formerly of Nicola Caldarone, now or lately of Thomas A. Scotti and wife, and in part on the Fountain Lot, so-called, to land formerly of said Stuart H. Aldrich, now or lately of said Estate of Martha L. A. Hoge;

thence generally southeasterly bounding generally southwesterly on said land of said Hoge Estate in part, in part on Aldrich Avenue and in part on the first mentioned land of said Hoge Estate to Narragansett Bay at the point and place of beginning.

ALSO the Fountain Lot, so-called, and a narrow strip of land leading thereto, bounding easterly on the tract hereinbefore described and southerly on said Hoge Estate land.

ALSO all of the grantor's right, title and interest in and to the land formerly occupied by said Rhode Island Suburban Railway Company adjoining said tract.

Together with all the grantor's riparian rights, privileges and appurtenances.

PARCEL IV

That certain tract or parcel of land with all the buildings and improvements thereon, situated in the City of Warwick, County of Kent, State of Rhode Island bounded and described as follows:

Beginning at a point in the southerly line of Rocky Point Avenue, which said point is three hundred (300) feet westerly of a stone bound set in the ground at the southwestly corner of Rocky Point Avenue and Palmer Avenue, said point of beginning being the northeasterly corner of land now or lately of Conrad and Anita Ferla, and is the northwesterly corner of the within described parcel; thence running southerly bounding westerly on said Ferla land a distance of three hundred fifty-eight and 37/100 (358.37) feet to land now or lately of Rocky Point Amusements, Inc.; thence turning and running easterly bounding southerly on said last-named land two hundred ninety-two and 3/10 (292.3) feet to other land of Rocky Point Amusements, Inc.; thence turning and running northerly bounding easterly on said last-named land one hundred seventy (170) feet, more or less, to the southerly terminus of Palmer Avenue; thence turning and running westerly bounding northerly on said terminus of Palmer Avenue to the westerly line of Palmer Avenue; thence turning and running northerly bounding easterly on said Palmer Avenue, one hundred seventy (170) feet, more or less, to said Rocky Point Avenue; thence turning and running westerly bounding northerly on said Rocky Point Avenue three hundred (300) feet to land now or lately of Conrad and Anita Ferla and the point and place of beginning.

Exhibit A

PARCEL V

That certain parcel of land situated at the intersection of Palmer Avenue and Rocky Point Avenue in the City of Warwick, County of Kent, State of Rhode Island, bounded and described as follows:

Beginning at a point, said point being the intersection of the westerly line of Palmer Avenue and the northerly line of Rocky Point Avenue; thence running northerly bounding easterly on Palmer Avenue, One hundred fifty-eight and 2/10 (158.2) feet to land now or lately of Vincent Morelli et ux; thence running westerly bounding northerly on said last named land, Two hundred forty-nine and 03/100 (249.03) feet to land now or lately of Richard L. Greene et ux; thence southerly bounding westerly on said Greene land, One hundred sixty-three (163) feet more or less to Rocky Point Avenue; thence easterly bounding southerly on Rocky Point Avenue, Two hundred fifty (250) feet more or less to Palmer Avenue at the point and place of beginning.

PARCEL VI

That certain parcel of land with all buildings and improvements thereon, situated in the City of Warwick, County of Kent and State of Rhode Island and bounded and described as follows:

Beginning at a point in the southerly line of Rocky Point Avenue, which said point is three hundred (300) feet westerly along the southerly line of Rocky Point Avenue from a stone bound set in the ground at the southwesterly corner of Rocky Point Avenue and Palmer Avenue, said point being the point of beginning, thence continuing westerly along the southerly line of Rocky Point Avenue a distance of four hundred three and 30/100 (403.30) feet to a point in the southerly line of Rocky Point Avenue, thence turning an angle of 90° with said avenue and running southerly in a straight line a distance of one hundred fifty two and 88/100 (152.88) feet to a tangent point of a curve thence running south and southeasterly on a curved line with an arc distance of one hundred seven and 99/100 (107.99) feet and a radius of seventy-five (75) feet to another tangent point and end of curve in said line, thence running easterly slightly southerly in a straight line a distance of fifty two and 64/100 (52.64) feet to a corner, thence turning an interior angle of 262° and 26' with last mentioned line and running southerly in a straight line one hundred twenty four and 29/100 (124.29) feet to a point in the northerly line of a narrow strip of land reserved for a water channel, thence turning an interior angle of 89° 58' and running easterly in a straight line along said water channel a distance of two hundred ninety three and 77/100 (293.77) feet, thence turning an interior angle of 88° 47', and running northerly in a straight line a distance of three hundred fifty eight and 37/100 (358.37) feet to Rocky Point Avenue and the point and place of beginning, said last line forming an interior angle of 91° 15' with Rocky Point Avenue and containing 129,704 square feet more or less.

Subject to a right of way over the westerly and southwesterly portion (of land) fifty (50) feet wide from Rocky Point Avenue and fifty two and 64/100 (52.64) feet easterly from the last point of tangent as set forth in prior deeds of record.

Exhibit A

PARCEL VII

That certain tract or parcel of land with all buildings and improvements thereon, situated on the northerly side of Aldrich Avenue in the City of Warwick, County of Kent, State of Rhode Island, bounded and described as follows:

Beginning at an iron pipe set in the northerly line of Aldrich Avenue at the southeast corner of lot seven (7) on that plat entitled "Plan of Land for David F. LaRoche Warwick, R.I. June, 1982 Scale 1" = 100' Bristol Associates" said plat being recorded in the Records of Land Evidence of said City of Warwick in File 2, Drawer 2, Card 82-2695, and said point of beginning also being the southwesterly corner of the parcel herein conveyed and a point in the arc of a curve being the northerly and northeasterly line of Aldrich Avenue having a radius of one hundred sixty and 00/100 (160.00) feet and a central angle of 128°21' 34"; thence running easterly and southeasterly in the arc of said curve in the northerly and northeasterly line of Aldrich Avenue two hundred eight and 45/100 (208.45) feet, more or less, to the point of tangency of the reverse curve having a radius of two hundred twenty-five and 20/100 (225.20) feet and a central angle of 20° 28' 00"; thence running southeasterly in the arc of said last described curve, being the northeasterly line of Aldrich Avenue eighty and 44/100 (80.44) feet to the point of tangency of said curve; thence running southeasterly in the northeasterly line of Aldrich Avenue forty-one and 44/100 (41.44) feet to the point of curvature of a curve having a radius of one hundred seventy-seven and 50/100 (177.50) feet and a central angle of 69° 32' 00"; thence running southeasterly and easterly in the arc of said curve being the northeasterly and northerly line of Aldrich Avenue two hundred fifteen and 43/100 (215.43) feet to the point of tangency of said curve; thence running easterly in the northerly line of Aldrich Avenue thirty and 00/100 (30) feet to the point of curvature of a curve having a radius of one hundred nineteen and 79/100 (119.79) feet and a central angle of 36° 55' 44"; thence running northeasterly in the arc of said curve being the northwesterly line of Aldrich Avenue seventy-seven and 21/100 (77.21) feet to the point of tangency of said curve; thence running northeasterly in the northwesterly line of Aldrich Avenue three hundred forty-seven and 80/100 (347.80) feet to an angle point in the said road; thence turning an interior angle of 197° and running northeasterly in the northwesterly line of Aldrich Avenue one hundred thirty-four and 25/100 (134.25) feet to a point: said point being the southeasterly corner of the hereindescribed parcel and being in the southwesterly line of land now or formerly owned by Rocky Point Amusements, Inc.; thence turning an interior angle of 84° 27' 15" and running northwesterly bounding northeasterly on said Rocky Point Amusements, Inc. land four hundred twenty-one and 87/100 (421.87) feet to an angle point; thence turning an interior angle of 206° 15' 00" and running northerly bounding easterly on said Rocky Point Amusements, Inc. land one hundred eighty-four and 80/100 (184.80) feet to a point at the northeasterly corner of the hereindescribed parcel; thence turning an interior angle of 83° 45' 00" and running westerly bounding northerly on a strip of land twenty (20) feet in width owned by Rocky Point Amusements, Inc., two hundred ninety-two (292) feet to an angle point; thence turning an interior angle of 184° and running westerly still bounding northerly on said twenty (20) foot strip to the northeasterly corner of lot seven (7) on the above-referenced David F. LaRoche plat, said point also being the northwesterly corner of the herein conveyed parcel; thence turning an interior angle of 90° 38' 28" and running southerly bounding westerly on said lot seven (7) on David F. LaRoche plat four hundred twenty-three and 92/100 (423.92) feet, more or less, to Aldrich Avenue and the point and place of beginning.

Subject to and with the benefit of all restrictions, conditions, privileges and rights-of-way of record.

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 24 of 26

Exhibit A

Parcel VIII

That certain parcel of land with all buildings and improvements thereon situated on the westerly side of Palmer Avenue and the Southerly side of Boylston Street in the City of Warwick and State of Rhode Island, bounded and described as follows:

Beginning at the intersection of the southerly line of Boylston Street with the westerly line of Palmer Avenue at the northeasterly corner of the herein described parcel;

Thence southerly bounded easterly on said Palmer Avenue one hundred twenty two and 36/100 (122.36) feet to the southerly line of a ten foot driftway laid out and delineated on a plat entitled: "Plat of the Subdivision of lots on the Rosalind Plat Recorded in Plat Book 4 page 6 Warwick Records Numbered 256, 257, 258, 259, 260 Belonging to John M. Colavecchio Scale 40 ft per inch By Richard W. Greene Jan 1924" which plat is recorded in the Records of Land Evidence in said City of Warwick on Plat Card 332;

Thence westerly along the southerly line of said driftway one hundred eighteen and 03/100 (118.03) feet to the northwesterly corner of Lot No. 1 on said plat;

Thence turning an interior angle of 90° and running northerly bounded westerly on land now or lately of John R. Finegan and Mildred A. Finegan one hundred and twenty (120) feet to the southerly line of Boylston Street;

Thence easterly bounded northerly on said Boylston Street one hundred sixty two and 01/100 (162.01) feet to Palmer Avenue at the point and place of beginning.

Said parcel comprises Lots Nos. five (5), six (6), and seven (7) on the plat referred to above together with the ten foot driftway. Said premises are also described as Lots Nos. 257, 259, and 260 on "The Rosalind Warwick, R.I. Shedd and Sarle Engineers 1898" recorded in Plat Book 4 at page 6 and (copy) on Plat Card 186.

Said premises are conveyed subject to the rights of others to use said ten foot driftway.

EXHIBIT B
EXCLUDED PARCEL

Case 1:99-cv-00565-L-DLM Document 458 Filed 12/19/2007 Page 26 of 26




GAROFALO

GAROFALO & ASSOCIATES, INC.
CIVIL & STRUCTURAL ENGINEERS\SURVEYORS
LAND PLANNERS\ENVIRONMENTAL SCIENTISTS

ADMINISTRATIVE SUBDIVISION
FOR
"ROCKY POINT"
SITUATED ON
ROCKY POINT AVENUE,
PALMER AVENUE & ALDRICH AVENUE
WARWICK, RHODE ISLAND
PREPARED FOR
CITY OF WARWICK

1